Mark Punzalan (State Bar No. 247599)
PUNZALAN LAW, P.C.
600 Allerton Street, Suite 201
Redwood City, CA 94063
Tel: (650) 362-4150
Fax: (650) 362-4151
Email: markp@punzalanlaw.com

[Additional Counsel on Signature Page]

*Attorneys for Movant Henry Low*
*and Proposed Counsel for Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENERGY RECOVERY INC. SECURITIES LITIGATION | Master File No. 3:15-cv-00265-EMC<br><br>**CLASS ACTION CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Henry Low ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Class Action Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by Energy Recovery, Inc. ("Energy Recovery" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities who purchased the common stock of Energy Recovery during the period May 8, 2014 through March 5, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by the defendants' violations of federal securities laws. This Complaint alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Energy Recovery designs, develops, and manufactures energy recovery devices that transform untapped energy into reusable energy from industrial fluid flows and pressure cycles. The Company markets its products directly to customers through its sales organization, as well as through authorized independent sales agents in the United States and internationally.

3. The Company's operations have historically been in the desalination industry. When defendant Thomas S. Rooney, Jr. ("Rooney") joined the Company in February 2011, he began shifting the Company's operations away from desalination towards oil and gas in an effort to diversify. Rooney referred to himself as a "turn-around CEO" and, according to insiders, sought to accomplish his objectives through a management style of "fear" and "intimidation."

4. Rooney executed drastic measures in his efforts to wean Energy Recovery and its investors off of desalination. Significantly, Rooney implemented a policy of not providing guidance as to the Company's operations. The only information Rooney provided would be over-the-top statements concerning the Company's "sales pipeline" and market response to its "disruptive technology."

5. Rooney may have intended to create a buzz about the Company's products. However, as the quarters progressed and the losses deepened, Rooney's statements became more and more desperate—ultimately crossing the line into recklessness if not outright fraudulent. For example, in the first quarter of 2014, Rooney advised investors and analysts that the Company had received "commercial proposals for a substantial number of clients and the sum total of all that is . . . close to a $100 million." In the second quarter of 2014, Rooney told investors that although he was no longer giving guidance, the Company "in fact [had] mega-projects in the pipeline and they will in fact or they are being manufactured towards." He emphasized that the Company had "opened the dam[n]" and has received "inbound interest well in excess of $100 million, commercial contracts, technical vetting, field plant visits." In the third quarter of 2014, Rooney's began telling investors that the issue of revenue should no longer be thought of as *if* but rather *when*—as he said during an earnings conference call held on November 11, 2014, "[t]he word internally now is that this oil and gas industry and revenue there for us is inevitable."

6. After nearly four years, however, Rooney had not achieved success. Energy Recovery had lost over $51.7 million on $128.3 million in revenue between 2011 and 2014. On January 12, 2015, Energy Recovery announced abruptly that Defendant Rooney would be resigning.

7. The truth behind Rooney's resignation was revealed shortly thereafter when the Company announced its fourth-quarter and year-end earnings on March 5, 2014 after the close of the market. Not only did Energy Recovery miss analyst expectations by over $0.13 per share (analysts were expecting $0.04, the Company returned a loss of $0.09), but then-current Chief Financial Officer Joel Gay revealed that Rooney's previous descriptions of the Company's "pipeline" had not been meaningfully accurate and should not have been relied upon.

8. In total, the Company's stock price declined from an intra-class period high of $6.15 per share on June 18, 2014 to $2.79 per share on March 6, 2015 after the close of the Class Period. This decline represented a loss of market capitalization of over $174 million.

9. Throughout the Class Period, Defendants intentionally and/or recklessly misrepresented the true state of Energy Recovery's operations and customer pipeline. These misrepresentations were relied upon with a special emphasis in light of Rooney's policy against giving corporate guidance. Unbeknownst to investors, Rooney's statements were materially false and/or inaccurate and had the effect of artificially inflating the Company's stock price. When the fraud was revealed, Energy Recovery's stock price dropped precipitously. Lead Plaintiff and all other members of the Class were damaged as a result thereof. This Complaint seeks to recover for those damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

12. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as the Company conducts business in this district.

13. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14. Lead Plaintiff Henry Low purchased Energy Recovery common stock at artificially inflated prices during the Class Period and has been damaged thereby. Lead

Plaintiff's transactions in Energy Recovery common stock were filed with the Court earlier in this action as an exhibit to a declaration in support of his motion for appointment as lead plaintiff. Exhibit "A" to the Declaration of Mark Punzalan dated March 23, 2015 (Docket No. 14-1). Lead Plaintiff incorporates by reference his certification, and the information contained therein, into this Complaint as if it were set forth fully below.

15. Defendant Energy Recovery is a Delaware corporation with headquarters in San Leandro, California. It is an industry leader in capturing reusable energy from industrial fluid flows and pressure cycles. During the Class Period the Company's stock was traded on the NASDAQ Global Select stock market ("NASDAQ") under the symbol "ERII".

16. Defendant Rooney joined Energy Recovery as the Company's Chief Executive Officer in February 2011. In January 2015, the Company announced that Rooney would be resigning. Mr. Joel Gay, Energy Recovery's Chief Financial Officer, replaced Rooney as Chief Executive Officer in April 2015.

17. Defendant Rooney:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or dissemination the false and misleading statements and information alleged herein;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f) approved or ratified these statements in violation of the federal securities laws.

18. As an officer, director, and/or controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and

was traded on NASDAQ and governed by the provisions of the federal securities laws, Rooney each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

19. Energy Recovery is liable for the acts of Rooney and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

20. The scienter of Rooney and other employees and agents of the Company is similarly imputed to Energy Recovery under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Background

21. Energy Recovery designs, manufactures, and distributes "pressure energy technology" devices used in the water, oil and gas, and chemical industries. The Company's devices are utilized in "fluid flow" applications, such as water desalination and oil and gas extraction.

22. Energy Recovery traditional strength has been in the water desalination industry. The Company possesses the vast majority of the market industry in water desalination. Historically, Energy Recovery has derived the majority of its revenue from water desalination operations.

