Nicholas I. Porritt (*admitted pro hac vice*)
Adam M. Apton (*admitted pro hac vice*)
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567

*Attorneys for Lead Plaintiff Henry Low and Lead Counsel for Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENERGY RECOVERY INC. SECURITIES LITIGATION | Master File No. 3:15-cv-00265-EMC<br><br>**AMENDED CLASS ACTION CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Henry Low ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Amended Class Action Consolidated Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by Energy Recovery, Inc. ("Energy Recovery" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities who purchased the common stock of Energy Recovery during the period March 7, 2013 through March 5, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by the defendants' violations of federal securities laws. This Complaint alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Energy Recovery designs, develops, and manufactures energy recovery devices that salvage reusable energy from industrial fluid flows and pressure cycles. Energy from pressure and fluid that would otherwise be lost during extraction processes are captured and recycled by Energy Recovery's products. The Company markets its products directly to customers through its sales organization as well as through authorized independent sales agents in the United States and internationally.

3. The Company's operations have historically been in the desalination industry. Defendant Thomas S. Rooney, Jr. ("Rooney") joined the Company in February 2011 with an objective to diversify the Company's operations away from desalination and towards the Oil and Gas sector. Rooney went to extreme lengths to accomplish this objective. As the facts show, Rooney's actions and words were not tied to reality, but instead designed to mislead investors, analysts, and prospective customers into believing that Energy Recovery's Oil and Gas operations were succeeding.

4. Rooney's fraudulent campaign began on March 7, 2013, with the false and misleading announcement that the Company had succeeded in obtaining a "verbal agreement" with a "significant oil company." This was untrue and intentionally so. The "significant oil

company" was Mexico's state-owned Petróleos Mexicanos, also known as Pemex. The "verbal agreement" was nothing more than a sales pitch that had gone "well" because the prospective customer showed "interest" in proceeding with discussions. Energy Recovery's former Vice President of Product Development for Oil and Gas (hereinafter referred to as "Former Employee 1" or "FE 1") met with Pemex, and told Rooney afterwards that an agreement had not been reached. When FE 1 asked Rooney why he had misrepresented the outcome of the Pemex meeting to investors, Rooney replied that he was "aware" but in his opinion it "doesn't mean that I can't talk about it." Energy Recovery never secured the Pemex contract.

5. Rooney's disregard for the truth continued throughout the Class Period. In each of Energy Recovery's quarterly and annual reports (Form 10-Q and Form 10-K), Rooney represented to investors that the Company had implemented and maintained a series of internal controls capable of detecting and preventing fraud. These representations were made in the form of certifications pursuant to the Sarbanes-Oxley Act of 2002. Rooney, however, used "fear" and "intimidation" to manipulate his employees. In one instance in April 2013, Rooney asked FE 1 to project Oil and Gas sales for the upcoming year. When FE 1 responded that sales were estimated to only be $1 million, Rooney proceeded to berate, or "strong-arm," FE 1 until FE 1 agreed to increase the projection to $4 million. Upon learning what had happened, Energy Recovery's former Chief Financial Officer ("CFO"), Alex Buehler ("Buehler"), told FE 1 that the projection needed to be restored to its original figure. FE 1 attempted to follow Buehler's directives, but Rooney insisted on keeping the $4 million estimate notwithstanding. According to FE 1, Rooney reprimanded Buehler for telling FE 1 to revise the projection. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

6. Rooney also actively misrepresented the status of the Company's Oil and Gas operations by providing materially false and/or inaccurate statements concerning Energy

Recovery's core products. Following a corporate retreat in the fall of 2013, Defendant Rooney, at the suggestion and influence of Defendant Audrey Bold ("Bold"), Energy Recovery's former Chief Marketing Officer ("CMO"), decided to take a new approach with respect to marketing the Company's products. Specifically, Rooney and Bold decided to market Energy Recovery's products notwithstanding the fact that they were not yet ready for commercialization. In other words, Rooney and Bold began marketing the Company's products as if they were ready to be deployed to customers even though the products were only engineering prototypes. By simply stating that a particular product was in use within a general region without specifying who was using them or where they were being used (*i.e.*, "anonymiz[ing]" the products), Rooney and Bold were able to portray the products as being commercialized and ready for deployment.

7. Rooney's and Bold's marketing strategy met resistance in September 2013 in advance of a Board of Directors meeting scheduled for November 2013. FE 1 told Rooney that he would refuse to present Energy Recovery's products at an upcoming industry conference sponsored by the Gas Processors Association (the "GPA") because the products were still engineering prototypes experiencing technical difficulties at field-testing sites with prospective customers. Rather than accepting FE 1's opinion, Rooney simply asked someone else to present the Company's products instead, Dr. Prem Krish (Energy Recovery's Chief Technology Officer). Dr. Krish also refused to present Energy Recovery's products. Ultimately, the Board of Directors agreed with FE 1 and Dr. Krish and successfully prevented Rooney from marketing Energy Recovery's products at the GPA.

8. Regardless, Rooney continued to provide materially false and/or misleading representations concerning the Company's products and operations to investors and analysts during quarterly conference calls. Throughout his entire tenure as Chief Executive Officer ("CEO"), Rooney repeatedly touted the Company's core products as being "disruptive technology," "value propositions," and, most significantly, ready for deployment to customer facilities. Quarter after quarter, when revenue would not materialize, Rooney would scapegoat

the "engineering and technical bureaucracies inside of these oil and gas companies," the "tremendous amount of bureaucracy and approvals, double approvals, triple approvals," and the "stages, hurdles and logistics" in the "field trial process[es]." Absent from Rooney's explanations, however, was any indication that the Company's products had failed critical internal tests, needed substantive redesign, or simply were not preforming as intended.

9. Nevertheless, Rooney began advising investors and analysts that the Company had received "commercial proposals for a substantial number of clients and the sum total of all that is . . . close to a $100 million," that the Company had "opened the dam" and received "inbound interest well in excess of $100 million, commercial contracts, technical vetting, field plant visits," and that revenue should no longer be thought of as *if* but rather *when*—as he said during an earnings conference call held on November 11, 2014, "[t]he word internally now is that this oil and gas industry and revenue there for us is inevitable." By touting the Company's supposed "pipeline" of sales while omitting the truth concerning the design and testing status of the products upon which the "pipeline" was purportedly based, Rooney materially misled investors into believing that revenue was guaranteed and imminent.

10. After nearly four years, however, Rooney had not achieved success. Energy Recovery had lost over $51.7 million on $128.3 million in revenue between 2011 and 2014. On January 12, 2015, Energy Recovery announced abruptly that Defendant Rooney would be resigning.

11. The truth behind Rooney's resignation was revealed shortly thereafter when the Company announced its fourth quarter and year earnings for fiscal 2014 on March 5, 2015, after the close of the market. Not only did Energy Recovery miss analyst expectations by over $0.13 per share (analysts were expecting $0.04, the Company returned a loss of $0.09), but then-current Chief Financial Officer Joel Gay ("Gay") revealed that Rooney's previous descriptions of the Company's "pipeline" had not been meaningfully accurate and should not have been relied upon.

12. In total, the Company's stock price declined from an intra-class period high of $7.67 per share on September 20, 2013 to $2.79 per share on March 6, 2015 after the close of the Class Period. This decline represented a loss of market capitalization of over $250 million.

13. Throughout the Class Period, Defendants intentionally and/or recklessly materially misrepresented the true state of Energy Recovery's operations. Unbeknownst to investors, Rooney's statements were materially false and/or inaccurate and had the effect of artificially inflating the Company's stock price. When the fraud was revealed, Energy Recovery's stock price dropped precipitously. Lead Plaintiff and all other members of the Class were damaged as a result thereof. This Complaint seeks to recover for those damages.

**JURISDICTION AND VENUE**

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. § 78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16. Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) as the Company conducts business in this district.

17. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

18. Lead Plaintiff Henry Low purchased Energy Recovery common stock at artificially inflated prices during the Class Period and has been damaged thereby. Lead Plaintiff's transactions in Energy Recovery common stock were filed with the Court earlier in this action as an exhibit to a declaration in support of his motion for appointment as lead

plaintiff. Exhibit "A" to the Declaration of Mark Punzalan dated March 23, 2015 (Doc. No. 14-1). Lead Plaintiff incorporates by reference his certification, and the information contained therein, into this Complaint as if it were set forth fully below.

19. Defendant Energy Recovery is a Delaware corporation with headquarters in San Leandro, California. It purports to be an industry leader in capturing reusable energy from industrial fluid flows and pressure cycles. During the Class Period the Company's stock was traded on the NASDAQ Global Select stock market ("NASDAQ") under the symbol "ERII".

20. Defendant Rooney joined Energy Recovery as the Company's CEO in February 2011. In January 2015, the Company announced that Rooney would be resigning. Gay, Energy Recovery's then-current CFO, replaced Rooney as CEO in April 2015.

21. Defendant Bold joined the Company in 2005 and served as its CMO until April 2015. Bold worked closely with Rooney and was responsible, in part, for Rooney's decision to market Energy Recovery's products even though they were not ready for commercialization. Bold also prepared press releases and public statements concerning contract negotiations and agreements with prospective clients. In a "recommendation" post on LinkedIn (a professional networking website) dated January 23, 2015, Rooney described his relationship with Bold as follows:

> I have worked closely with Audrey Bold for four years and I'm pleased to say that she is easily the best marketing professional that I've had the pleasure of working with in my career. Audrey is an experienced and highly-skilled Chief Marketing Officer with the complete package spanning all four marketing P's of Product, Price, Place and Promotion.
>
> As would be expected, Audrey Bold has deep expertise and proven abilities in cutting-edge marketing communications but what sets Audrey apart is her versatility and balanced skill set across the entire marketing spectrum and well beyond that to include playing a key executive role in investor relations and internal employee and corporate culture building.
>
> I was extremely impressed to watch Audrey successfully lead an effort to fend-off a much larger and highly-aggressive competitor. She did so through an analysis of

> client and industry perceptions which led to her repositioning the company's value proposition. Doing so drove the company's market share - within six months - from 50% to a staggering 90% on a global basis for three straight years. All of which was done with gross margins in excess of 60%.
>
> Audrey is adept and experienced at marketing on a global basis whether it's staging complex events on six different continents in the same year or framing critical messaging for different cultures, languages and media around the world.
>
> Audrey is a very innovative executive and she was even willing to push me out of my comfort zone and into important new areas such as social media and the use of new marketing technologies as well as by producing a spirit-lifting employee lip-dub video. In each and every case I was very happy that she pushed me.
>
> Over the course of four years of working together, Audrey Bold has become one of my most trusted advisors. I consider Audrey Bold to be a uniquely talented CMO with limitless future executive potential.

22. Defendants Rooney and Bold:

(a) directly participated in the management of the Company;

(b) were directly involved in the day-to-day operations of the Company at the highest levels;

(c) were privy to confidential proprietary information concerning the Company and its business and operations;

(d) were involved in drafting, producing, reviewing and/or dissemination the false and misleading statements and information alleged herein;

(e) were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f) approved or ratified these statements in violation of the federal securities laws.

23. As officers, directors, and/or controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on NASDAQ and governed by the provisions of the federal securities laws, Rooney each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that had become

materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

24. Energy Recovery is liable for the acts of Rooney, Bold, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

25. The scienter of Rooney, Bold, and other employees and agents of the Company are similarly imputed to Energy Recovery under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Background

26. Energy Recovery designs, manufactures, and distributes "pressure energy technology" devices used in the water, Oil and Gas, and chemical industries. The Company's devices are utilized in "fluid flow" applications, such as water desalination and Oil and Gas extraction.

27. Historically, Energy Recovery has derived the majority of its revenue from water desalination operations. Defendant Rooney joined Energy Recovery in February 2011 with an objective to diversify the Company's operations. Rooney attempted to accomplish this goal by focusing on the Oil and Gas industry. Rooney described the transition as follows during an earnings conference call on March 6, 2014:

> Three years ago when I first joined Energy Recovery I made diversification a top priority, precisely because of the timing uncertainty that we face in desalination markets around the world. The global demand for water and the commensurate need for desalination plants is a wonderful and durable megatrend and we're pleased to be one of the world's leading providers of desalination technologies. But the unpredictable cycles and the lumpy revenues that come with desalination are tough on a company like ours and frankly tough on our shareholders as well.
>
> That is precisely why taking our core technologies and redeploying them in order to diversify into new verticals is critical to our future and has been a key focus of our efforts over the past 3 years. So let's take stock of what we have accomplished from a diversification standpoint over the past 3 years and where we go from here.

> Prior to 2011, Energy Recovery had only sold a handful of individual components for direct use in the oil and gas industry and exclusively through its recently acquired Pump Engineering division. The problem at that time was that Pump Engineering really didn't have a commercially marketable solution or even an oil and gas value proposition per se.
>
> As 2011 unfolded, we focused on restaffing and rebuilding our R&D team. We also hired new product development experts and we began to align ourselves with 3 major oil and gas clients who are willing to pilot new gas processing technologies with us.
>
> In 2012, we poured millions into researching and developing 3 new platform technologies for use within the sour gas processing industry. Technologies that we now refer to as IsoBoost, IsoGen and IsoPro. We did so in concert and in collaboration with our oil and gas industry plant partners. By the end of 2012 we had developed full commercial scale plant ready version of our IsoBoost, IsoGen and IsoPro technologies. Several of these even made it all the way into field operations into 2012.
>
> In 2013, we continued to pour millions into developing, testing and refining our 3 platform technologies. By the end of 2013 all 3 of our oil and gas technology platforms have been shipped to field locations around the world. In 2 cases we even acquired powerful written and video endorsements of our revolutionary new technologies. The third endorsement should come this year.