23. Defendant Rooney joined energy Recovery in February 2011 with an objective to diversify the Company's operations. Over the next few years, Rooney attempted to wean the Company and its investors off of Energy Recovery's desalination operations.

24. By the first quarter of fiscal 2014, Rooney's efforts to move away from desalination were patently evident. During an earnings conference call held on May 8, 2014, Defendant Rooney stated in pertinent part:

> As I stated in our last earnings call I won't try to speculate on desalination growth trends either in the short-term or over the long run, as attempting to predict future desalination industry growth trend is brought with problems and doing so simply doesn't benefit our shareholders. What does benefit of shareholders is driving the company as it makes progress in diversifying into new and much larger markets. So let's now turn to our ongoing progress in building new markets beyond desalination. Since the start of 2014 and over the past two months in particular, the company has made significant advancements in our effort to penetrate and build-out or oil and gas business.
>
> I think it's very important to point out that as late as December of 2013 the company had no dedicated sales personnel pursuing the oil and gas market. In January of this year we recruited and deployed six full-time people as our initial sales force dedicated exclusively to the oil and gas market. Furthermore, prior to February of this year, the company had not presented any of its new oil and gas technologies at an oil and gas industry conference anywhere in the world.
>
> Starting on February 23, at the very prominent launch Reid Gas Conditioning Conference in Oklahoma, the company launched a high profile, high energy marketing campaign aimed at the global oil and gas industry. In just the past two months we have participated in nine industry conferences spanning six countries and five continents. This high profile global marketing launch marks the official debut for energy recovery in the oil and gas industry. Our presence at this conference has included speaking engagements, technical whitepapers, seminars and sales meetings.

25. Rooney continued this movement away from desalination throughout the second-quarter of fiscal 2014. During an earnings conference call held on August 7, 2014, Defendant Rooney stated in pertinent part as follows:

> Now, I would like to share a perspective on the status quo and the exciting evolution of Energy Recovery. Back in 2011, the company announced and began executing against the three prong strategy. One, reduce cost to maximize gross margins. Two, reposition to achieve optimal market share in desalination. And three, achieve growth through the penetration of new markets. Having successfully achieved and demonstrated the first two imperatives, the company's resources have been pivoted and deployed to executing as the third objective with the particular focus on penetrating what we have generically referred to as oil and gas.
>
> As the CFO I am keenly interested in facilitating the optimal allocation of resources to generate the highest returns for our shareholders, while ensuring sufficient cash flow to allow for the healthy operation of our long standing desalination business. In this it is convenient to think of Energy Recovery's product portfolio in two primary categories. Mature referring to desalination and

> early stage or for the most part pre-revenue. Indeed, oil and gas falls into the later category as do other and similarly disruptive technologies that are currently under development.
>
> While the long-term fundamentals of the global desalination market remains strong as does our commanding market share there in, we view the early stage and pre-revenue opportunities as representing the most explosive growth and value creation potential for our shareholders thereby commanding peak investments in the unyielding attention of management. By design, our capital structure and balance sheet allow for the aggressive yet thoughtful funding of these initiatives whether research and development, sales and marketing or general and administrative expenditures. Importantly given the depth and compelling nature of the value proposition of our early stage technologies, we also have the flexibility to execute share repurchases via the existing already approved stock buyback program, should market conditions present an opportunity to do so.

26. While Rooney's efforts to distract investors from failing desalination operations may have been successful, his policies against guidance left investors in the dark. Rooney recognized the need for additional insight into the Company's operations. During the August 7, 2014 conference call, Rooney stated as follows:

> Over the past 12 months, it has become very clear to me that investors place a great deal of value and possibly the entire value of the company on the performance of our existing desalination business as reported in our quarterly earnings reports. I certainly understand why? Ironically, the entire focus of our management team has been and continues to be on creating shareholder value through a number of very significant and very exciting growth initiatives that will take us well beyond desalination. The disconnect between how investors value the company and how the management team is creating value is undoubtedly the result of asymmetric information. And that is something that I intend to change.

27. Notwithstanding his stated policy against providing guidance, Rooney proceeded to hype and tout the Company's "pipeline" and "customer activity." Given his stated awareness of a need for insight into corporate operations and customer activity, Rooney was especially cognizant of the fact that investors would place special emphasis on whatever information he selected to disclose—particularly his statements about the Company's growing pipeline and market reaction to Energy Recovery's products.

**B. <u>Defendants Made Materially False and/or Misleading Statements</u>**

*May 8, 2014*

28. Energy Recovery held an investor conference call on May 8, 2014 to discuss the Company's earnings for the first-quarter of fiscal 2014 (the "1Q14 Conference Call"). The 1Q14 Conference Call began at 10:30 a.m. during market hours. Defendant Rooney and then-current Chief Financial Officer Alex Buehler attended the call on behalf of Energy Recovery.

29. Defendant Rooney's opening remarks included the following statements:

> We have used these industry events to both educate as well as advertise our solutions to our audience, displaying sophisticated scale models and commercial economic model for our new technologies.
>
> The response that we've received from the oil and gas industry has been somewhat overwhelming and has included requests for face to face strategic meetings all over the world, as well as numerous requests for commercial proposals. **Today in 2014, we have responded to close to $100 million in requests for commercial proposals for our products. That number far exceeds anything that the company has ever experienced.**
>
> As a result of the very strong feedback receiving from the oil and gas industry, emanating from just two short months of the industry exposure, we have decided to once again expand the number of our dedicated oil and gas sales and marketing professionals, as well as expanding our oil and gas engineering support team. The outlook is very promising.[1]

30. In the question-and-answer session that followed the Company's opening remarks, Defendant Rooney elaborated on the Company's purported pipeline of activity:

> Q <Patrick Jobin – Credit Suisse>: Great, and congrats on the first revenue for oil and gas, that's exciting, and I know it's been many years in the making. So, just a few questions on some of the comments you have made. The $100 million of proposals, how many customers did that reflect? And then how should we think about the cadence of converting some of those proposals to orders, kind of throughout the year and kind of think about that as part of the revenue mix over time?
>
> A <Tom Rooney>: Yes, the $100 million worth of requests from clients was a wonderful thing for us to see and really is stressing us to keep up with it. It comes from many clients, across many continents. Quite a few out of the Middle East, but I want to say four different clients on four different continents, four or five

[1] Lead Plaintiff obtained this excerpt from the 1Q14 Conference Call from SeekingAlpha.com. All transcript excerpts within this Complaint have been obtained from SeekingAlpha.com.

different continents. So it's a highly varied number of clients. I don't know exactly how many clients. It's not from one client. It's not from one or two. It's a large number of clients all over the world.