28. Between 2011 and 2014, Rooney ran the day-to-day operations of Energy Recovery as the Company's CEO. With amorphous phrases such as "disruptive technology" and "value proposition," Rooney was able to generate a significant amount of interest around the Company, its products, and its prospective customers.

29. This interest was short-lived, as Rooney was not able to deliver revenue. With each passing quarter, Rooney provided investors and analysts with a potpourri of excuses. Never, however, did Rooney tell investors that the Company's products were not ready for sale or that it had failed to obtain even a single contract.

## B. Energy Recovery's Oil and Gas Operations

*Energy Recovery's Core Products and Marketing Strategy*

30. Energy Recovery's former Vice President of Product Development for Oil and Gas provided pertinent information concerning Energy Recovery's Oil and Gas operations. This individual, who wishes to remain confidential, is referred to herein as "Former Employee

1" or "FE 1". FE 1 worked for Energy Recovery from July 2011 through July 2014. FE 1 was primarily based in the Company's headquarters located in San Leandro, California. FE 1 was hired by Energy Recovery to assist Rooney diversify out of water desalination and into Oil and Gas services, including but not limited to developing products and business in the Oil and Gas sector (*i.e.*, developing a diversification strategy) and identifying companies to acquire (*e.g.*, pumping companies) that would expand Energy Recovery's presence in the Oil and Gas sector. On a day-to-day basis, FE 1 worked with Rooney and Buehler. This included reporting to Rooney in one-on-one meetings, management meetings (which were held weekly on Mondays), and telephone calls after client meetings.

31. In October 2013, Rooney began voicing a desire to market products that were not yet commercially developed. According to FE 1, the term commercial development indicated that the product had been field-tested and approved, plans and specifications had been sent to a manufacturer, and the product was being produced on a commercial level. To the contrary, Energy Recovery's products at this point in time were only engineering prototypes (*i.e.*, either in the midst of field-testing or being modified to remedy certain design deficiencies). FE 1 recalled that Rooney's new marketing strategy came from Defendant Bold. FE 1's recollection on this point is based on FE 1's observations during a Company retreat in Tucson, Arizona, in October 2013. FE 1 reported that Rooney adopted Bold's marketing mentality during the retreat. After the retreat, Rooney and Bold began working very closely together. For example, Rooney began taking Bold to client presentations instead of Buehler. Bold convinced Rooney that with smart marketing, Energy Recovery could market products before they were ready for commercialization. Specifically, Rooney and Bold could "anonymize" the products by simply stating that a particular product was in use within a general region (*i.e.*, marketing the products without specifying who was using them or where they were being used). The effect of this would be to create the impression that Energy Recovery's products were in use in the field.

32. FE 1 objected to Rooney's and Bold's marketing strategy shortly after the corporate retreat in October 2013 in the context of a decision regarding whether or not the Company should present at an upcoming industry conference sponsored by the Gas Processors Association, or GPA. FE 1 expressed the opinion that Energy Recovery was not ready to present its products because, at that point in time, the products were still in the field-testing stage and not performing as intended.

33. For example, in mid-September 2013, one of Energy Recovery's potential clients, Chesapeake Energy Corp. ("Chesapeake") was experiencing problems with the Company's IsoPro product. Specifically, the IsoPro's "contactor" component was not applying pressure properly throughout the processing phase. The "contactor" is a component or stage in which gas comes into contact with liquid. In other words, the product was not able to function dynamically and had to be controlled manually. Chesapeake began raising concerns with FE 1 about the total installation costs of the product. FE 1 relayed these concerns to Rooney. Rooney became worried that Chesapeake may not proceed with Energy Recovery's IsoPro product and, as a result, Rooney told FE 1 not to discuss the problems with Chesapeake with anyone, including the public.

34. That same month, Energy Recovery's IsoGen product also failed a critical internal test. The particular problem with the product involved vibrations emanating from a bearing between a turbine and generator. The vibrations were so severe that they began to bend the product's chassis, which resulted in the nonalignment of the motor and leaking. The test had been performed in San Leandro, California. When FE 1 reported the test results to Rooney, Rooney told FE 1 not to tell the Company's prospective client, Saudi Aramco, that the test had failed. Instead, Rooney told FE 1 to tell Saudi Aramco that Energy Recovery was "making product more robust." Meanwhile, Defendant Bold drafted a press release announcing the pending shipment of the Company's products to Saudi Aramco. FE 1 objected verbally and in

email to announcing the pending shipment given the fact that it was not accurate and that Saudi Aramco had not approved it.

35. Notwithstanding, Rooney wanted to present Energy Recovery's products at the GPA conference, which was scheduled to occur in March or April 2014. In September 2013, FE 1 had a conversation with Rooney during a management meeting at the San Leandro office. FE 1 told Rooney that FE 1 refused to present the Company's products at the GPA conference because the product was not ready yet. In response, Rooney immediately asked Dr. Prem Krish (Energy Recovery's Chief Technology Officer) to present at the GPA instead of FE 1. Nocair Bensalah (Energy Recovery's Vice President, Manufacturing, and Bold were present during this conversation.

36. Thereafter, Dr. Krish went to FE 1 and asked FE 1 for advice because he, just like FE 1, did not feel comfortable presenting the products at the GPA conference. FE 1 and Dr. Krish then went to Rooney to tell them that neither of them would present the Company's products at the GPA conference. Facetiously, Dr. Krish suggested that Rooney have Bold present at the conference in light of the fact that she could avoid certain technical questions on the basis that she was in marketing and not engineering. Rooney asked Dr. Krish why he was declining to speak at the conference, to which Dr. Krish replied that Energy Recovery simply did not have a working product yet.

37. On November 5, 2013, Energy Recovery's Board of Directors held a meeting. During the meeting, FE 1 presented on the status of the Company's products (*i.e.*, that they were in the engineering prototype phase). One of the Company's directors later told that FE 1 that after FE 1 had left the meeting, the Board of Directors had asked Rooney why he was so intent on presenting at the GPA if FE 1 was advising against it. According to FE 1, the director said that Rooney responded by stating that "[FE 1] and [Buehler] are now against me so I guess I can't." The Board of Directors decided that the Company would not attend the GPA conference.

38. According to FE 1, by late-2013, Energy Recovery's Oil and Gas products still had not reached commercialization. The IsoBoost product had field-tested, but was still in the engineering prototype phase. Energy Recovery's two other products were also still in the engineering prototype phase—IsoGen had failed internal lab tests twice and had not been field-tested and IsoPro was still waiting to be put into the field after being assembled for Chesapeake. All of Energy Recovery's products were engineering prototypes, which meant that nothing was ready for commercial production.

39. Meanwhile, Rooney and Bold were actively marketing these products as commercial. Rooney and Bold even went so far as to record a promotional video for the IsoBoost product by filming a gas processing facility in Texas that used only a component of the IsoBoost product (as opposed to the IsoBoost product itself). The component was a product manufactured by Pump Engineering, a company acquired by Energy Recovery in December 2009. Rooney and Bold visited the gas processing facility and recorded the promotional video in December 2013.

*Rooney's Prospective Clients and Contract Negotiations*

40. Rooney repeatedly misrepresented the Company's arrangements and contractual negotiations with prospective clients. Rooney first misled investors with respect to the status of a potential deal with Pemex. On March 6, 2013, FE 1 called Rooney to report the status of a meeting with Pemex. FE 1 traveled to Mexico in early-March 2013 to present ERII's Oil and Gas products. While the discussion was encouraging, a deal was not signed. After the client presentation, FE 1 called Rooney to tell Rooney what had occurred. FE 1 reported that a deal was possible provided FE 1 could design a product to meet Pemex's specifications—FE 1 said that the meeting had gone "well" and that Pemex showed "interest" in proceeding with discussions. Further, FE 1 reported that, due to the fact that Pemex was state-owned, ERII would need to participate in a public bidding and procurement process. FE 1 explained to Rooney that, because Pemex was a state-run company, the procurement phase would be

significant in terms of length. FE 1 told Rooney that the process begins with ERII providing Pemex a design plan (or value proposition). If acceptable, Pemex will forward ERII to its business management department and then its procurement department. Pemex would then be required to tender projects for open market bidding. In response, firms would provide Pemex with commercial and technical bids. Pemex would then, and only then, make a decision. Pemex told FE 1 that the procurement process could take anywhere from 6 to 18 months. FE 1 explained the procurement process to Rooney during the phone call.

41. Notwithstanding the fact that an agreement had not been reached with Pemex, Rooney told investors otherwise the very next day on March 7, 2013. FE 1 learned what Rooney had told investors shortly thereafter. FE 1, who was still in Mexico, spoke with a colleague who congratulated FE 1 on closing a contract. Considering that FE 1 had in fact not closed a contract, FE 1 asked the colleague to explain. The colleague told FE 1 that Rooney had announced an Oil and Gas deal during an investor conference call. FE 1 returned from Mexico approximately one week later. At that time, FE 1 approached Rooney about Rooney's statements to investors. FE 1 said to Rooney that FE 1 had heard that the investor conference call went well. FE 1 asked Rooney if Rooney realized that it would take a while before the Pemex opportunity could potentially materialize into a contract. Rooney said that he was "aware," but that that "[didn't] mean that [he] [couldn't] talk about it." ERII ultimately did not get Pemex contract.

42. Rooney similarly misrepresented the Company's dealings with another client, Sinopec Corp ("Sinopec"). Rooney claimed that he has met with Sinopec's executive management during his visit to the Sinopec facility. This did not happen, however. FE 1 and Defendant Rooney traveled to China to visit Sinopec's Oil and Gas facility near Beijing, China. FE 1 recalled that the trip occurred between October 25 and 28, 2013. Defendant Bold accompanied FE 1 and Rooney. During the facility visit at Sinopec, FE 1 asked Rooney if he

wanted to meet a member of Sinopec's executive management team. Rooney declined, stating "No, I have visited the plant and that is good enough."

43. Upon returning to corporate headquarters, FE 1 recalled that Rooney told Alex Buehler that Rooney had met Sinopec's "second in command," the person who reports directly to Sinopec's Chief Executive Officer. Buehler later called FE 1 to verify this information, which according to FE 1 had become common practice (*i.e.*, trying to reconcile Rooney's accounts of trips and meetings with what actually occurred).

*The Company's Internal Controls over Financial Reporting*

44. As a public company, SEC rules required Energy Recovery to maintain disclosure controls and procedures and internal control over financial reporting to provide reasonable assurance regarding the reliability and accuracy of the Company's public disclosures. Accordingly, Energy Recovery purportedly documented and tested its internal controls and procedures to assess the effectiveness of its internal control over financial reporting in accordance with the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in "*Internal Control — Integrated Framework (1992)*" for fiscal 2013 and "*Integrated Control — Integrated Framework (2013)*" for fiscal 2014. Pursuant to the Sarbanes-Oxley Act of 2002, the Company's executive management, including Rooney, was required to certify that the Company was complying with the law. Contrary to what was actually occurring within the Company, Rooney certified that he had implemented and maintained adequate internal controls.

45. According to FE 1, Rooney would very actively ask about sales projections and would "calibrate them" depending on the responses he received. For example, during a trip to the Middle East in April 2013, an argument ensued between FE 1 and Rooney while waiting for a flight at an airport in Frankfurt, Germany. Rooney was developing projections for 2014 and asked FE 1 how much FE 1 was projecting in sales for the Oil and Gas division. FE 1 told Rooney that FE 1 was projecting $1 million. Rooney told FE 1 that a projection of $1 million

was unacceptable. According to FE 1, when Rooney was dissatisfied, he would become very angry. Further, according to FE 1, Rooney had a tendency to treat people as "personal property" and "bully" them. Rooney proceeded to "strong-arm" FE 1 about the projection until FE 1 finally agreed to increase it to $4 million.

46. Following Rooney's and FE 1's argument, Buehler called FE 1 and asked him why FE 1 had revised the projection upwards. FE 1 told Buehler that Rooney had said that the projection was unacceptable and therefore FE 1 had to change them. Buehler told FE 1 that revising the projection upwards was improper and that FE 1 had to change it to the original forecast.

47. Thereafter, FE 1 told Rooney that FE 1 needed to change the projection back to the original amount. Rooney immediately asked FE 1 if this was the result of some conversation FE 1 had with Buehler. According to FE 1, Rooney subsequently reprimanded Buehler for telling FE 1 to revise the projections. FE 1's understanding about what Rooney said to Buehler is based on the fact that Buehler later asked FE 1 if FE 1 had told Rooney that Buehler had told FE 1 to change the projections back to the original amount. Rooney told FE 1 that revenue needed to be increased because Rooney would be presenting projections in front of the Company's Board of Directors at a meeting initially scheduled for May 2013 (and subsequently rescheduled to June 2013). Rooney told FE 1 that he needed to be able to present better numbers to the Board of Directors. Based on Rooney's direction, FE 1 told Buehler that the projection would not be able to be restored to its original amount. Rooney ultimately presented the $4 million projection to the Board of Directors.

48. According to FE 1, Rooney "calibrated" FE 1's projections every year, as he did with the desalination team as well. FE 1 learned this from Energy Recovery's former SVP of Sales. In response to FE 1's question as to whether Rooney ever "calibrated" the desalination projections, the SVP of sales said "yes, all the time."

**C. <u>Defendants Made Materially False and/or Misleading Statements</u>**

*March 7, 2013*

49. Energy Recovery held an investor conference call on March 7, 2013 to discuss the Company's earnings for the fourth quarter and fiscal year of 2012 (the "4Q12 Conference Call"). The 4Q12 Conference Call began at 11:30 a.m. (eastern) during market hours. Defendant Rooney and Buehler attended the call on behalf of Energy Recovery.