As I had mentioned we have been to nine industry conferences, literally all over the world, and we get to go to a conference where we weren't overwhelmed with requests coming out of it. So it's a large number, it's a high variety of clients, large number of requests.

As to the conversion, I think that takes time. We expect to see some of them, the intent to contracts this year. Although I have to say that, I'm not an expert in the pace of the oil and gas industry and I could be wrong. What is incredibly heartening to me is the unmistakable desire that the industry is now showing us. We're not pushing proposals to them. They are asking us to respond to their specific requests.

**I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year.** But I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert, but I will dwell on, I guess the one point that I know which is the amount of attention we are getting in the specific commercial requests and the magnitude of all of those.

31. Defendant Rooney elaborated further in response to a question from a different analyst:

Q <JinMing Liu – Ardour Capital>: Okay, can you disclose what; you say these clients decided to purchase that equipment system at the end at what kind of a dollar amount?

A <Tom Rooney>: I can't. Its suffice it to say our client in Saudi Arabia constrains our ability to make any public announcements about the terms and conditions, so I'm limited in that regard.

Q <JinMing Liu – Ardour Capital>: Okay.

A <Tom Rooney>: I can't even tell you the name of the client in Saudi Arabia.

Q <JinMing Liu – Ardour Capital>: Okay, but $100 million number potentially is very helpful, but can you further give us some insight into the potential [indiscernible] commonly customers putting made inquiries and those type of things.

A <Tom Rooney>: So we've had, what I call social inquiries or technology inquiries from dozens and dozens of clients, some have asked, some of the biggest names in the oil and gas -- well, quite a few of the biggest names in the oil and

> gas industry, we've now had several follow up meetings including being invited to their world headquarters to present to rooms that can have a dozen engineers in them.
>
> **Beyond that we have been -- we received requests for very specific commercial proposals pertaining to specific locations with technical specs already provided to us. Requesting commercial proposals for a substantial number of clients and the sum total of all that is as I say, close to a $100 million, if all were converted to one time cash sales. And these are, I would say these are much further along the line than just casual, what would it be if I wanted a such and such, these are where we received a couple of pages of technical specs about a specific plant located in a specific location looking for a technical proposal from us and a commercial proposal from us.**
>
> So these are, these are not casual browsing by clients, we get that too, but it kind of [indiscernible] to see the level of commercial interest that we received in just the first 60 days. We do not by the way intend to update the level of commercial activity that we have.
>
> So, next quarter I won't be saying that a $100 million is now $300 million or something like that, we absolutely do not intend to do that, we're not going to engage in that sort of level of disclosure.
>
> I just felt that because we, until February 23 we had not had an outward presence in the oil and gas industry. We had not presented at a major oil and gas industry conference. We started that entire process on February 23 of this year and saw overwhelming response, so much so that it led to this inbound interest for technical and commercial proposals at a level we never expected and I thought it would be valuable.
>
> A lot of analysts, lot of investors have asked us to give some kind of data point as to progress being made and I felt that that data point was factual and would give great insight into the tremendous level of interest coming from the industry and it's not one client, or it's not two clients, it's a large number of clients, I think it's coming if I recall, coming from four different continents. And I think that speaks volumes to what has transpired just in the last 60 days.

32. The above bold-faced statements are materially false and/or misleading because Rooney's statements gave a misleading description of the Company's operations. Specifically, Rooney's statements falsely led investors to believe that the Company had identified material sources of revenue and that revenue-generating actions were already underway at the time of the statement. In reality, as would be disclosed later, Rooney's statements concerning the

Company's "pipeline" were neither meaningful nor accurate and should not have been relied upon.

33. Defendant Rooney's statements were material because investors considered in connection with their decisions to purchase and/or sell Energy Recovery stock. On May 8, 2014, Energy Recovery stock closed at $4.43 per share. The following day, on May 9, 2014, Energy Recovery stock closed at $4.61 per share. Defendant Rooney's statements on May 8, 2014 prompted a 4% increase in Energy Recovery stock on unusually heavy trading. Further, Defendant Rooney acknowledged the materiality of his statement by recognizing that "[a] lot of analysts, lot of investors [had] asked [the Company] to give some kind of data point as to progress being made . . . ."

*August 7, 2014*

34. Energy Recovery held an investor conference call on August 7, 2014 to discuss the Company's earnings for the second-quarter of fiscal 2014 (the "2Q14 Conference Call"). The 2Q14 Conference Call began at 10:30 a.m. during market hours. Defendant Rooney and then-current Chief Financial Officer Joel Gay attended the call on behalf of Energy Recovery.

35. Following the Company's opening remarks, Defendant Rooney made the following statements concerning the Company's ongoing operations in response to analyst questions:

> Q <David Rose – Wedbush Securities>: But just to be clear last year, when you built up inventory, Carlsbad was pretty clearly yours and flowing into the fourth quarter as you had called out previously. There are no other major mega-project announcements. So, I don't see how Q4 coincides with the inventory build given that you generally build six months ahead of time. Can you help me understand that?
>
> A <Tom Rooney>: Yes. So, David let me take that question and it really turns on the assumption that we don't – that we haven't announced mega-projects through press releases. The fact is that's the case. And I think embedded in your question is the assumption that because we haven't issued press releases around mega-project victories, we don't have any. In point of fact, we do – we made a decision 9, 10 months ago to deemphasize press releases on MPD projects. In fact, I don't think we have had an MPD press release in maybe a year. **And I can**

> **tell you as a matter of fact that we have mega-projects under contract that in years past we may have chosen to issue press releases on. So, we do in fact have mega-projects in the pipeline and they will in fact or they are being manufactured towards.** So, we simply made the choice that too much emphasis on the company was on our desalination business. And we were exacerbating that problem by making all of our press releases around what I guess I would call running the mill MPD announcements. And so we made a decision upward to the year ago to deemphasize those press releases. We were never in the perfect cycle of announcing every MPD. We announced several or many or most, but never all and we have simply taken it now to the extreme, where we simply don't announce MPD or any desal contracts unless they represent something strategic, something unique something newsworthy for investors.