50. Defendant Rooney's opening remarks were extraordinarily positive towards the Company's Oil and Gas prospects. In pertinent part, Defendant Rooney stated as follows:

> This large investment in R&D will serve us well as we turn our focus and attention to the oil and gas industry. As pleased as I am to report significant financial improvement in 2012, the company's most remarkable accomplishment this year came from the substantial progress made in developing products that will allow us to diversify into the oil and gas industry.
>
> In 2012, we designed and developed 3 new technologies for use in the oil and gas industry, while working with 3 high profile oil and gas clients. These new technologies were in various stages of field deployment and testing, and the results to date are promising. We are now transitioning more aggressively into the commercial deployment stage, and to that end, we have just hired our first dedicated oil and gas sales executive.
>
> The opportunities in oil and gas are very real. **Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client.** We've just now begun our outbound sales effort.
>
> . . .
>
> Assuming that we continue to make progress in our field tests, we anticipate that oil and gas revenues will represent as much as 20% of our overall revenues in 2014. Even with the significant desalination growth that is forecasted for 2014.
>
> . . .
>
> 2012 was a very successful year for us here at Energy Recovery, and we see 2013 as the final transition year for the company enabling us to return to full speed in 2014 with a combination of high revenue growth, positive cash flow and meaningful net income.

51. In the question-and-answer session that followed, Defendant Rooney elaborated on the Company's Oil and Gas activity:

> Q <Steven John Shaw, Sidoti & Company, LLC>: Right. And then [Rooney], can you just provide a little more color on the oil and gas industry. I know you stated that it's going to make up approximately 20% of 2013 revenue. It seems like a quick ramp-up, and maybe how that's developing and what kind of customers is it, is it more of a [natural] gas drilling sort of thing?
>
> A <Defendant Rooney>: Actually that will be 20% of our revenue in 2014.
>
> Q <Steven John Shaw, Sidoti & Company, LLC>: Okay, 2014. I'm sorry.
>
> A <Defendant Rooney>: Yes. It'd be several million of revenue this year. The oil and gas has been effectively no revenue in the past. I don't think we even had a dollar in 2012. So it'll be several million in 2013, and roughly 20% of our revenue in 2014. And yes, it's the natural gas or the gas processing segment of the oil and gas industry. And there is a massive installed base of sour gas processing facilities around the world, and so the immediate addressable market is very, very large, substantial hundreds and hundreds of millions of dollars just for our products. And so for us it's a technical acceptance and ramp-up.
>
> . . .
>
> Q <JinMing Liu, Ardour Capital Investments, LLC>: Yes, today your oil/gas projections for 2014, that 20% sales of total revenue, what needs to happen for you to achieve that kind of level of sales, meaning say what have to happen with your current field trials?
>
> A <Defendant Rooney>: Sure. So the revenue that we see coming in 2013 is an assortment of field trials where we're paid for the field trials and for the first installations. And we have first installations that are in field trials as we speak with very large oil and gas clients. Those current clients have expressed extreme interest in moving to projects 2, 3, 4, and 5 and so on. So when we refer to 2014 revenues being rather significant, it's based on the promising results we've seen from the field trials combined with the extreme interest from those oil and gas clients in terms of follow-on projects. But we're also anticipating that we will have other field trials underway this year. **As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year.** And that will likely spawn additional projects next year. And when we refer to field trials, now and more and more now, we're being fully paid for those field trials. Those field trials upon success beget many more opportunities. So the verbal agreement that we had with the client yesterday was the first of 20 gas field operations that they'd like to attack. So upon enjoying field success with one,

with one large oil company, you get opportunities at multiple other installed installations. Add to that, adding other field installations and you get kind of a mushrooming effect. And in almost every -- in every case we've not had to compete because there just is no competition. So there's no multiple vendor procurement mode right now.

Q <JinMing Liu, Ardour Capital Investments, LLC>: Okay. How many oil and gas companies have indicated interest to you so far?

A <Defendant Rooney>: We probably have ongoing discussions with 8 to 10 right now. **We actually have not moved forward with anymore than the first 3 until just recently because we did not want to expose ourselves to anymore technology risk than we had with the first 3. We've seen enough in the trials now to change that and so as I'd mentioned, we hired our first full-time sales executive just in the last few days and we're going to full commercial sales mode. We don't see the technology risk being severe anymore so with the 8 to 10 that we've been working with, we're now actively in discussions about moving forward with various projects.** We could easily be in conversations with 30. I mean what we are describing to these oil companies is so unique and the value proposition is distinct enough, we talked 3 to 5-year payback period, it's not hard to get excitement going.

. . .

Q <John Segrich, Restorative LLC>: Thanks a lot for taking the question. I just want to follow up a little bit on JinMing's question regarding kind of growth phase in oil and gas. It sounds like you guys have really turned the corner on desalination and some of those projects are going to come back, maybe they come a little earlier, but there is certainly a cycle ahead of you now. When you look at the oil and gas ramp, you've got your trial customers. So it sounds like you're expecting let's say a low-to-mid single digit million type ramp in 2013. And then is it incorrect to think that could jump to somewhere in the teens of millions, if you get the uptick that you are looking at from the oil and gas industry for 2014?

A <Defendant Rooney>: Yes. I mean what we are saying is several million in 2013 and roughly 20% of our revenue in 2014. We have to be careful because in terms of trying to give more explicit guidance than that, what I can tell you is that the field trials have looked very promising and the conversations with the oil companies we've got going on right now suggest extreme interest. **But there are certain engineering and technical bureaucracies inside of these oil and gas companies and so as we work our way through that for full commercial acceptance, the timeline is the part that becomes least certain to us, but the level of interest is extreme.** The technical success as we say is promising and the addressable market is very, very large. And so as we combined those, we're confident in the notion of doing several million of revenue this year for the first time ever, and by next year having it as a rather significant portion of our revenue.

> I'm less worried about technical risk today than I would have been 8, 9, 10 months ago. I am more bullish about client interest, and I'm more bullish about the addressable market. **The part that I don't control and maybe I don't even have as much clarity on as I will say a year from now is the path that you work through technical and commercial acceptance with these large giants. We will for sure make it through that, but does it take a month or 3 months or 6 months or where -- and in each oil giant case, it seems to have a little bit different pace and speed, but we seem to be getting a great deal of attention in moving things along nicely.**

52. The bold-faced statements in paragraphs 50-51 above were materially false and/or misleading because Rooney's statements gave a misleading description of the Company's Oil and Gas operations. Specifically, Rooney's statements misled investors with respect to the Company's purported first Oil and Gas customer agreement as well as the status of the Company's Oil and Gas products.

53. With respect to Rooney's statements concerning the Company's first "verbal agreement," these statements are simply not true. Rooney was referring to Pemex, whom FE 1 had met with the day before the 4Q12 Conference Call. FE 1 told Rooney that although the deal seemed promising, an agreement had not been reached. FE 1 had also discussed the lengthy procurement and bidding process with Rooney at that time. When FE 1 questioned Rooney why he had represented otherwise, Rooney was indifferent to the truth and stated that he was "aware" but that that "doesn't mean that I can't talk about it." Energy Recovery ultimately did not get Pemex contract.

54. In addition to misleading investors with respect to the status of Energy Recovery's first purported Oil and Gas customer, Rooney also misled investors as to the status of the Company's Oil and Gas products. In fact, according to FE 1, Energy Recovery's products remained in the engineering prototype phase well into the late-2013 and beyond. Accordingly, by identifying "engineering and technical bureaucracies," Rooney materially misled investors to believe that the reason for delayed revenue had nothing to do with the premature development status of the Company's core products.

55. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. To this end, a number of analysts discussed the potential for positive growth arising from the Company's increasing presence in the oil and stock sector, including Ardour Capital Investments, LLC, Wedbush Securities Inc., and Sidoti & Company, LLC. On March 7, 2013, Energy Recovery's stock price increased from $4.59 per share to $4.70 per share. Defendant Rooney's statements on March 7, 2013, prompted a 2.4% increase in Energy Recovery's stock price on heavier than normal trading volume.

*March 12, 2013*

56. On March 12, 2013, Energy Recovery filed its annual report (Form 10-K) for fiscal 2012 with the SEC (the "2012 Annual Report"). Defendant Rooney signed the 2012 Annual Report.

57. The 2012 Annual Report represented that the Company was maintaining adequate internal controls. The 2012 Annual Report stated as follows:

> **Changes in Internal Control Over Financial Reporting**
>
> **There were no changes in our internal control over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting**.

58. In conjunction with the 2012 Annual Report, Defendant Rooney submitted a certification concerning the Company's internal controls. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Thomas S. Rooney, Jr., certify that:
>
> 1. I have reviewed this annual report on Form 10-K of Energy Recovery, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**

> **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

59. The bold-faced statements in paragraphs 57-58 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

60. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investor reading the 2012 Annual Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

61. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy

Recovery stock. On March 12, 2013, Energy Recovery's stock price decreased from $3.89 per share to $3.74 per share over the course of the following day. Defendant Rooney's statements concerning the Company's internal controls prevented a further loss in the Company's stock price.

*May 9, 2013*

62. Energy Recovery held an investor conference call on May 9, 2013 to discuss the Company's earnings for the first quarter and fiscal year of 2013 (the "1Q13 Conference Call"). The 1Q13 Conference Call began at 10:30 a.m. (eastern) during market hours. Defendant Rooney and Buehler attended the call on behalf of Energy Recovery.

63. Defendant Rooney's opening remarks continued to mislead investors into believing that absence of revenue was not related to the developmental status of the Company's core products. In pertinent part, Defendant Rooney stated as follows:

> Now let me switch our attention to the oil and gas segment. For some time now, we have been forecasting several million dollars of oil and gas revenues in 2013. At this point in time, that appears unlikely in 2013. One of our key assumptions was the successful conclusion of new product trials by the first quarter of 2013. At this stage, we are well along in the process of collaborating with our 3 oil and gas clients to develop, deploy and evaluate these field trials. Each collaboration is different, but overall, I can report that we are somewhere between 6 months and 12 months behind where we thought we would be at this point in time.
>
> **For the most part, our challenges are more about logistics, approvals and procedures than matters of technical success and acceptance.** The timeline and process to develop and deploy commercially viable energy recovery devices for the oil and gas markets has definitely taken longer than we expected. With what we know today, we expect to generate roughly 10% of our overall revenues in 2014 from our oil and gas portfolio of products.

64. Analysts questioned Defendant Rooney at length concerning the delay within the Company's Oil and Gas operations. Based on Defendant Rooney's responses, investors were led to believe that Energy Recovery's customers were to blame. Defendant Rooney stated, in pertinent part, as follows:

Q <Patrick Jobin, Credit Suisse AG>: Just a question on the oil and gas delays, just maybe some more color there and also when we should expect to see contracts that would give us more confidence in the 10% number for '14.

A <Defendant Rooney>: Sure. So we would expect to see contracts this year, certainly within the next 4 to 5 months and the color on the trial is that there is extreme interest in the devices that we're doing, but it turns out that this is an entirely -- not only are these new devices, but this is an entirely new category, and as such, it doesn't fit into any box inside the oil and gas industry. And so, in one case dealing with a very large oil and gas company, they simply have had challenges even getting a purchase order out of their own purchasing department because they simply don't have a category to put this in. So, it's kind of interesting; it's an industry that most people would say is risk-averse and won't try new things, that turns out to be categorically incorrect. But then there is a huge bureaucracies within -- or through which new trials take new products.

**And so, in all cases, it's been a tremendous amount of bureaucracy and approvals, double approvals, triple approvals in some cases and so we are methodically working through that and so I guess that of a severe case of naïveté, we felt that upon delivering technically successful devices, we would instantly go into trial modes and trial modes with last 6 months, we would get approvals and move on. And it turns out there is more -- there are more hurdles, more bureaucracy, and we are literally creating a new industrial category around Energy Recovery from pressurized fluid flows and so, we simply need to be considerably more patient.** In a number of cases as we move through these trials, we've been invited to attend and present at industry conferences that, in the future, based on the remarkable new technologies we put out there, but at the same time, we've seen an adoption roadmap that's simply 6 to 12 months longer than we expected. But we fully expect to see contracts this year that will enable us to drive the 10% of our revenue for next year.

65. Defendant Rooney also continued to reassure investors of the market's overwhelming interest in Energy Recovery's products. In pertinent part, Rooney states as follows:

Q <JinMing Liu, Ardour Capital Investments, LLC>: Yes, just one quick one. Can you give us any quantity of color of the increase interest on biogas industry?

A <Defendant Rooney>: Yes, yes, I just got back from 2 separate trips to the Middle East in last month. And as we have explored and gone through initial technology testing, there has been a tremendous amount of interest in exploring other applications. There are many fluid flows with inside the oil and gas industry. We have been very disciplined in looking at one fluid flow. It happens to

> be a fluid that is associated with gas processing and as we laboriously go through the various hurdles proving the technology to some of these oil and gas clients, they are already starting to, if you will, jump the gun and say, well what about this fluid flow, what about that fluid flow and it's been -- the interest level has been extremely high.
>
> We've also -- about 6 months to 9 months ago, we also moved out of stealth mode and started to approach other oil and gas clients other than our original 3. And we've yet to meet with an oil and gas client who didn't express interest, and that was a pleasant surprise. So I guess the answer to your question is, we expanded long range addressable market is a deepening of an understanding of what our current clients think is possible along with very positive feedback from the half a dozen other oil and gas clients that we have recently began to open up conversations with.