36. Defendant Rooney expanded further upon the Company's then ongoing operations:

> Q <Patrick Jobin – Credit Suisse>: No, I think we appreciate known as a crystal ball here. On the oil and gas, a few questions on that topic, you mentioned you're really excited about the core activity that you're seeing early sales types of indications clearly some very aggressive commentary around the investments you are putting in place. So, I guess the two questions I have on that market would be what's the magnitude of quotes that you have issued to perspective customers and can you quantify that from a dollar perspective and number of customers relative to a quarter or two ago? And then from the commentary about aggressively investing in sales given the explosive growth potential, can we just maybe ballpark how we should anticipate your OpEx to ramp given that investment?
>
> A <Tom Rooney>: Okay. So, there were a handful of questions there. **The – I think we announced last quarter that after our outbound marketing efforts that began on February 23 I believe we had close to $100 million of commercial interest. We have – that number continues to grow and I would prefer not to quantify that anymore and kind of get into that cycle, but let's just say it continues to grow very nicely, where we stand and we are putting together and issuing commercial proposals against that interest level.** Where we see activities now, we have a few installations that we have executed in the past and where we are now is we have actually scheduled and conducted onsite visits for new clients to see past installations.
>
> And suffice it our say, **the results have been eye-popping**. The level of interest when a future client looks at a past installation has nothing – has been nothing, but amping up the excitement level for future clients. We have had clients flying from the Middle East to see installations in North America. We have had clients – we have a client flying in from Asia to do the very same thing next week. So, where we sit today is we find at first the high level of interest for us to quote commercial projects. The next step then is show me what you have already got in

> place? Let me talk to your existing clients. We are seeing those things stack up and line up in a beautiful way. What the next phase intends to be is what does the – when does this installation calendarize into somebody's plan. So, an existing plant that's going have to retrofit on to it typically we will have a shutdown cycle that might take a week or two and happen once or twice a year, we don't have to schedule when that would happen inside of their plant.
>
> And so there is sort of this methodical timeframe that things go through. **So, what we are seeing is we opened the dam if you will on February 23, inbound interest well in excess of $100 million, commercial contracts, technical vetting, field plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things.** Unfortunately, in some cases, people might say well, I am definitely going to do this technology and my next plant shutdown is December and if we can't get it into December, then it has to be the subsequent December. So, you get kind of this time slot alignment issue, but with enough clients looking at enough deals with us, that doesn't become a problem as time goes by. So, we are forging ahead, the level of interest is high, the activity level is very high, not every deal that we look at pans out, sometimes the economics are strong, sometimes they are not, sometimes the technical fit is great, sometimes it's not, some clients move fast, some clients move – most clients slowly. **That's one thing we have learned, but the activity level and the interest level has been very, very positive.** On the other question, which was OpEx, Joel, you want to take that?

37. Defendant Rooney further emphasized the Company's pipeline operations in response to another analyst question later in the call:

> Q <Robert Smith – Center for Performance Investing>: And with respect to oil and gas, so you gave us that initial number of $100 million proposal activity, I think you said it's continued to improve, is there anyway to look at without divulging an additional number I mean the pace of activity there?
>
> A <Tom Rooney>: **Well, the $100 million and it's certainly quite a bit more than that now is as much as we can handle in terms of processing and pursuing and so on.** And so we are attempting to digest what we have on our plate at this stage, while at the same time travelling the world and meeting with new clients and looking at new opportunities and so on. So I don't want to try to quantify it anymore than that. I think the more important question for investors to think about is the time to commercially transition or the time to turn those into contracts. And that – heretofore that's been we have missed the mark on that. I would have thought that the industry would have a slightly quicker pace in terms of bringing this to actual reality.
>
> The level of interest and certain pundits have said all this value proposition doesn't resonate. I can just tell you that about three weeks ago one of the most prominent oil and gas giants in the world was actually telling us that we were

> grossly understating our value proposition that our technology actually materially improves plant up time and that that was near gold to them. And actually suggested that he meet with our marketing department to help clarify just how powerful our value proposition is to them in the oil and gas space. And furthermore this individual wants to write a white paper and present it at an industry conference. So when you see that level of deep appreciation for our value proposition and extreme interest but then you watch the pace that it takes to them get to contract and put the contracts into the field, you start to feel there is a little bit of disconnect. But I think what we are learning is that this industry have some very large players and a move at their pace. And we have to conform to their pace**. So I think possibly a more interesting question for investors to think about is not is there are $100 million plus worth of pipeline activity, sales pipeline activity, but exactly how quickly will this turn into (revenue).**

38. The above bold-faced statements are materially false and/or misleading because Rooney's statements gave a misleading description of the Company's operations. Specifically, Rooney's statements falsely led investors to believe that the Company had identified material sources of revenue and that revenue-generating actions were already underway at the time of the statement. Rooney misled investors to believe that pipeline revenue was inevitable—"if" was not the question, but rather "when." In reality, as would be disclosed later, Rooney's statements concerning the Company's "pipeline" were neither meaningful nor accurate and should not have been relied upon.

39. Defendant Rooney's statements were material because investors considered in connection with their decisions to purchase and/or sell Energy Recovery stock. On August 7, 2014, Energy Recovery stock closed at $3.88 per share. The following day, on August 8, 2014, Energy Recovery stock closed at $4.15 per share. Defendant Rooney's statements on August 7, 2014 prompted a 7% increase in Energy Recovery stock on unusually heavy trading. Further, Defendant Rooney acknowledged the heightened materiality of his statements by noting that the Company had largely stopped providing investors with operational insight.