66. The bold-faced statements in paragraphs 63-64 above were materially false and/or misleading because Rooney's statements gave a misleading description of the Company's Oil and Gas operations. In fact, according to FE 1, Energy Recovery's products remained in the engineering prototype phase well into late-2013 and beyond. Accordingly, delays in Oil and Gas revenues were not caused solely or even primarily by "logistics, approvals and procedures." By identifying these issues, Rooney materially misled investors to believe that the reason for delayed revenue had nothing to do with the premature development status of the Company's core products.

67. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On May 9, 2013, Energy Recovery's stock price decreased from $3.83 per share to $3.65 per share. Defendant Rooney's statements on May 9, 2013 prompted a 4.5% decrease in Energy Recovery's stock price on heavier than normal trading volume, averting a much larger sell-off in Energy Recovery stock.

68. In addition to the 1Q13 Conference Call, Energy Recovery filed a quarterly report (Form 10-Q) with the SEC for the period ended March 31, 2013 on May 9, 2013 (the "1Q13 Quarterly Report"). Defendant Rooney and Buehler signed the 1Q13 Quarterly Report.

69. The 1Q13 Quarterly Report provided, in pertinent part that, Energy Recovery's executive management had designed, evaluated, implemented, and approved the Company's internal controls over financial disclosure and concluded that they were effective. The 1Q13 Quarterly Report stated as follows:

> (a) *Evaluation of disclosure controls and procedures*. Under the supervision and with the participation of our management, including the President and Chief Executive Officer and the Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as of the end of the period covered by this report.
>
> **Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer have concluded that these disclosure controls and procedures are effective.**
>
> (b) Changes in internal controls. **There were no changes in our internal control over financial reporting during the quarter ended March 31, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

70. In addition, the 1Q13 Quarterly Report included a certification from Defendant Rooney affirming the effectiveness of the Company's internal controls. This certification, which was submitted in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and signed by Rooney, provided as follows:

> I, Thomas S. Rooney, Jr., certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Energy Recovery, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**

> **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

71. The bold-faced statements in paragraphs 69-70 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

72. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investors reading the 1Q13 Quarterly Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

73. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On May 9, 2013, Energy Recovery's stock price decreased from $3.83 per share to $3.65 per share. Defendant Rooney's statements on May 9, 2013 prompted a 4.5% decrease in Energy Recovery's stock price on heavier than normal trading volume, averting a much larger sell-off in Energy Recovery stock.

*August 1, 2013*

74. Energy Recovery held an investor conference call on August 1, 2013 to discuss the Company's earnings for the second quarter and fiscal year of 2013 (the "2Q13 Conference Call"). The 2Q13 Conference Call began at 10:30 a.m. (eastern) during market hours. Defendant Rooney and Buehler attended the call on behalf of Energy Recovery.

75. Defendant Rooney's opening remarks partially revealed the falsity behind the statements made during the 2Q13 Conference Call. In pertinent part, Defendant Rooney stated as follows:

> In the second quarter, we continue to make progress with our oil and gas field trials. These are important field trials that will position Energy Recovery extremely well within the oil and gas industry. **Entering the oil and gas industry with revolutionary new energy recovery devices is and has taken longer than we originally expected but the outlook is very promising.** We have solid expectations for revenue in 2014, followed by strong growth well into the future.

76. In response to analyst questions, Rooney stated further that:

> Q <Laurence Alexander, Jefferies LLC>: And can you give a little bit more detail on progress to be made on the oil and gas and industrial applications?
>
> A <Defendant Rooney>: **So on the oil and gas area, as was mentioned in the last call, the field trial process has many more stages, hurdles and logistics to it than we knew when we first entered it.** So I have to take the blame for asserting the pace that we would be moving at. But we're making the progress, we're getting very good feedback from all 3 of our beta site clients and in fact they have energetically engaged with us in conversations about additional applications inside of their own oil and gas space. So the mid and long range outlook is as good or better than we have seen it before, but we have had to accept the facts that these field trials don't happen over the course of several months, they can take one or 2 years. And so we've gotten well into that process with them.

77. The bold-faced statements in paragraphs 75-76 above were materially false and/or misleading because Rooney's statements gave a misleading description of the Company's Oil and Gas operations. In fact, according to FE 1, Energy Recovery's products remained in the engineering prototype phase well into late-2013 and beyond. Accordingly, by

blaming the "field trial process," Rooney materially misled investors to believe that the reason for delayed revenue had nothing to do with the premature development status of the Company's core products.

78. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On August 1, 2013, Energy Recovery's stock price increased from $4.37 per share to $4.97 per share over the course of the following week. Defendant Rooney's statements on August 1, 2013 prompted a 14% increase in Energy Recovery's stock price on heavier than normal trading volume.

*August 6, 2013*

79. Energy Recovery filed a quarterly report (Form 10-Q) with the SEC for the period ended June 30, 2013 on August 6, 2013 (the "2Q13 Quarterly Report"). Defendant Rooney and then-current Chief Financial Officer Alexander Buehler signed the 2Q13 Quarterly Report.

80. The 2Q13 Quarterly Report provided, in pertinent part that, Energy Recovery's executive management had designed, evaluated, implemented, and approved the Company's internal controls over financial disclosure and concluded that they were effective. The 2Q13 Quarterly Report stated as follows:

> (a) *Evaluation of disclosure controls and procedures*. Under the supervision and with the participation of our management, including the President and Chief Executive Officer and the Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as of the end of the period covered by this report.
>
> **Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer have concluded that these disclosure controls and procedures are effective.**

> (b) Changes in internal controls. **There were no changes in our internal control over financial reporting during the quarter ended June 30, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**
>
> We implemented a new enterprise resource planning ("ERP") system effective July 1, 2013. We believe that the new ERP system will simplify and strengthen our internal control over financial reporting.

81. In addition, the 2Q13 Quarterly Report included a certification from Defendant Rooney affirming the effectiveness of the Company's internal controls. This certification, which was submitted in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and signed by Rooney, provided as follows:

> I, Thomas S. Rooney, Jr., certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Energy Recovery, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our

> supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and
>
> 5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**
>
> **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

82. The bold-faced statements in paragraphs 80-81 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of

all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

83. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investor reading the 2Q13 Quarterly Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

84. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On August 6, 2013, Energy Recovery's stock price increased from $4.71 per share to $4.97 per share over the course of the following days. Defendant Rooney's statements on August 6, 2013 furthered an increase in Energy Recovery's stock price that was prompted by Rooney's statements from August 1, 2013.

*November 7, 2013*

85. Energy Recovery held an investor conference call on November 7, 2013 to discuss the Company's earnings for the third quarter of fiscal 2013 (ended September 30, 2013) (the "3Q13 Conference Call"). The 2Q13 Conference Call began at 11:30 a.m. (eastern) during market hours. Defendant Rooney and Buehler attended the call on behalf of Energy Recovery.

86. During the 3Q13 Conference Call, Defendant Rooney provided investors with a materially false and/or misleading impression of the Company's operations and, in general, the status of the Company's core product technology. Specifically, Rooney misled investors as to the Company's dealings with two of its prospective customers—Saudi Aramco and China's

Sinopec Corp.—and also misled investors to believe that the Company's technology was developed and ready to be deployed. With respect to Saudi Aramco, Defendant Rooney stated in pertinent part as follows:

> In the third quarter, we signed a number of new desalination contracts, the majority of them in the Middle East region. In Saudi Arabia, our PX technology is part of ACCIONA Agua's first desalination contract in the City of Al Jubail [ph]. The plant will produce a 100,000 cubic meters per day of potable water for residents and industrial uses and our devices will yield over 116 million kilowatt hours in energy savings. In Oman, Cadagua and its partners will use our devices to desalinate seawater in the City of Al Ghubrah. This technological first, a desalination mega-project featuring 8 trains, each desalinating 30,000 cubic meters of seawater per day, will produce 50 million gallons of fresh water to supply 800,000 residents.
>
> . . .
>
> If you are familiar with gas processing facilities, energy costs are a major portion of total costs. We are confident that our potential to collaborate in our future oil and gas projects remain strong. The emphasis on gas exploration is high, as China is a net importer. Sinopec is just one of our oil and gas pilot projects with major players on 3 continents. **Just this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Energy Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia.**

87. This bold-faced statement in paragraph 86 above is materially false and misleading because Energy Recovery's IsoGen product was not ready for shipment. According to FE 1, on or about September 24, 2013, the Company's IsoGen product had failed a critical internal test and required replacement parts. Rooney's statement concerning the anticipated shipment of the IsoGen product was false because certain components within the IsoGen product needed to be replaced. According to FE 1, delivery of the replacement parts was not even scheduled to occur during the fourth quarter of fiscal 2013; consequently, there was no physical way that Energy Recovery was going to be able to ship the IsoGen product to Saudi Aramco before fiscal 2014.

88. Defendant Rooney also mislead investors with regard to the Company's dealings with Sinopec. During the 3Q13 Conference Call, Rooney stated in pertinent part as follows:

> In fact, during the conference, there was a noticeable and compelling interest in renewable energy sources such as osmotic power using the latest water technologies for which Energy Recovery is a key player. Nearby in Shanghai, I was invited to speak on a panel entitled Beyond Subsidies and Business Unusual in Asia at the Bloomberg Leadership Forum in Shanghai. This Forum brought together 60 of the sectors thought-leaders from a diverse mix of Asia's leading firms including Chinese energy manufacturers diversified in international industrials and information and communication technology players.
>
> We focused on key areas such as business models for an age of clean-energy consolidations and the role of international firms to support future large scale industry demands for water and technology. **While in China, we also took the occasion to visit with the regional leadership and plant management of the Sinopec facility in the Chaoyang gas plant where we saw first hand, the progress being achieved in one of our oil and gas field trials.**
>
> We came away very impressed by the progress achieved and even more convinced of the opportunity this new market brings to us. As indicated by the client, lower power consumption is the #1 initiative for Sinopec overall. At the plant level, we were told that our Energy Recovery devices lowered the power consumption of the total plant by more than 25%, which equates to a very compelling value proposition.
>
> . . .
>
> It does. **And so 10 days ago or so, I was physically at the plant in China with Sinopec and they are and were effusive in their praise, sharing with us their economics, specifically named individuals at the plant level and at the corporate level that stand ready to give references.**
>
> And also open the door to plant visits from friendly countries, but open the door to plant visits with open arms and including by the way to other oil and gas players inside of China. **So we feel very, very good about that and we expect the same thing. I could say that just first hand, having physically been at the plants, and dealt with my counterpart at Sinopec, and also at the plant level management.**
>
> The relationship is very, very high. **The feedback is very, very strong and the willingness to collaborate with us and to allow others to see what's going on at their plant is absolute at this stage.** So we feel very good about opening the flood gates now and bringing in sort of second and third round clients to see and witness what's going on.

89. The bold-faced statements in paragraph 88 above were materially false and/or misleading because Defendant Rooney did not in fact meet with Sinopec's executive management during his visit to the Sinopec facility. In fact, during the facility visit at Sinopec, FE 1 asked Rooney if he wanted to meet a member of Sinopec's executive management team. Rooney declined, stating "No, I have visited the plant and that is good enough."

90. Defendant Rooney also misled investors concerning the Company's overall development of its core product technology. During the 3Q13 Conference Call, Rooney represented to investors, in pertinent part, as follows:

> We continue to study the long-term growth prospects in the firming of the global desalination market and we're excited about the commercial introduction of our new oil and gas products. **Oil and gas field trials are progressing, providing us with confidence that we will generate meaningful revenue in a market where there are already 1,200 eligible facilities.** The innovation, manufacturing efficiencies and disciplined cost control implemented throughout the organization over the past several years, provide us with a strong foundation to capitalize on the growing demand for Energy Recovery equipment in the desalination and other emerging markets such as oil and gas to create for our shareholders.
>
> . . .
>
> Sure, the revenue opportunity at an average facility is on the order of about $1 million if you think about the 1,200 plants that exist, so about $1 billion of one-time TAM. So that's the first one. But what we see happening right now, is we are now starting to line up second and third clients to visit some of these plant facilities. And so we would expect that in 2014, we will start to ink contracts, commercial contracts for the next wave of projects, predicated on the field trials that are going on.
>
> Of course revenue recognition requires us to actually sign contracts, manufacture products and ship. So the big question for us would be as we -- and we see the year 2014 as a year when we ink contracts with clients. So contracts that are inked in the first 3 or 4 months of the year can be turned into revenue in the first year. So we have to be a bit cautious.
>
> **The one thing that we've learned about the oil and gas industry is that it has its own pace and we've been working through things at the oil and gas industry pace, but we are convinced that we're going to be moving now to contracts.** We are lining up a series of clients that will start to visit the other

> plants and subsequently negotiate contracts with us, commercial contracts. And all of that will take place in 2014.
>
> . . .
>
> Yes. Well, I think what you'll probably see in the first and second quarter of next year is press releases around contracts and new deals and so on. Our Q4 earnings call I think takes place in the middle of March, so it would be more or less at that point in time that we would expect to be doing deals with clients. **It takes what -- the one thing that I'm learning about the oil and gas industry is that at points in time, they move with incredible speed and then there are aspects of the process that take a long time.**
>
> With 1 of the 3 clients that we had, we were 2 years into the relationship and took us almost a year to finalize the written contract documentation. So, and we do not issue press releases about new projects until we have finally and formally inked and signed the finalized deals. We don't typically make press releases about tentative hand shake agreements. And so I'm a little bit cautious about whether or not I'll be able to say, we will have press releases issued around formal finalized contracts in January, February, March, but that process I'm convinced will be going on in the first and second quarter after people have visited plants and lined up deals.