*November 11, 2014*

40. Energy Recovery held an investor conference call on November 11, 2014 to discuss the Company's earnings for the third-quarter of fiscal 2014 (the "3Q14 Conference Call"). The 3Q14 Conference Call began at 10:30 a.m. during market hours. Defendant

Rooney and then-current Chief Financial Officer Joel Gay attended the call on behalf of Energy Recovery.

41. Defendant Rooney's opening remarks included the following statements:

> Over the past year, we have provided insight as to the oil and gas opportunity, more specifically gas processing and the fruits of our sales and marking campaign in the form of proposal activity. **The $100 million plus in solicited proposals is an indication of the strength of our value proposition.** One, it allows for significant energy savings as well as an increase in capacity utilization by improving the reliability, availability and maintainability of the plant.

42. Following the Company's opening remarks, Defendant Rooney made the following statements concerning the Company's ongoing operations in response to analyst questions:

> Q <Patrick Jobin – Credit Suisse>: It makes sense, potential five-year and a field-trial period. Last question is just more simple ones. In Q4 would you anticipate any mega project revenue or is it too tough to tell at this stage? The second question was on oil and gas; do you think 2015 would have meaningful or material revenue beyond the rental revenue?
>
> A <Tom Rooney>: I think, Joel, the first question was MPD revenue into the fourth quarter. I think Joel alluded to that in his comments when he said that we've got a significant MPD project that has been delayed now two quarters. Where we sit right now, we do think that that project will ship this quarter. I think you can assume that since it has delayed already two quarters, it fits in the category of – we won't know until it goes out the door.
>
> To answer your question, yes, I think we expect MPD revenue in the fourth quarter. This is an industry where that kind of thing slips all the time, so we will have to wait and see. **And then meaningful revenue on oil and gas next year, I think where we stand right now is that we see a whole wall of client activity going on and proposal activity, that give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year.**
>
> We're positioning for significant revenue in 2015, **but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable**. Is it going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016? We're taking it one step at a time. **The word internally now is that this oil and gas industry and revenue there for us is inevitable**.
>
> The strength of our value proposition has gone up dramatically through some studies that are being done by some of our clients that will beget white papers and

> industry conferences so the level of attention on our products is going up dramatically, creating this inevitability. Significant revenue in 2015? I would like to think so, **but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us**.

43. The above bold-faced statements are materially false and/or misleading because Rooney's statements gave a misleading description of the Company's operations. Specifically, Rooney's statements falsely led investors to believe that the Company had identified material sources of revenue and that revenue-generating actions were already underway at the time of the statement. Rooney discussed a very active "wall" of "client activity" and then emphasized to investors that revenue was "inevitable." In reality, as would be disclosed later, Rooney's statements concerning the Company's "pipeline" were neither meaningful nor accurate and should not have been relied upon.

44. Defendant Rooney's statements were material because investors considered in connection with their decisions to purchase and/or sell Energy Recovery stock. On November 11, 2014, Energy Recovery stock closed at $4.43 per share. The following day, on November 12, 2014, Energy Recovery stock closed at $4.83 per share. Defendant Rooney's statements on November 11, 2014 prompted a 9% increase in Energy Recovery stock on unusually heavy trading.

## C. <u>The Truth Begins to Emerge</u>

45. On January 12, 2015, Energy Recovery issued a press release announcing that the Company would be transitioning its Chief Executive Officer (the "January 2015 Press Release"). The January 2015 Press Release stated in pertinent part as follows:

> **Energy Recovery Announces Chief Executive Officer Transition**
>
> **SAN LEANDRO, Calif., January 12, 2015** — <u>Energy Recovery Inc.</u> (NASDAQ: ERII), the leader in pressure energy technology for industrial fluid flows, announced today that as part of its continuing diversification, Mr. Thomas S. Rooney, Jr. will be resigning as Chief Executive Officer to facilitate a transition during which the Company will identify and appoint a successor to further lead the Company's efforts in the oil and gas industry while continuing to strengthen its market leading position in desalination. The Company's Board of

> Directors will actively seek a Chief Executive Officer in the coming weeks and will keep investors apprised of its progress.
>
> Mr. Rooney stated, "Over the past four years Energy Recovery has developed three new and highly-innovative technologies specifically designed for the oil & gas industry, which have both diversified the Company's operations and set it on a path for future growth. We believe it is in the best interest of our Company and our shareholders to now bring in an executive with considerable expertise in the oil and gas industry, with necessary acumen and industry connections to maximize our potential. I'm excited about the future prospects of Energy Recovery and will work closely with the Board over the next several months to ensure a smooth and orderly CEO transition."
>
> Hans Peter Michelet, Chairman of the Board of Directors stated, "Tom has been instrumental in our diversification into fluid flows other than in desalination. During his tenure not only has the company maintained its commanding position in SWRO but introduced new products to reduce energy consumption and energy waste across multiple industries. We truly appreciate Tom's contributions in positioning ERI at the forefront of a new commercial dawn. We are pleased that Energy Recovery has a deep group of committed and experienced professionals that will continue to move the Company in the right direction during this transition".

46. On January 13, 2015, Energy Recovery filed a current report (Form 8-K) with the SEC (the "January 2015 Form 8-K"). The January 2015 Form 8-K confirmed that Defendant Rooney would be stepping down as Energy Recovery's Chief Executive Officer.

47. The January 2015 Form 8-K stated in pertinent part as follows:

> On January 12, 2015, Energy Recovery, Inc. (the "Company") and its President and Chief Executive Officer, Thomas S. Rooney, Jr., entered into an amendment (the "Amendment") to that certain offer letter dated February 14, 2011 (the "Agreement") which was previously disclosed by the Company in a Current Report on Form 8-K filed on February 15, 2011. Under the terms of the Amendment, Mr. Rooney will resign as a member of the Board of Directors and any of its subsidiaries effective January 13, 2015. Mr. Rooney will continue to serve as Chief Executive Officer until his successor is named (the "Transition Period") and thereafter immediately resign. Mr. Rooney's resignation as a member of the Board of Directors was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies, or practices. Mr. Rooney will continue to receive full salary and benefits through March 31, 2015, even if a successor is named before such a date. In addition to the Additional Benefits, which includes a lump sum payment and certain accelerated equity vesting, provided for in the Agreement, and subject to the terms of the Amendment, Mr. Rooney will assume an advisory role to the

> Company under an agreed upon consulting agreement for a period of eighteen months unless terminated sooner pursuant to its terms. A copy of the draft consulting agreement is filed herewith as Exhibit 10.2.