91. The bold-faced statements in paragraph 90 above were materially false and/or misleading because they led investors to believe that the delay in Oil and Gas revenue was due to general industry practice. In reality, the lack of Oil and Gas revenue was largely due to the fact that the Company's products were not ready to be deployed and were continuing to experience significant technical difficulties during field-testing.

92. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On November 7, 2013, Energy Recovery's stock price decreased from $5.59 per share to $4.74 per share the following day. Defendant Rooney's statements on November 7, 2013 prompted a 15% decrease in Energy Recovery's stock price on heavier than normal trading volume, avoiding losses that would have been far greater and more severe.

93. In addition to the 3Q13 Conference Call, Energy Recovery filed a quarterly report (Form 10-Q) with the SEC for the period ended September 30, 2013 on November 7,

2013 (the "3Q13 Quarterly Report"). Defendant Rooney and Buehler signed the 3Q13 Quarterly Report.

94. The 3Q13 Quarterly Report provided, in pertinent part that, Energy Recovery's executive management had designed, evaluated, implemented, and approved the Company's internal controls over financial disclosure and concluded that they were effective. The 1Q13 Quarterly Report stated as follows:

> (a) *Evaluation of disclosure controls and procedures*. Under the supervision and with the participation of our management, including the President and Chief Executive Officer and the Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as of the end of the period covered by this report.
>
> **Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer have concluded that these disclosure controls and procedures are effective.**
>
> (b) Changes in internal controls. **There were no changes in our internal control over financial reporting during the quarter ended September 30, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

95. In addition, the 3Q13 Quarterly Report included a certification from Defendant Rooney affirming the effectiveness of the Company's internal controls. This certification, which was submitted in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and signed by Rooney, provided as follows:

> I, Thomas S. Rooney, Jr., certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Energy Recovery, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**

> **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

96. The bold-faced statements in paragraphs 94-95 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

97. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investors reading the 3Q13 Quarterly Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

98. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On November 7, 2013, Energy Recovery's stock price decreased from $5.59 per share to $4.74 per share the following day. Defendant Rooney's statements on November 7,

2013 prompted a 15% decrease in Energy Recovery's stock price on heavier than normal trading volume, avoiding losses that would have been far greater and more severe.

*March 6, 2014*

99. Energy Recovery held an investor conference call on March 6, 2014 to discuss the Company's earnings for the fourth quarter and year earnings for fiscal 2013 (the "4Q13 Conference Call"). The 4Q13 Conference call began at 11:30 a.m. (eastern) during market hours. Defendant Rooney and Buehler attended the call on behalf of Energy Recovery.

100. During the 4Q13 Conference Call, Defendant Rooney continued to mislead investors concerning Energy Recovery's Oil and Gas operations. In his opening remarks, Defendant Rooney described the Company's Oil and Gas operations as follows:

> **In 2013, we continued to pour millions into developing, testing and refining our 3 platform technologies [IsoBoost, IsoGen, and IsoPro]. By the end of 2013 all 3 of our oil and gas technology platforms have been shipped to field locations around the world. In 2 cases we even acquired powerful written and video endorsements of our revolutionary new technologies. The third endorsement should come this year.**
>
> **In November and December of last year, I personally traveled to locations in the United States and China to see our technology in action and I heard firsthand the success stories that our clients had to share. I was very moved by what I heard.**
>
> . . .
>
> **With sales cycle in these 2 industries can be long, but we will remain confident that we will achieve revenue in 2014 with serious growth leading into 2015. Where we sit today I feel very good about how far we have come in 3 short years. We have spent the past 3 years steadily and patiently building our position in the oil and gas industry to appoint where today we're now comfortably moving into full speed commercial roll out. The long term potential for Energy Recovery in the oil and gas industry is immense. By our analysis the total addressable market for energy recovery solutions in the oil and gas industry is well in excess of a $1 billion per year and that doesn't include the ammonia processing industry which is large in of itself.**

101. Analysts questioned Rooney further concerning the Company's progress in Oil and Gas during the question-and-answer session of the 4Q13 Conference Call. Rooney elaborated as follows:

> Q <James Patrick McIlree, Chardan Capital Markets, LLC>: And then this year 2014, I just want to make sure I understand what you're saying about the oil and gas market. You think you're going to have some initial sales in that market but 2015 is the real big year for that market. Is that right?
>
> A <Defendant Rooney>: **That's right. There is no question we will have revenues this year. We actually have at least one executed contract that I'm aware of and actually received payment from one client. So I don't think there is any doubt at all, we will have revenue in the oil and gas industry this year. How much revenue we have from oil and gas this year is considerably less important to us than piling up wins that will drive revenue for us in 2015 and '16 and so as has been pointed out in the past the lead time for our delivery of our technologies can be on the order of 6-7 months. We're overwhelmed right now with commercial requests for proposals and contacts in the industry. So I would say without question we will have oil and gas revenue this year. It may be an unimpressive amount but that really doesn't matter what we're really focusing on is stacking up contracts this year that will drive important revenues for us in 2015, 2016 and beyond.**
>
> . . .
>
> Q <JinMing Liu, Ardour Capital Investments, LLC>: First a follow-up on the R&D expense into next year and into the future. Can you share with us what you're upsides on the R&D front whether you are trying to get more application into volume gas or improve your current pressure exchanger or get some other applications like the osmotic power.
>
> A <Defendant Rooney>: JinMing most of what we're spending on will be breakthrough new technologies that enable us to penetrate market verticals that we're not currently in. **But of course there will be some monies spent on refining our technologies. So I would give you as an example we have IsoBoost, IsoGen and IsoPro. IsoBoost is now a proven technology and it's one that's very appealing to the oil and gas industry. It's at the core, there is the turbocharger. IsoGen is a device that generates electricity also at the core it uses turbine. IsoPro is the stallion if you will, the very, very high efficiency device. The core of which is the pressure exchanger. Its performance is so extreme that it requires specialized operating protocols at a plant because it knocks out so much of the energy requirements at the plant that it causes the plant to change its operating protocols. So we're working to refine and develop that technology to merry up well with these plants.** So we will indeed

> over the next 24 months continue to invest in the development of that technology but I would say that the majority of the spending we have one project right now that we may spend $2 million on an incredibly advanced disruptive technology that opens a $1 billion market to us that it is a brand new technology. We haven't talked about it and it's altogether new.
>
> And it is the result of 2 things. One is the marketing study last year highlighted a very special market for us to enter and at the same time one of the top engineers that we hired had specific expertise in that area. So between our R&D acumen and an identified market, we made the decision in the fourth quarter of last year to invest very heavily to attack that new market and so that's an example of where we are not refining an existing technology but advancing a brand new disruptive technology and by the way we would seek to have 2 or 3 of those opportunities every single year.

102. The bold-faced statements in paragraphs 100-101 above were materially false and/or misleading because they led investors to believe that the delay in Oil and Gas revenue was due to general industry practice. In reality, the lack of Oil and Gas revenue was largely due to the fact that the Company's products were just not ready to be deployed and were continuing to experience significant technical difficulties during field-testing.

103. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On March 6, 2014, Energy Recovery's stock price increased from $4.75 per share the day before to $6.49 per share. Defendant Rooney's statements on March 6, 2014, prompted a 36% increase in Energy Recovery's stock price on heavier than normal trading volume.

*March 11, 2014*

104. On March 11, 2014, Energy Recovery filed its annual report (Form 10-K) for fiscal 2013 with the SEC (the "2013 Annual Report"). Defendant Rooney signed the 2013 Annual Report.

105. The 2013 Annual Report represented that the Company was maintaining adequate internal controls. The 2013 Annual Report stated as follows:

> **Changes in Internal Control Over Financial Reporting**
>
> We implemented a new enterprise resource planning ("ERP") system effective July 1, 2013. We believe that the new ERP system will simplify and strengthen our internal control over financial reporting.
>
> With the exception of our new ERP system, **there were no changes in our internal control over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting**.

106. In conjunction with the 2013 Annual Report, Defendant Rooney submitted a certification concerning the Company's internal controls. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Thomas S. Rooney, Jr., certify that:
>
> 1. I have reviewed this annual report on Form 10-K of Energy Recovery, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and
>
> 5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**
>
> **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

107. The bold-faced statements in paragraphs 105-106 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of

all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

108. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investor reading the 2013 Annual Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

109. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On March 11, 2014, Energy Recovery's stock price increased from $5.87 per share to $6.00 per share. Defendant Rooney's statements on March 1, 2014, prompted a 2% increase in Energy Recovery's stock price on heavier than normal trading volume.

*May 8, 2014*

110. Energy Recovery held an investor conference call on May 8, 2014 to discuss the Company's earnings for the first-quarter of fiscal 2014 (the "1Q14 Conference Call"). The 1Q14 Conference Call began at 10:30 a.m. (eastern) during market hours. Defendant Rooney and Buehler attended the call on behalf of Energy Recovery.

111. Defendant Rooney's opening remarks included the following statements:

> We have used these industry events to both educate as well as advertise our solutions to our audience, displaying sophisticated scale models and commercial economic model for our new technologies.
>
> The response that we've received from the oil and gas industry has been somewhat overwhelming and has included requests for face to face strategic meetings all over the world, as well as numerous requests for commercial

> proposals. **Today in 2014, we have responded to close to $100 million in requests for commercial proposals for our products. That number far exceeds anything that the company has ever experienced.**
>
> As a result of the very strong feedback receiving from the oil and gas industry, emanating from just two short months of the industry exposure, we have decided to once again expand the number of our dedicated oil and gas sales and marketing professionals, as well as expanding our oil and gas engineering support team. The outlook is very promising.[1]

112. In the question-and-answer session that followed the Company's opening remarks, Defendant Rooney elaborated on the Company's purported pipeline of activity:

> Q <Patrick Jobin, Credit Suisse>: Great, and congrats on the first revenue for oil and gas, that's exciting, and I know it's been many years in the making. So, just a few questions on some of the comments you have made. The $100 million of proposals, how many customers did that reflect? And then how should we think about the cadence of converting some of those proposals to orders, kind of throughout the year and kind of think about that as part of the revenue mix over time?
>
> A <Defendant Rooney>: Yes, the $100 million worth of requests from clients was a wonderful thing for us to see and really is stressing us to keep up with it. It comes from many clients, across many continents. Quite a few out of the Middle East, but I want to say four different clients on four different continents, four or five different continents. So it's a highly varied number of clients. I don't know exactly how many clients. It's not from one client. It's not from one or two. It's a large number of clients all over the world.
>
> As I had mentioned we have been to nine industry conferences, literally all over the world, and we get to go to a conference where we weren't overwhelmed with requests coming out of it. So it's a large number, it's a high variety of clients, large number of requests.
>
> As to the conversion, I think that takes time. We expect to see some of them, the intent to contracts this year. Although I have to say that, I'm not an expert in the pace of the oil and gas industry and I could be wrong. What is incredibly heartening to me is the unmistakable desire that the industry is now showing us. We're not pushing proposals to them. They are asking us to respond to their specific requests.
>
> **I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year**

[1] Lead Plaintiff obtained this excerpt from the 1Q14 Conference Call from SeekingAlpha.com. All transcript excerpts within this Complaint have been obtained from SeekingAlpha.com.

**and into next year.** But I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert, but I will dwell on, I guess the one point that I know which is the amount of attention we are getting in the specific commercial requests and the magnitude of all of those.

113. Defendant Rooney elaborated further in response to a question from a different analyst:

Q <JinMing Liu, Ardour Capital>: Okay, can you disclose what; you say these clients decided to purchase that equipment system at the end at what kind of a dollar amount?

A <Defendant Rooney>: I can't. Its suffice it to say our client in Saudi Arabia constrains our ability to make any public announcements about the terms and conditions, so I'm limited in that regard.

Q <JinMing Liu, Ardour Capital>: Okay.

A <Defendant Rooney>: I can't even tell you the name of the client in Saudi Arabia.

Q <JinMing Liu, Ardour Capital>: Okay, but $100 million number potentially is very helpful, but can you further give us some insight into the potential [indiscernible] commonly customers putting made inquiries and those type of things.

A <Defendant Rooney>: So we've had, what I call social inquiries or technology inquiries from dozens and dozens of clients, some have asked, some of the biggest names in the oil and gas -- well, quite a few of the biggest names in the oil and gas industry, we've now had several follow up meetings including being invited to their world headquarters to present to rooms that can have a dozen engineers in them.

**Beyond that we have been -- we received requests for very specific commercial proposals pertaining to specific locations with technical specs already provided to us. Requesting commercial proposals for a substantial number of clients and the sum total of all that is as I say, close to a $100 million, if all were converted to one time cash sales. And these are, I would say these are much further along the line than just casual, what would it be if I wanted a such and such, these are where we received a couple of pages of technical specs about a specific plant located in a specific location looking for a technical proposal from us and a commercial proposal from us.**

So these are, these are not casual browsing by clients, we get that too, but it kind of [indiscernible] to see the level of commercial interest that we received in just

> the first 60 days. We do not by the way intend to update the level of commercial activity that we have.
>
> So, next quarter I won't be saying that a $100 million is now $300 million or something like that, we absolutely do not intend to do that, we're not going to engage in that sort of level of disclosure.
>
> I just felt that because we, until February 23 we had not had an outward presence in the oil and gas industry. We had not presented at a major oil and gas industry conference. We started that entire process on February 23 of this year and saw overwhelming response, so much so that it led to this inbound interest for technical and commercial proposals at a level we never expected and I thought it would be valuable.
>
> A lot of analysts, lot of investors have asked us to give some kind of data point as to progress being made and I felt that that data point was factual and would give great insight into the tremendous level of interest coming from the industry and it's not one client, or it's not two clients, it's a large number of clients, I think it's coming if I recall, coming from four different continents. And I think that speaks volumes to what has transpired just in the last 60 days.