48. The market responded sharply to this news. On January 9, 2015 (the last full trading day before the above disclosure), Energy Recovery stock closed at $4.67 per share. On January 12, 2015, Energy Recovery stock closed at $4.59 per share. On January 13, 2015, Energy Recovery stock closed at $4.44 per share. On January 14, 2015, Energy Recovery stock closed at $3.90 per share. On January 15, 2015, Energy Recovery stock closed at $3.75 per share. In total, Energy Recovery stock declined $0.92 per share, or a total of almost 20%, on unusually heavy volume. In response to the Company's disclosure about Rooney, Energy Recovery's market capitalization decreased by approximately $50 million.

49. Less than two months after the Company's abrupt announcement about Rooney, Energy Recovery reported year-end and fourth-quarter earnings. On March 5, 2015, Energy Recovery issued a press release (which was filed with the SEC the same day) after the close of trading revealing the Company's fourth-quarter and year-end financial earnings (the "March 2015 Press Release"). The March 2015 Press Release revealed to investors that the Company's earnings-per-share for the fourth-quarter of fiscal 2014 was a loss of ($0.09). Analysts had been expecting a positive earnings-per-share of $0.04. Energy Recovery missed analyst estimates by $0.13 per share. Further, the Company's annual earnings had declined by $0.30 per share from ($0.06) to ($0.36).

50. Energy Recovery held an investor conference call following the issuance of its press release and the close of the market (the "4Q14 Conference Call"). The 4Q14 Conference Call began at 5:30 p.m. after market hours. By this time, Defendant Rooney was no longer with the Company; then-current Chief Financial Officer Joel Gay and Chairman of the Board Hans Peter Michelet attended the call on behalf of Energy Recovery.

51. Joel Gay discussed, at length, his disappointment over the Company's recent operations. Mr. Gay remarked, in pertinent part, as follows:

> Now let us get into the substance of this call. **Beginning with an assessment of our financial performance in 2014, while not a surprise given our understanding of the global desalination and oil and gas markets, as well as our financial performance reported through the third quarter, 2014 was nonetheless disappointing and frankly unacceptable. To characterize it is anything less would be equally unacceptable.**

52. Mr. Gay also commented on Defendant Rooney's existing policies relating to giving guidance and insight into the Company's operations:

> Thank you, HP. Before we begin, allow me to characterize how I will be executing these calls such that we can engage in an informative and productive dialogue. The company is in the midst of transition and as such we will take this opportunity to discern a new path forward.
>
> What can you expect from me? **You can expect candor and openness. I will clearly articulate our strategy and characterize our performance accordingly.** You can expect an execution bias with a singular goal over time of delivering results. You can expect a management by the numbers approach with a focus on optimal resource allocation.
>
> . . .
>
> Allow me to use a metaphor to better unpack this concept. The company is in a reload versus rebuild situation. **While macro economic factors and systematic risks contributed to our revenue performance in 2014 and general industry risk aversion affected our ability to generate sales orders within the oil and gas and chemical processing markets, we cannot decouple operating results or rather operating tactics from results.** Our focus is therefore here: to reload and generate results, the company has rationalized its focus, both from a geographic and market perspective and implemented austerity measures to realign our cost structure with the economic conditions and organizational priorities.
>
> . . .
>
> **The deployment of this operational framework will not guarantee but rather increase the probability of quantifiable results and allow for optimal resource allocation. What does this mean in the context of sales order generation and our pipeline generally? We have in the past quantified the pipeline as a means of conveying progress. We will abandon this approach, as such does not meet the criteria of being meaningfully quantifiable. I can, however, say that after a comprehensive examination we are pursuing opportunities within a pipeline the integrity of which continues to improve and we'll only announce actual contract awards. Again we seek to generate and communicate quantifiable results.**

53. Mr. Gay's remarks during the 4Q14 Conference Call indicate that Defendant Rooney and his management of the Company were to blame for the Company's "disappointing" and "unacceptable" earnings. Further, Mr. Gay revealed to investors that Defendant Rooney's previous statements concerning the Company's pipeline were not meaningful and should not have been relied upon.

54. The market reacted sharply to this news. On March 5, 2015, Energy Recovery's stock closed at $3.26 per share. As the market absorbed Energy Recovery's disclosure during the course of the following day, the Company's stock price dropped precipitously. On March 6, 2015, Energy Recovery stock closed at $2.79 per share. In total, Energy Recovery stock declined by $0.47 per share, or 14.5%. Energy Recovery lost over $24.5 million in market capitalization in the span of just one day.

**D. Defendants Acted With Scienter**

55. In the absence of any other corporate guidance, Rooney proceeded to give investors and analysts materially false and/or misleading information concerning the Company's then-existing pipeline and customer activity. Rooney made these statements intentionally and/or without any reasonable basis in fact.

*Defendant Rooney knew that Energy Recovery's pipeline was materially less robust than he represented.*

56. During the 1Q14 Conference Call, Defendant Rooney told investors that management had a "fair understanding" of the Company's likely sources of revenue for every quarter. In pertinent part, Rooney stated: "Every quarter, at the beginning of the quarter we have a fair -- the management team and the board has a fair understanding of what will result that quarter, in terms of revenue."