114. The above bold-faced statements in paragraphs 111-113 are materially false and/or misleading because Rooney's statements gave a misleading description of the Company's operations. Specifically, Rooney's statements falsely led investors to believe that the Company had identified material sources of revenue and that revenue-generating actions were already underway at the time of the statement. In reality, as would be disclosed later, Rooney's statements concerning the Company's "pipeline" were neither meaningful nor accurate and should not have been relied upon. Further, by touting the Company's supposed "pipeline" of sales while omitting the truth concerning the design and testing status of the products upon which the "pipeline" was purportedly based, Rooney materially misled investors into believing that revenue was guaranteed and imminent.

115. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On May 8, 2014, Energy Recovery stock closed at $4.43 per share. The following day, on May 9, 2014, Energy Recovery stock closed at $4.61 per share. Defendant

Rooney's statements on May 8, 2014 prompted a 4% increase in Energy Recovery stock on unusually heavy trading. Further, Defendant Rooney acknowledged the materiality of his statement by recognizing that "[a] lot of analysts, lot of investors [had] asked [the Company] to give some kind of data point as to progress being made . . . ."

116. In addition to the 1Q14 Conference Call, Energy Recovery filed a quarterly report (Form 10-Q) with the SEC for the period ended March 31, 2014 on May 8, 2013 (the "1Q14 Quarterly Report"). Defendant Rooney and Buehler signed the 1Q14 Quarterly Report.

117. The 1Q14 Quarterly Report provided, in pertinent part that, Energy Recovery's executive management had designed, evaluated, implemented, and approved the Company's internal controls over financial disclosure and concluded that they were effective. The 1Q14 Quarterly Report stated as follows:

> (a) *Evaluation of disclosure controls and procedures*. Under the supervision and with the participation of our management, including the President and Chief Executive Officer and the Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as of the end of the period covered by this report.
>
> **Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer have concluded that these disclosure controls and procedures are effective.**
>
> (b) Changes in internal controls. **There were no changes in our internal control over financial reporting during the quarter ended March 31, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

118. In addition, the 1Q14 Quarterly Report included a certification from Defendant Rooney affirming the effectiveness of the Company's internal controls. This certification, which was submitted in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and signed by Rooney, provided as follows:

> I, Thomas S. Rooney, Jr., certify that:

1. I have reviewed this quarterly report on Form 10-Q of Energy Recovery, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the**

> **registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**
>
> > **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
> >
> > **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

119. The bold-faced statements in paragraphs 117-118 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

120. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investor reading the 1Q14 Quarterly Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

121. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On May 8, 2014, Energy Recovery stock closed at $4.43 per share. The following day, on May 9, 2014, Energy Recovery stock closed at $4.61 per share. Defendant Rooney's statements on May 8, 2014 prompted a 4% increase in Energy Recovery stock on unusually heavy trading.

*August 7, 2014*

122. Energy Recovery held an investor conference call on August 7, 2014 to discuss the Company's earnings for the second-quarter of fiscal 2014 (the "2Q14 Conference Call"). The 2Q14 Conference Call began at 10:30 a.m. during market hours. Defendant Rooney and Gay attended the call on behalf of Energy Recovery.

123. Following the Company's opening remarks, Defendant Rooney made the following statements concerning the Company's ongoing operations in response to analyst questions:

> Q <Patrick Jobin, Credit Suisse>: No, I think we appreciate known as a crystal ball here. On the oil and gas, a few questions on that topic, you mentioned you're really excited about the core activity that you're seeing early sales types of indications clearly some very aggressive commentary around the investments you are putting in place. So, I guess the two questions I have on that market would be what's the magnitude of quotes that you have issued to perspective customers and can you quantify that from a dollar perspective and number of customers relative to a quarter or two ago? And then from the commentary about aggressively investing in sales given the explosive growth potential, can we just maybe ballpark how we should anticipate your OpEx to ramp given that investment?
>
> A <Defendant Rooney>: Okay. So, there were a handful of questions there. **The – I think we announced last quarter that after our outbound marketing efforts that began on February 23 I believe we had close to $100 million of commercial interest. We have – that number continues to grow and I would prefer not to quantify that anymore and kind of get into that cycle, but let's just say it continues to grow very nicely, where we stand and we are putting together and issuing commercial proposals against that interest level.** Where we see activities now, we have a few installations that we have executed in the

past and where we are now is we have actually scheduled and conducted onsite visits for new clients to see past installations.

And suffice it our say, the results have been eye-popping. The level of interest when a future client looks at a past installation has nothing – has been nothing, but amping up the excitement level for future clients. We have had clients flying from the Middle East to see installations in North America. We have had clients – we have a client flying in from Asia to do the very same thing next week. So, where we sit today is we find at first the high level of interest for us to quote commercial projects. The next step then is show me what you have already got in place? Let me talk to your existing clients. We are seeing those things stack up and line up in a beautiful way. What the next phase intends to be is what does the – when does this installation calendarize into somebody's plan. So, an existing plant that's going have to retrofit on to it typically we will have a shutdown cycle that might take a week or two and happen once or twice a year, we don't have to schedule when that would happen inside of their plant.

And so there is sort of this methodical timeframe that things go through. **So, what we are seeing is we opened the dam if you will on February 23, inbound interest well in excess of $100 million, commercial contracts, technical vetting, field plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things.** Unfortunately, in some cases, people might say well, I am definitely going to do this technology and my next plant shutdown is December and if we can't get it into December, then it has to be the subsequent December. So, you get kind of this time slot alignment issue, but with enough clients looking at enough deals with us, that doesn't become a problem as time goes by. So, we are forging ahead, the level of interest is high, the activity level is very high, not every deal that we look at pans out, sometimes the economics are strong, sometimes they are not, sometimes the technical fit is great, sometimes it's not, some clients move fast, some clients move – most clients slowly. That's one thing we have learned, but the activity level and the interest level has been very, very positive. On the other question, which was OpEx, Joel, you want to take that?

124. Defendant Rooney further emphasized the Company's pipeline operations in response to another analyst question later in the call:

Q <Robert Smith, Center for Performance Investing>: And with respect to oil and gas, so you gave us that initial number of $100 million proposal activity, I think you said it's continued to improve, is there anyway to look at without divulging an additional number I mean the pace of activity there?

A <Defendant Rooney>: **Well, the $100 million and it's certainly quite a bit more than that now is as much as we can handle in terms of processing and pursuing and so on.** And so we are attempting to digest what we have on our plate at this stage, while at the same time travelling the world and meeting with

> new clients and looking at new opportunities and so on. So I don't want to try to quantify it anymore than that. I think the more important question for investors to think about is the time to commercially transition or the time to turn those into contracts. And that – heretofore that's been we have missed the mark on that. I would have thought that the industry would have a slightly quicker pace in terms of bringing this to actual reality.
>
> The level of interest and certain pundits have said all this value proposition doesn't resonate. I can just tell you that about three weeks ago one of the most prominent oil and gas giants in the world was actually telling us that we were grossly understating our value proposition that our technology actually materially improves plant up time and that that was near gold to them. And actually suggested that he meet with our marketing department to help clarify just how powerful our value proposition is to them in the oil and gas space. And furthermore this individual wants to write a white paper and present it at an industry conference. So when you see that level of deep appreciation for our value proposition and extreme interest but then you watch the pace that it takes to them get to contract and put the contracts into the field, you start to feel there is a little bit of disconnect. But I think what we are learning is that this industry have some very large players and a move at their pace. And we have to conform to their pace**. So I think possibly a more interesting question for investors to think about is not is there are $100 million plus worth of pipeline activity, sales pipeline activity, but exactly how quickly will this turn into (revenue).**

125. The above bold-faced statements in paragraphs 123-124 are materially false and/or misleading because Rooney's statements gave a misleading description of the Company's operations. Specifically, Rooney's statements falsely led investors to believe that the Company had identified material sources of revenue and that revenue-generating actions were already underway at the time of the statement. Rooney misled investors to believe that pipeline revenue was inevitable—"if" was not the question, but rather "when." In reality, as would be disclosed later, Rooney's statements concerning the Company's "pipeline" were neither meaningful nor accurate and should not have been relied upon. Further, by touting the Company's supposed "pipeline" of sales while omitting the truth concerning the design and testing status of the products upon which the "pipeline" was purportedly based, Rooney materially misled investors into believing that revenue was guaranteed and imminent.

126. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable

investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On August 7, 2014, Energy Recovery stock closed at $3.88 per share. The following day, on August 8, 2014, Energy Recovery stock closed at $4.15 per share. Defendant Rooney's statements on August 7, 2014 prompted a 7% increase in Energy Recovery stock on unusually heavy trading. Further, Defendant Rooney acknowledged the heightened materiality of his statements by noting that the Company had largely stopped providing investors with operational insight.

127. In addition to the 2Q14 Conference Call, Energy Recovery filed a quarterly report (Form 10-Q) with the SEC for the period ended June 30, 2014 on August 7, 2014 (the "2Q14 Quarterly Report"). Defendant Rooney and Buehler signed the 1Q14 Quarterly Report.

128. The 2Q14 Quarterly Report provided, in pertinent part that, Energy Recovery's executive management had designed, evaluated, implemented, and approved the Company's internal controls over financial disclosure and concluded that they were effective. The 2Q14 Quarterly Report stated as follows:

> (a) *Evaluation of disclosure controls and procedures*. Under the supervision and with the participation of our management, including the President and Chief Executive Officer and the Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as of the end of the period covered by this report.
>
> **Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer have concluded that these disclosure controls and procedures are effective.**
>
> (b) Changes in internal controls. **There were no changes in our internal control over financial reporting during the quarter ended June 30, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

129. In addition, the 2Q14 Quarterly Report included a certification from Defendant Rooney affirming the effectiveness of the Company's internal controls. This certification,

which was submitted in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and signed by Rooney, provided as follows:

> I, Thomas S. Rooney, Jr., certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Energy Recovery, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the**

> **case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and

> 5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**
>
> **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

130. The bold-faced statements in paragraphs 128-129 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

131. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investor reading the 2Q14 Quarterly Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial

reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

132. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On August 7, 2014, Energy Recovery stock closed at $3.88 per share. The following day, on August 8, 2014, Energy Recovery stock closed at $4.15 per share. Defendant Rooney's statements on August 7, 2014 prompted a 7% increase in Energy Recovery stock on unusually heavy trading.

*November 10, 2014*

133. Energy Recovery filed a quarterly report (Form 10-Q) with the SEC for the period ended September 30, 2014 on November 10, 2014 (the "3Q14 Quarterly Report"). Defendant Rooney and Buehler signed the 3Q14 Quarterly Report.

134. The 3Q14 Quarterly Report provided, in pertinent part that, Energy Recovery's executive management had designed, evaluated, implemented, and approved the Company's internal controls over financial disclosure and concluded that they were effective. The 3Q14 Quarterly Report stated as follows:

> (a) *Evaluation of disclosure controls and procedures*. Under the supervision and with the participation of our management, including the President and Chief Executive Officer and the Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 as of the end of the period covered by this report.
>
> **Based on that evaluation, the Chief Executive Officer and the Chief Financial Officer have concluded that these disclosure controls and procedures are effective.**
>
> (b) Changes in internal controls. **There were no changes in our internal control over financial reporting during the quarter ended September 30, 2014 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

135. In addition, the 3Q14 Quarterly Report included a certification from Defendant Rooney affirming the effectiveness of the Company's internal controls. This certification, which was submitted in accordance with Section 302 of the Sarbanes-Oxley Act of 2002 and signed by Rooney, provided as follows:

> I, Thomas S. Rooney, Jr., certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of Energy Recovery, Inc.;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

> effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> (d) **Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and
>
> 5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):**
>
> **(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting**.

136. The bold-faced statements in paragraphs 134-135 above were materially false and/or misleading because they omitted significant information concerning the Company's internal controls and/or control environment. Specifically, the above statements failed to disclose material information concerning Rooney's manipulation of Energy Recovery's internal projections and practice of "bully[ing]" subordinates. As detailed by FE 1, Rooney would "strong-arm" FE 1 until FE 1 agreed to increase internal projections of Oil and Gas sales. According to FE 1, Energy Recovery's former SVP of Sales reported that Rooney would "calibrate" the desalination projections in the same manner. Rooney's conduct created a severely negative and fraudulent control environment, which undermined the effectiveness of all other aspects of the Company's internal controls including those relating directly to financial reporting and disclosure.

137. In light of Defendant Rooney's conduct, his representations concerning the Company's internal controls are materially false and misleading. Investor reading the 3Q14

Quarterly Report and Rooney's accompanying certification were misled to believe that the Company was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines. This impression is in no way able to be reconciled with Rooney's actual conduct. The truth about Energy Recover's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company.

138. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On November 11, 2014, Energy Recovery stock closed at $4.43 per share. The following day, on November 12, 2014, Energy Recovery stock closed at $4.83 per share. Defendant Rooney's statements on November 11, 2014 prompted a 9% increase in Energy Recovery stock on unusually heavy trading.

*November 11, 2014*

139. Energy Recovery held an investor conference call on November 11, 2014 to discuss the Company's earnings for the third-quarter of fiscal 2014 (the "3Q14 Conference Call"). The 3Q14 Conference Call began at 10:30 a.m. during market hours. Defendant Rooney and Gay attended the call on behalf of Energy Recovery.

140. Defendant Rooney's opening remarks included the following statements:

> Over the past year, we have provided insight as to the oil and gas opportunity, more specifically gas processing and the fruits of our sales and marking campaign in the form of proposal activity. **The $100 million plus in solicited proposals is an indication of the strength of our value proposition.** One, it allows for significant energy savings as well as an increase in capacity utilization by improving the reliability, availability and maintainability of the plant.