57. Further to the point, a former employee ("FE1") of Energy Recovery (who wishes to remain anonymous) confirmed that Rooney was aware of the Company's true state of customer activity. FE1 was Energy Recovery's Marketing Communications Director from July 2012 to March 2015. FE1's job responsibilities included corporate rebranding, advertising, and

public relations. FE1's objective was to market Energy Recovery's oil and gas products. FE1 reported to former Chief Marketing Officer Audrey Bold. FE1 also worked closely with Defendant Rooney when preparing for earnings calls. To this end, FE1 was responsible for putting together presentations regarding market research. FE1 would work with Rooney and Ms. Bold to "accurately state information to shareholders about what the market looked like and what sales looked like."

58. FE1 attended a sales meeting held in San Francisco in December 2014 or January 2015. Defendant Rooney attended the meeting along with other members of senior management, including the Company's Chief Sales Officer and sales manager for "mega projects." The purpose of the meeting was for each of the Company's department heads to provide updates to the Chief Sales Officer about the business in an effort to update him/her since his/her recent hire in October 2014. The Company's sales manager for "mega projects" "gave a bleak forecast for what was going to come for 2015, it was sad and hard to hear," according to FE1.

59. Rooney's statements concerning the Company's pipeline and market reaction to Energy Recovery's products are also undermined by reports that management ordered the shipment of inferior quality reports so as to be able to meet monthly sales targets. As described in an issue of *Water Desalination Report* ("*WDR*") dated January 19, 2015, "a source told *WDR* that the company's management had grown so concerned about 'meeting their numbers' that in one recenve case, they ordered the shipment of some obviously inferior quality products to meet monthly sales targets. As a result, the managing director of the international OEM on the receiving end confirmed to *WDR* that they have quite doing business with the [C]ompany altogether."

60. The conduct described in *WDR*'s report does not appear to be a one-time occurrence. A former employee of Energy Recovery ("FE2") (who wishes to remain anonymous), who had been employed as the Company's Senior Planning Scheduler from June

2012 through February 2013, described a similar occurrence. FE2 reported to Lindsay Reau (Energy Recovery's Director of Production), who reported to Nocair Bensalah (Energy Recovery's current VP of Operations). FE2 scheduled work for products based on consumer forecasts, tracked and reported weekly assemblies, and planned/scheduled workflow for departments. FE2 recalled an instance where he/she was directed by Lindsay Reau to manufacture sub-standard pressure exchangers for client orders. FE2 explained that he/she was directed to use materials from used products in order to facilitate orders faster. He/she raised this issue his/her management as a concern, but no one cared. FE2 stated that Lindsay Reau and Nocair Bensalah were "Rooney's pets," *i.e.*, received orders from Rooney.

61. Defendant Rooney's control over the Company allowed him to do as he pleased in terms of what he disclosed to investors. One of Energy Recovery's former employees (who also wishes to remain anonymous) ("FE3") described an atmosphere of "intimidation and fear." FE3 was Energy Recovery's Chief Technology Officer and Director of Manufacturing Processes from March 2009 through September 2012. FE3 reported directly to Defendant Rooney. FE3 witnessed Energy Recovery's transition under Rooney first-hand, which included Rooney telling FE3 that FE3 was "paid too much" and that he/she had to "create value, and that [he/she] was a 'load' on the manufacturing department and too much overhead." FE3 recalled that Rooney told him/her this "everyday."

62. Defendant Rooney's treatment of FE3 was not uncommon. According to FE3, Rooney began to fire all of the former management's hires in order to be able to control all aspects of the Company. In order to accomplish this level of control, Rooney in particular fired Patti Lusk (Energy Recovery's former VP of Human Resources) and Carolyn Bostick (Energy Recovery's former General Counsel). FE3 stated that, "[Rooney] made sure there was very little controls in San Leandro by getting his [own] people and using intimidation and fear."

63. By removing those that presented obstacles to him, Rooney was able to portray the Company's operations (pipeline and costumer activity) however he pleased. FE3 believed

that Rooney consistently over-promised on projects. Yet, when confronted about the Company's internal controls, Rooney would disagree and seek to have his objectors fired. FE3 recalled an instance in the summer of 2012 when Pierre Vedel (Energy Recovery's former Chief Information Officer) and Patti Lusk (VP of Human Resources) discussed these internal control issues (described by FE3 as "information control issues") with Rooney. According to FE3, Mr. Vedel and Rooney disagreed on the types of controls the Company needed. Rooney, in turn, wanted Mr. Vedel to leave the Company.

64. FE3's description of Rooney over-promising on projects was corroborated by another high-level former employee. This former employee (who wishes to remain anonymous) ("FE4") was Energy Recovery's former SVP of Sales from December 2005 through September 2014. FE4 stated that Rooney "may have been too optimistic or over exaggerated" when describing the Company's pipeline and customer activity. FE4 characterized Rooney's statements as "aggressive assumptions."

65. Rooney's "aggressive assumptions," however, were not *just* "aggressive assumptions. FE4 stated that the sales forecast process involved capturing leads and opportunities from the customer relations management system and having discussions with the Company's finance department. FE4 described the finance department as "conservative." Accordingly, Rooney transformed the finance department's "conservative" forecasts into something that the Company's SVP of Sales regarded as "too optimistic," "over exaggerated," and "aggressive." But for Rooney's involvement, investors would have received accurate descriptions of the Company's pipeline and customer activity.

*Rooney's abrupt departure from the Company is evidence of scienter.*

66. While Energy Recovery stated that Rooney's resignation was not the result of any particular disagreement between him and the Company, the fact remains that his resignation came abruptly and without warning just weeks in advance of the Company's "disappointing" and "unacceptable" fourth-quarter and year-end earnings results.

67. The timing of Rooney's resignation relative to the Company's corrective disclosure on March 5, 2013 creates an inference that Rooney's removal from executive management was neither innocent nor the byproduct of a mutual decision. The timing of his resignation relative to the Company's awful earnings results supports an inference that Rooney was pushed out of office due to his materially false and/or misleading statements concerning the Company's operations and customer activity.