141. Following the Company's opening remarks, Defendant Rooney made the following statements concerning the Company's ongoing operations in response to analyst questions:

> Q <Patrick Jobin, Credit Suisse>: It makes sense, potential five-year and a field-trial period. Last question is just more simple ones. In Q4 would you anticipate any mega project revenue or is it too tough to tell at this stage? The second question was on oil and gas; do you think 2015 would have meaningful or material revenue beyond the rental revenue?
>
> A <Defendant Rooney>: I think, Joel, the first question was MPD revenue into the fourth quarter. I think Joel alluded to that in his comments when he said that we've got a significant MPD project that has been delayed now two quarters. Where we sit right now, we do think that that project will ship this quarter. I think you can assume that since it has delayed already two quarters, it fits in the category of – we won't know until it goes out the door.
>
> To answer your question, yes, I think we expect MPD revenue in the fourth quarter. This is an industry where that kind of thing slips all the time, so we will have to wait and see. **And then meaningful revenue on oil and gas next year, I think where we stand right now is that we see a whole wall of client activity going on and proposal activity, that give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year.**
>
> We're positioning for significant revenue in 2015, **but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable**. Is it going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016? We're taking it one step at a time. **The word internally now is that this oil and gas industry and revenue there for us is inevitable**.
>
> The strength of our value proposition has gone up dramatically through some studies that are being done by some of our clients that will beget white papers and industry conferences so the level of attention on our products is going up dramatically, creating this inevitability. Significant revenue in 2015? I would like to think so, **but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us**.

142. The above bold-faced statements in paragraphs 140-141 are materially false and/or misleading because Rooney's statements gave a misleading description of the Company's operations. Specifically, Rooney's statements falsely led investors to believe that the Company had identified material sources of revenue and that revenue-generating actions were already underway at the time of the statement. Rooney discussed a very active "wall" of "client activity" and then emphasized to investors that revenue was "inevitable." In reality, as would be disclosed later, Rooney's statements concerning the Company's "pipeline" were

neither meaningful nor accurate and should not have been relied upon. Further, by touting the Company's supposed "pipeline" of sales while omitting the truth concerning the design and testing status of the products upon which the "pipeline" was purportedly based, Rooney materially misled investors into believing that revenue was guaranteed and imminent.

143. Defendant Rooney's statements were material because there was a substantial likelihood that the truth would have altered the total mix of information and a reasonable investor would have considered it in deciding whether or not to purchase and/or sell Energy Recovery stock. On November 11, 2014, Energy Recovery stock closed at $4.43 per share. The following day, on November 12, 2014, Energy Recovery stock closed at $4.83 per share. Defendant Rooney's statements on November 11, 2014 prompted a 9% increase in Energy Recovery stock on unusually heavy trading.

## D. The Truth Begins to Emerge

144. On January 12, 2015, Energy Recovery issued a press release announcing that the Company would be transitioning its Chief Executive Officer (the "January 2015 Press Release"). The January 2015 Press Release stated in pertinent part as follows:

> **Energy Recovery Announces Chief Executive Officer Transition**
>
> **SAN LEANDRO, Calif., January 12, 2015** — Energy Recovery Inc. (NASDAQ: ERII), the leader in pressure energy technology for industrial fluid flows, announced today that as part of its continuing diversification, Mr. Thomas S. Rooney, Jr. will be resigning as Chief Executive Officer to facilitate a transition during which the Company will identify and appoint a successor to further lead the Company's efforts in the oil and gas industry while continuing to strengthen its market leading position in desalination. The Company's Board of Directors will actively seek a Chief Executive Officer in the coming weeks and will keep investors apprised of its progress.
>
> Mr. Rooney stated, "Over the past four years Energy Recovery has developed three new and highly-innovative technologies specifically designed for the oil & gas industry, which have both diversified the Company's operations and set it on a path for future growth. We believe it is in the best interest of our Company and our shareholders to now bring in an executive with considerable expertise in the oil and gas industry, with necessary acumen and industry connections to maximize our potential. I'm excited about the future prospects of Energy

> Recovery and will work closely with the Board over the next several months to ensure a smooth and orderly CEO transition."
>
> Hans Peter Michelet, Chairman of the Board of Directors stated, "Tom has been instrumental in our diversification into fluid flows other than in desalination. During his tenure not only has the company maintained its commanding position in SWRO but introduced new products to reduce energy consumption and energy waste across multiple industries. We truly appreciate Tom's contributions in positioning ERI at the forefront of a new commercial dawn. We are pleased that Energy Recovery has a deep group of committed and experienced professionals that will continue to move the Company in the right direction during this transition".

145. On January 13, 2015, Energy Recovery filed a current report (Form 8-K) with the SEC (the "January 2015 Form 8-K"). The January 2015 Form 8-K confirmed that Defendant Rooney would be stepping down as Energy Recovery's Chief Executive Officer.

146. The January 2015 Form 8-K stated in pertinent part as follows:

> On January 12, 2015, Energy Recovery, Inc. (the "Company") and its President and Chief Executive Officer, Thomas S. Rooney, Jr., entered into an amendment (the "Amendment") to that certain offer letter dated February 14, 2011 (the "Agreement") which was previously disclosed by the Company in a Current Report on Form 8-K filed on February 15, 2011. Under the terms of the Amendment, Mr. Rooney will resign as a member of the Board of Directors and any of its subsidiaries effective January 13, 2015. Mr. Rooney will continue to serve as Chief Executive Officer until his successor is named (the "Transition Period") and thereafter immediately resign. Mr. Rooney's resignation as a member of the Board of Directors was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies, or practices. Mr. Rooney will continue to receive full salary and benefits through March 31, 2015, even if a successor is named before such a date. In addition to the Additional Benefits, which includes a lump sum payment and certain accelerated equity vesting, provided for in the Agreement, and subject to the terms of the Amendment, Mr. Rooney will assume an advisory role to the Company under an agreed upon consulting agreement for a period of eighteen months unless terminated sooner pursuant to its terms. A copy of the draft consulting agreement is filed herewith as Exhibit 10.2.

147. The market responded sharply to this news. On January 9, 2015 (the last full trading day before the above disclosure), Energy Recovery stock closed at $4.67 per share. On January 12, 2015, Energy Recovery stock closed at $4.59 per share. On January 13, 2015, Energy Recovery stock closed at $4.44 per share. On January 14, 2015, Energy Recovery stock

closed at $3.90 per share. On January 15, 2015, Energy Recovery stock closed at $3.75 per share. In total, Energy Recovery stock declined $0.92 per share, or a total of almost 20%, on unusually heavy volume. In response to the Company's disclosure about Rooney, Energy Recovery's market capitalization decreased by approximately $50 million.

148. Less than two months after the Company's abrupt announcement about Rooney, Energy Recovery reported year-end and fourth-quarter earnings. On March 5, 2015, Energy Recovery issued a press release (which was filed with the SEC the same day) after the close of trading revealing the Company's fourth-quarter and year-end financial earnings (the "March 2015 Press Release"). The March 2015 Press Release revealed to investors that the Company's earnings-per-share for the fourth-quarter of fiscal 2014 was a loss of ($0.09). Analysts had been expecting a positive earnings-per-share of $0.04. Energy Recovery missed analyst estimates by $0.13 per share. Further, the Company's annual earnings had declined by $0.30 per share from ($0.06) to ($0.36).

149. Energy Recovery held an investor conference call on March 5, 2015, following the issuance of its press release and the close of the market (the "4Q14 Conference Call"). The 4Q14 Conference Call began at 5:30 p.m. after market hours. By this time, Defendant Rooney was no longer with the Company; Gay and Chairman of the Board Hans Peter Michelet attended the call on behalf of Energy Recovery.

150. Gay discussed, at length, his disappointment over the Company's recent operations. Gay remarked, in pertinent part, as follows:

> Now let us get into the substance of this call. **Beginning with an assessment of our financial performance in 2014, while not a surprise given our understanding of the global desalination and oil and gas markets, as well as our financial performance reported through the third quarter, 2014 was nonetheless disappointing and frankly unacceptable. To characterize it is anything less would be equally unacceptable.**

151. Gay also commented on Defendant Rooney's existing policies relating to giving guidance and insight into the Company's operations:

> Thank you, HP. Before we begin, allow me to characterize how I will be executing these calls such that we can engage in an informative and productive dialogue. The company is in the midst of transition and as such we will take this opportunity to discern a new path forward.
>
> What can you expect from me? **You can expect candor and openness. I will clearly articulate our strategy and characterize our performance accordingly.** You can expect an execution bias with a singular goal over time of delivering results. You can expect a management by the numbers approach with a focus on optimal resource allocation.
>
> . . .
>
> Allow me to use a metaphor to better unpack this concept. The company is in a reload versus rebuild situation. **While macro economic factors and systematic risks contributed to our revenue performance in 2014 and general industry risk aversion affected our ability to generate sales orders within the oil and gas and chemical processing markets, we cannot decouple operating results or rather operating tactics from results.** Our focus is therefore here: to reload and generate results, the company has rationalized its focus, both from a geographic and market perspective and implemented austerity measures to realign our cost structure with the economic conditions and organizational priorities.
>
> . . .
>
> **The deployment of this operational framework will not guarantee but rather increase the probability of quantifiable results and allow for optimal resource allocation. What does this mean in the context of sales order generation and our pipeline generally? We have in the past quantified the pipeline as a means of conveying progress. We will abandon this approach, as such does not meet the criteria of being meaningfully quantifiable. I can, however, say that after a comprehensive examination we are pursuing opportunities within a pipeline the integrity of which continues to improve and we'll only announce actual contract awards. Again we seek to generate and communicate quantifiable results.**

152. Gay's remarks during the 4Q14 Conference Call indicate that Defendant Rooney and his management of the Company were to blame for the Company's "disappointing" and "unacceptable" earnings. Further, Gay revealed to investors that Defendant Rooney's previous statements concerning the Company's pipeline were not meaningful and should not have been relied upon.

153. The market reacted sharply to this news. On March 5, 2015, Energy Recovery's stock closed at $3.26 per share. As the market absorbed Energy Recovery's disclosure during the course of the following day, the Company's stock price dropped precipitously. On March 6, 2015, Energy Recovery stock closed at $2.79 per share. In total, Energy Recovery stock declined by $0.47 per share, or 14.5%. Energy Recovery lost over $24.5 million in market capitalization in the span of just one day.

**E. <u>Defendants Acted With Scienter</u>**

*Defendant Rooney's Disregard for the Truth*

154. Defendant Rooney disregarded the truth about Energy Recovery's Oil and Gas operations on numerous occasions—he misrepresented the status of the Company's negotiations with Pemex, his meeting with Sinopec, and the anticipated shipment date for Saudi Aramco. Rooney also misrepresented to investors the status of the Company's core product technology, claiming instead that the delay in revenue was due to bureaucracy at Oil and Gas companies. Finally, Rooney falsely assured investors that he was maintaining an adequate set of internal controls while in reality he was "strong-arm[ing]" his employees and manipulating internal projections in an effort to provide the Board of Directors with better numbers to the Board of Directors.

155. Rooney made these actions and statements in direct opposition to high-level senior employees within the Company. FE 1 challenged Rooney directly on issues pertaining to the Company's public statements concerning Pemex and the development status of its core products. Rooney disregarded FE 1's warnings on each occasion. The only explanation for Rooney's actions and statements is that he acted with an intent to deceive or a complete recklessness as to the risk of misleading investors. Rooney's actions and statements give rise to a strong inference of scienter.

*Defendant Rooney's Portrayal of Energy Recovery's Pipeline*

156. During the 1Q14 Conference Call, Defendant Rooney told investors that management had a "fair understanding" of the Company's likely sources of revenue for every quarter. In pertinent part, Rooney stated: "Every quarter, at the beginning of the quarter we have a fair -- the management team and the board has a fair understanding of what will result that quarter, in terms of revenue."

157. Further to the point, a former employee ("FE 2") of Energy Recovery (who wishes to remain anonymous) confirmed that Rooney was aware of the Company's true state of customer activity. FE 2 was Energy Recovery's Marketing Communications Director from July 2012 to March 2015. FE 2's job responsibilities included corporate rebranding, advertising, and public relations. FE 2's objective was to market Energy Recovery's Oil and Gas products. FE 2 reported to former CMO Audrey Bold. FE 2 also worked closely with Defendant Rooney when preparing for earnings calls. To this end, FE 2 was responsible for putting together presentations regarding market research. FE 2 would work with Rooney and Ms. Bold to "accurately state information to shareholders about what the market looked like and what sales looked like."

158. FE 2 attended a sales meeting held in San Francisco in December 2014 or January 2015. Defendant Rooney attended the meeting along with other members of senior management, including the Company's Chief Sales Officer and sales manager for "mega projects." The purpose of the meeting was for each of the Company's department heads to provide updates to the Chief Sales Officer about the business in an effort to update him/her since his/her recent hire in October 2014. The Company's sales manager for "mega projects" "gave a bleak forecast for what was going to come for 2015, it was sad and hard to hear," according to FE 2.

159. Rooney's statements concerning the Company's pipeline and market reaction to Energy Recovery's products are also undermined by reports that management ordered the

shipment of inferior quality reports so as to be able to meet monthly sales targets. As described in an issue of *Water Desalination Report* ("*WDR*") dated January 19, 2015, "a source told *WDR* that the company's management had grown so concerned about 'meeting their numbers' that in one recent case, they ordered the shipment of some obviously inferior quality products to meet monthly sales targets. As a result, the managing director of the international OEM on the receiving end confirmed to *WDR* that they have quit doing business with the [C]ompany altogether."