68. FE3 (former Chief Technology Officer and Director of Manufacturing Processes) corroborated the conclusion that Rooney did not resign voluntarily. According to FE3, despite Rooney's attempts to maintain control over the Company, Ole Peter Lorentzen (Energy Recovery's Chariman of the Board of Directors) acquired enough shares of the Company's common stock to control the shareholder vote (or at least heavily influence it). Mr. Lorentzen proceeded to gain seats on the Company's Board of Directors and fill them with appointees. FE3 stated that Rooney's loss of control over the Board of Directors was "catastrophic" to his reign over the Company and his resignation was a consequence.

69. FE3's description of Rooney's resignation is corroborated by an article from *WDR* published on January 19, 2015. The article describes Rooney's resignation as anything but voluntary. The article states, in pertinent part, as follows:

> In February 2011, when Tom Rooney took over for GG Piqué as CEO of Energy Recovery Inc (ERII), many desalters thought that ERII was an acquisition target and that he was brought in to oversee a merger or takeover. However, when WDR interviewed him shortly after his appointment, Mr Rooney insisted that he was not a "pump-it and dump-it guy", but rather a "build-it, grow-it, change-it guy".
>
> Last week, nearly four years after Mr Rooney failed to either build it or grow it—the company lost over $51.7 million on $128.3 million in revenue between Q1 2011 and Q3 2014— ERII announced that it would change its CEO. Although his board resignation was effective last week, he will remain CEO until 31 March, or until a successor is named.
>
> Only six days before Mr Rooney's resignation, a blogger wrote, "[ERII] management's over-the-top cheerleading of the oil and gas opportunity since 2012 has left shareholders bitter and wanting." The report noted that the company had

> stopped providing guidance on future earnings in 2014, and predicted "ERII will likely post a huge loss…and the share price will tank like it did in 2012."
>
> OP Lorentzen, one of ERII's early Norwegian investors and a former board member, has re-acquired a 15+ percent stake in the company over the past two years and is now its largest shareholder. WDR has learned that just three days before the resignation, Lorentzen nominated himself and two associates, including ERII's former CFO, to board positions. This fueled speculation that Mr Rooney's resignation was a pre-emptive move, to avoid the inevitable.

70. FE1 (former Marketing Communications Director) further corroborated the conclusion that Rooney's resignation was not voluntary. FE1 stated that Energy Recovery's Board of Directors asked Rooney to "step down." Similarly, a former employee (also wishing to remain anonymous) who served as the Company's Director of Business and Product Development from July 2011 through January 2015 ("FE5") likewise confirmed that "[Rooney] was terminated" and that "he didn't resign."

*Rooney perpetuated the fraud in order to receive extremely disproportionate compensation.*

71. Defendant Rooney received exorbitant compensation relative to Energy Recovery's other members of senior management. While employee compensation in and of itself typically falls short of raising a strong inference of scienter, here a strong inference is warranted based upon the fact that Defendant Rooney's compensation was so overwhelmingly disproportionate to other employees.

72. Rooney's compensation for 2011, 2012, 2013 and 2014 was as follows: $1,921,267; $1,550,068; $997,164; and $1,448,971 (respectively). Rooney's pay for 2014 was greater than the total compensation of the Company's Chief Technology Officer, Chief Sales Officer, and Chief Marketing Officer *combined*; only the Company's former Chief Financial Officer (now Chief Executive Officer) came close to matching Rooney with a total compensation of just over $1 million. Likewise, Rooney's pay for 2011, 2012, and 2013 was substantially greater than *every* other member of the Company's executive management.

73. Upon information and belief, Defendant Rooney remains unemployed. Given the lucrative position he held at Energy Recovery, his compensation was a motivating factor to retain his job as long as possible—even if that meant over-promising project pipelines to investors and analysts.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

74. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of Energy Recovery during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

75. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Energy Recovery's common stock was actively traded on NASDAQ (Global Select). While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least tens of thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Energy Recovery or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

76. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

78. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the misstatements and omissions alleged herein were made with scienter;

(c) Whether the statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Energy Recovery; and

(d) To what extent the members of the Class have sustained damages, and the proper measure of damages.

79. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all member is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

80. At all relevant times, the market for Energy Recovery's common stock was an efficient market for the following reasons, among others:

(a) Energy Recovery's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) Energy Recovery communicated with public investors via established market communication mechanisms, including disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Energy Recovery was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Energy Recovery was reflected in and incorporated into the Company's stock price during the Class Period.

81. As a result of the foregoing, the market for Energy Recovery's common stock promptly digested current information regarding Energy Recovery from all publicly available sources and reflected such information in Energy Recovery's stock price. Under these circumstances, all purchasers of Energy Recovery's common stock during the Class Period suffered similar injury through their purchase of Energy Recovery's common stock at artificially inflated prices, and a presumption of reliance applies.

82. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

83. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

84. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

85. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Energy Recovery who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## **COUNT I**

(*Violation of Section 10(b) and Rule 10b-5 Against All Defendants*)

86. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Energy Recovery's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

88. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Energy Recovery's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

89. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Energy Recovery as specified herein.

90. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Energy Recovery's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Energy Recovery and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Energy Recovery's securities during the Class Period.

91. Each of Rooney' primary liability, and controlling person liability, arises from the following facts: (1) Rooney were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a

senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

92. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Energy Recovery's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

93. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Energy Recovery's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Energy Recovery's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not

disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Energy Recovery's securities during the Class Period at artificially high prices and were or will be damaged thereby.

94. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Energy Recovery's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Energy Recovery's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

95. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

96. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

97. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

(*Violation of Section 20(a) Against Rooney*)

98. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99. Rooney acted as controlling persons of Energy Recovery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Rooney had the power to

influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Rooney were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

100. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101. As set forth above, Energy Recovery and Rooney each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

102. By virtue of their positions as controlling persons, Rooney are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

103. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 11, 2015

Respectfully submitted,

**PUNZALAN LAW, P.C.**

By: /s/ *Mark Punzalan*
Mark Punzalan

600 Allerton St., Suite 201
Redwood City, CA 94063
Tel: (650) 362-4150
Fax: (650) 362-4151

Nicholas I. Porritt (admitted *pro hac vice)*
Adam M. Apton (to be admitted *pro hac vice*)
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567

*Attorneys for Lead Plaintiff Henry Low and Lead Counsel for Class*