160. The conduct described in *WDR*'s report does not appear to be a one-time occurrence. A former employee of Energy Recovery ("FE 3") (who wishes to remain anonymous), who had been employed as the Company's Senior Planning Scheduler from June 2012 through February 2013, described a similar occurrence. FE 3 reported to Lindsay Reau (Energy Recovery's Director of Production), who reported to Nocair Bensalah (Energy Recovery's current VP of Operations). FE 3 scheduled work for products based on consumer forecasts, tracked and reported weekly assemblies, and planned/scheduled workflow for departments. FE 3 recalled an instance where he/she was directed by Lindsay Reau to manufacture sub-standard pressure exchangers for client orders. FE 3 explained that he/she was directed to use materials from used products in order to facilitate orders faster. He/she raised this issue his/her management as a concern, but no one cared. FE 3 stated that Lindsay Reau and Nocair Bensalah were "Rooney's pets," *i.e.*, received orders from Rooney.

161. Defendant Rooney's control over the Company allowed him to do as he pleased in terms of what he disclosed to investors. One of Energy Recovery's former employees (who also wishes to remain anonymous) ("FE 4") described an atmosphere of "intimidation and fear." FE 4 was Energy Recovery's Chief Technology Officer and Director of Manufacturing Processes from March 2009 through September 2012. FE 4 reported directly to Defendant Rooney. FE 4 witnessed Energy Recovery's transition under Rooney first-hand, which included Rooney telling FE 4 that FE 4 was "paid too much" and that he/she had to "create value, and

that [he/she] was a 'load' on the manufacturing department and too much overhead." FE 4 recalled that Rooney told him/her this "everyday."

162. Defendant Rooney's treatment of FE 4 was not uncommon. According to FE 4, Rooney began to fire all of the former management's hires in order to be able to control all aspects of the Company. In order to accomplish this level of control, Rooney in particular fired Patti Lusk (Energy Recovery's former VP of Human Resources) and Carolyn Bostick (Energy Recovery's former General Counsel). FE 4 stated that, "[Rooney] made sure there was very little controls in San Leandro by getting his [own] people and using intimidation and fear."

163. By removing those that presented obstacles to him, Rooney was able to portray the Company's operations (pipeline and costumer activity) however he pleased. FE 4 believed that Rooney consistently over-promised on projects. Yet, when confronted about the Company's internal controls, Rooney would disagree and seek to have his objectors fired. FE 4 recalled an instance in the summer of 2012 when Pierre Vedel (Energy Recovery's former Chief Information Officer) and Patti Lusk (VP of Human Resources) discussed these internal control issues (described by FE 4 as "information control issues") with Rooney. According to FE 4, Mr. Vedel and Rooney disagreed on the types of controls the Company needed. Rooney, in turn, wanted Mr. Vedel to leave the Company.

164. FE 4's description of Rooney over-promising on projects was corroborated by another high-level former employee. This former employee (who wishes to remain anonymous) ("FE 5") was Energy Recovery's former SVP of Sales from December 2005 through September 2014. FE 5 stated that Rooney "may have been too optimistic or over exaggerated" when describing the Company's pipeline and customer activity. FE 5 characterized Rooney's statements as "aggressive assumptions."

165. Rooney's "aggressive assumptions," however, were not *just* "aggressive assumptions. FE 5 stated that the sales forecast process involved capturing leads and opportunities from the customer relations management system and having discussions with the

Company's finance department. FE 5 described the finance department as "conservative." Accordingly, Rooney transformed the finance department's "conservative" forecasts into something that the Company's SVP of Sales regarded as "too optimistic," "over exaggerated," and "aggressive." But for Rooney's involvement, investors would have received accurate descriptions of the Company's pipeline and customer activity.

*Defendant Rooney's Abrupt Departure from the Company*

166. While Energy Recovery stated that Rooney's resignation was not the result of any particular disagreement between him and the Company, the fact remains that his resignation came abruptly and without warning just weeks in advance of the Company's "disappointing" and "unacceptable" fourth-quarter and year-end earnings results.

167. The timing of Rooney's resignation relative to the Company's corrective disclosure on March 5, 2015 creates an inference that Rooney's removal from executive management was neither innocent nor the byproduct of a mutual decision. The timing of his resignation relative to the Company's awful earnings results supports an inference that Rooney was pushed out of office due to his materially false and/or misleading statements concerning the Company's operations and customer activity.

168. Gay's and Hans Peter Michelet's comments during the 4Q14 Conference Call strongly support the conclusion that Rooney's resignation was not voluntary. At length, Gay and Hans Peter Michelet discussed numerous ways in which the Company had gone awry under Rooney's supervision, including disclosure to investors and the Company's Oil and Gas operations. Had Rooney's leadership been anything but a significant failure, Energy Recovery's leadership would have been far less critical of the Company's operations.

169. FE 4 (former Chief Technology Officer and Director of Manufacturing Processes) corroborated the conclusion that Rooney did not resign voluntarily. According to FE 4, despite Rooney's attempts to maintain control over the Company, Ole Peter Lorentzen (Energy Recovery's Chairman of the Board of Directors) acquired enough shares of the

Company's common stock to control the shareholder vote (or at least heavily influence it). Mr. Lorentzen proceeded to gain seats on the Company's Board of Directors and fill them with appointees. FE 4 stated that Rooney's loss of control over the Board of Directors was "catastrophic" to his reign over the Company and his resignation was a consequence.

170. FE 4's description of Rooney's resignation is corroborated by an article from *WDR* published on January 19, 2015. The article describes Rooney's resignation as anything but voluntary. The article states, in pertinent part, as follows:

> In February 2011, when Tom Rooney took over for GG Piqué as CEO of Energy Recovery Inc (ERII), many desalters thought that ERII was an acquisition target and that he was brought in to oversee a merger or takeover. However, when WDR interviewed him shortly after his appointment, Mr Rooney insisted that he was not a "pump-it and dump-it guy", but rather a "build-it, grow-it, change-it guy".
>
> Last week, nearly four years after Mr Rooney failed to either build it or grow it—the company lost over $51.7 million on $128.3 million in revenue between Q1 2011 and Q3 2014— ERII announced that it would change its CEO. Although his board resignation was effective last week, he will remain CEO until 31 March, or until a successor is named.
>
> Only six days before Mr Rooney's resignation, a blogger wrote, "[ERII] management's over-the-top cheerleading of the oil and gas opportunity since 2012 has left shareholders bitter and wanting." The report noted that the company had stopped providing guidance on future earnings in 2014, and predicted "ERII will likely post a huge loss…and the share price will tank like it did in 2012."
>
> OP Lorentzen, one of ERII's early Norwegian investors and a former board member, has re-acquired a 15+ percent stake in the company over the past two years and is now its largest shareholder. WDR has learned that just three days before the resignation, Lorentzen nominated himself and two associates, including ERII's former CFO, to board positions. This fueled speculation that Mr Rooney's resignation was a pre-emptive move, to avoid the inevitable.

171. FE 2 (former Marketing Communications Director) further corroborated the conclusion that Rooney's resignation was not voluntary. FE 2 stated that Energy Recovery's Board of Directors asked Rooney to "step down." Similarly, a former employee (also wishing to remain anonymous) who served as the Company's Director of Business and Product

Development from July 2011 through January 2015 ("FE 6") likewise confirmed that "[Rooney] was terminated" and that "he didn't resign."

*Defendant Rooney's Extremely Disproportionate Compensation*

172. Defendant Rooney received exorbitant compensation relative to Energy Recovery's other members of senior management. While employee compensation in and of itself typically falls short of raising a strong inference of scienter, here a strong inference is warranted based upon the fact that Defendant Rooney's compensation was so overwhelmingly disproportionate to other employees.

173. Rooney's compensation for 2011, 2012, 2013 and 2014 was as follows: $1,921,267; $1,550,068; $997,164; and $1,448,971 (respectively). Rooney's pay for 2014 was greater than the total compensation of the Company's Chief Technology Officer, Chief Sales Officer, and CMO *combined*; only Gay, the Company's former Chief Financial Officer (now Chief Executive Officer), came close to matching Rooney with a total compensation of just over $1 million. Likewise, Rooney's pay for 2011, 2012, and 2013 was substantially greater than *every* other member of the Company's executive management.

174. Upon information and belief, Defendant Rooney remains unemployed. Given the lucrative position he held at Energy Recovery, his compensation was a motivating factor to retain his job as long as possible—even if that meant over-promising project pipelines to investors and analysts.

**F. <u>Defendants' Misrepresentations and Omissions Directly Caused Plaintiff's Losses</u>**

175. Defendants misled investors to believe that (a) Defendant Rooney had successfully diversified Energy Recovery's operations into the Oil and Gas sector, (b) Energy Recovery had secured contracts and received significant and substantive customer interest, (c) the Company's core products were ready to be deployed to customer facilities, (d) Energy Recovery had implemented and maintained an adequate set of internal controls over financial

reporting. As explained in detail above, these statements were materially false and/or misleading at the time they were made.

176. Defendant Rooney was at the center of each of these misrepresentations and omissions. He was responsible for the Company's diversification efforts, business development and contract negotiations, product sales, and internal controls. Defendant Rooney's fraudulent conduct in each of these areas led to Rooney's departure from the Company. While the Company publicly portrayed Rooney's departure as a resignation, the facts strongly suggest otherwise as discussed above.

177. Defendant Rooney's fraudulent conduct while serving as CEO of Energy Recovery resulted in repeated losses, missed guidance, widespread investor disappointment, and significant declines in Energy Recovery's stock price. Defendants' misrepresentations and omissions during the Class Period concealed the risks related to and arising from Rooney's acts and omissions while serving as CEO. The risks concealed by Defendants' misrepresentations and omissions during the Class Period ultimately materialized and, consequently, resulted in significant losses to Plaintiff and other shareholders of Energy Recovery.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

178. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of Energy Recovery during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

179. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Energy Recovery's common stock was actively traded on NASDAQ (Global Select). While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead

Plaintiff believes that there are at least tens of thousands of members in the proposed Class. Members of the Class may be identified from records maintained by Energy Recovery or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

180. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

181. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

182. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the misstatements and omissions alleged herein were made with scienter;

(c) Whether the statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Energy Recovery; and

(d) To what extent the members of the Class have sustained damages, and the proper measure of damages.

183. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all member is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress

individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET**

184. At all relevant times, the market for Energy Recovery's common stock was an efficient market for the following reasons, among others:

(a) Energy Recovery's common stock met the requirements for listing and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) Energy Recovery communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Energy Recovery was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Energy Recovery was reflected in and incorporated into the Company's stock price during the Class Period.

185. As a result of the foregoing, the market for Energy Recovery's common stock promptly digested current information regarding Energy Recovery from all publicly available sources and reflected such information in Energy Recovery's stock price. Under these circumstances, all purchasers of Energy Recovery's common stock during the Class Period suffered similar injury through their purchase of Energy Recovery's common stock at artificially inflated prices, and a presumption of reliance applies.

186. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE**

187. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

188. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

189. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Energy Recovery who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

**COUNT I**

(*Violation of Section 10(b) and Rule 10b-5 Against Rooney and Energy Recovery*)

190. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

191. During the Class Period, Defendants Rooney and Energy Recovery carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Energy Recovery's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Rooney and Energy Recovery took the actions set forth herein.

192. Defendants Rooney and Energy Recovery: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Energy Recovery's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Rooney and Energy Recovery are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

193. Defendants Rooney and Energy Recovery, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Energy Recovery as specified herein.

194. Rooney and Energy Recovery employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Energy

Recovery's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Energy Recovery and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Energy Recovery's securities during the Class Period.

195. Defendants Rooney and Energy Recovery had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Rooney's and Energy Recovery's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Energy Recovery's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Rooney's and Energy Recovery's overstatements and misstatements of the Company's financial condition throughout the Class Period, Rooney and Energy Recovery, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

196. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Energy Recovery's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Energy Recovery's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Rooney and Energy Recovery, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by

Rooney and Energy Recovery but not disclosed in public statements by Rooney and Energy Recovery during the Class Period, Plaintiff and the other members of the Class acquired Energy Recovery's securities during the Class Period at artificially high prices and were or will be damaged thereby.

197. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Energy Recovery's financial results, which was not disclosed by Rooney and Energy Recovery, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Energy Recovery's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

198. By virtue of the foregoing, Rooney and Energy Recovery have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

199. As a direct and proximate result of Rooney's and Energy Recovery's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

200. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## **COUNT II**

(*Violation of Section 20(a) Against Rooney and Bold*)

201. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

202. Rooney and Bold acted as controlling persons of Energy Recovery within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Rooney and Bold had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Rooney and Bold were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

203. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

204. As set forth above, Energy Recovery violated Section 10(b), and Rule 10b-5 promulgated thereunder, by its acts and omissions as alleged in this Complaint.

205. By virtue of their positions as controlling persons, Rooney and Bold are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Rooney's and Bold's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

206. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 9, 2015

Respectfully submitted,

**LEVI & KORSINSKY LLP**

/s/ Adam M. Apton
Nicholas I. Porritt (*admitted pro hac vice*)
Adam M. Apton (*admitted pro hac vice*)
LEVI & KORSINSKY LLP
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567

*Attorneys for Lead Plaintiff Henry Low and Lead Counsel for Class*

**PUNZALAN LAW, P.C.**
Mark Punzalan
600 Allerton St., Suite 201
Redwood City, CA 94063
Tel: (650) 362-4150
Fax: (650) 362-4151
Email: markp@punzalanlaw.com

*Liaison Counsel for Class*

4815-2899-6137, v. 2