United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE ENERGY RECOVERY INC. SECURITIES LITIGATION

Master Case No. 15-cv-00265-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Docket No. 64

## I. INTRODUCTION

Plaintiffs have filed a class action against Energy Recovery Inc., and two of its officers, Thomas Rooney and Audrey Bold, for violations of federal securities laws. In essence, Plaintiffs charge Defendants with making false and misleading statements about Energy Recovery's contractual negotiations with prospective clients, requests for commercial proposals, core products, and internal controls over financial reporting. *See generally* Amended Class Action Consolidated Complaint ("Compl."). Defendants have moved to dismiss on a number of grounds, including: (1) that the alleged misstatements are protected under the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision for forward looking statements, (2) that they constitute vague statements of corporate optimism, and (3) that there are insufficient allegations suggesting that the statements were false when made. Finally, defendants argue that the Plaintiffs' allegations fail to give rise to a "strong inference" of scienter as required. The Court **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss.

## II. REQUESTS FOR JUDICIAL NOTICE

### A. Defendants' Request

Defendants request judicial notice over seven categories of documents or to consider them

under the doctrine of incorporation by reference: (1) Energy Recovery's Form 8-K filed October 19, 2015; (2) Energy Recovery's earnings and conference call transcripts; (3) Energy Recovery's Forms 10-K filed with the SEC; (4) Historic Stock Quotes of Energy Recovery between October 19, 2015 and October 23, 2015 as provided by NASDAQ; (5) October 21, 2015 Report entitled "Schlumberger Endorsement Carries Weight: Upgrading on Oil & Gas Potential" by Credit Suisse; (6) November 5, 2015 Report entitled "More Teeth to the Schlumberger Vor Teq Agreement Than Initially Appreciated" by Credit Suisse; and (7) January 19, 2015 issue of Water Desalination Report. *See* Decl. of David M. Furbush in Support of Defs.' Mot. ("Furbush Decl."), Docket No. 65; Defendants' Request for Judicial Notice ("D's RJN"), Docket No. 66.

B. Plaintiffs' Objection and Motion to Strike

Plaintiffs object to the Court's consideration of four of the items. Lead Plaintiff's Motion to Strike and Objection to Defendants' Request for Judicial Notice ("RJN Response"), Docket No. 68. Plaintiffs object to Exhibits A, B, C, and C.1. These exhibits related to a licensing agreement between Energy Recovery and Schlumberger Technology Corporation ("Schlumberger") on October 14, 2015 and announced on October 19, 2015:

> (1) **Exhibit A** is a copy of Energy Recovery's Form 8-K filed with the SEC on October 19, 2015. The form disclosed the Schlumberger Agreement as a material definitive agreement and included a press release announcing the Schlumberger Agreement;
>
> (2) **Exhibit B** is a table of Energy Recovery's closing stock price on the NASDAQ Stock Market from October 19, 2015 to October 23, 2015;
>
> (3) **Exhibit C** is a copy of a market analyst report by Credit Suisse, dated October 21, 2015, titled "Schlumberger Endorsement Carries Weight: Upgrading on Oil & Gas Potential";
>
> (4) **Exhibit C.1** is a copy of a market analyst report by Credit Suisse, dated November 5, 2015 titled "More Teeth to the Schlumberger VorTeq Agreement Than Initially Appreciated."

Plaintiffs are asking the Court to strike all factual assertions and arguments about the

Schlumberger deal from defendants' motion to dismiss because the deal was not referenced in the Complaint. RJN Response at 4. Defendants respond that Exhibits A and B are filings with the SEC and matters of public record not subject to reasonable dispute. Docket No. 70 at 1-2, Defendant's Reply to Lead Plaintiff's Objection to Request For Judicial Notice and Opposition to Motion to Strike. As for Exhibits C and C.1, Defendants contend that the Complaint specifically quotes statements made by Energy Recovery about the VorTeq product (subject of the agreement between Energy Recovery and Schlumberger). *Id.* at 2.

C.     Legal Standard for Judicial Notice

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), evidence beyond the pleadings should not be considered unless: (1) the document is attached to or incorporated by reference into the complaint; or (2) the fact is subject to judicial notice pursuant to Federal Rule of Evidence 201. *United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011).

Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Courts may take judicial notice of "*undisputed* matters of public record," but generally may not take judicial notice of "*disputed* facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (emphasis in original). Facts subject to judicial notice may be considered on a motion to dismiss. *Mullis v. U.S. Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).

The doctrine of incorporation by reference is distinct from judicial notice. The doctrine "permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the . . . pleadings.'" *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)).

A court "may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion. The court may treat

such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal citations omitted). Such documents do not convert the motion to dismiss into a motion for summary judgment. *Id.* The Ninth Circuit states that "judicial notice is inappropriate where the facts to be noticed are irrelevant." *Meador v. Pleasant Valley State Prison*, 312 F. App'x 954, 956 (9th Cir. 2009).

1. Unopposed Items

Defendants do not object to the Court considering Plaintiffs' Exhibits D-P. The Court **GRANTS** Plaintiffs' requests for judicial notice of the Exhibits D-P. When ruling on a motion to dismiss, a court may take judicial notice of SEC filings. *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006). In this case, Energy Recovery's Forms 10-K and transcripts of conference earnings calls are judicially noticeable because they are matters of public record. Courts can consider securities offerings and corporate disclosure documents that are publicly available. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); *see also Kuehbeck v. Genesis Microchip Inc.*, No. C 02-05344 JSW, 2005 WL 1787426,*4 (N.D. Cal. July 27, 2005) (granting request for judicial notice of press releases, earnings call transcripts, and SEC filings referenced in the complaint). As for Exhibit P (January 19, 2015 issue of *Water Desalination Report*), it is referenced in the Complaint. Compl. ¶¶ 159, 170.

2. Opposed Items

The Court **DECLINES** Defendants' requests for judicial notice of the Exhibits C and C.1 and **GRANTS** Plaintiffs' motion to strike all defendants' factual assertions and arguments derived from these exhibits. While the Court may take judicial record of matters of public record, "[s]uch documents as analyst reports, however, may only be considered when they are submitted to establish 'whether and when certain information was provided to the market' not the truth of the matters asserted in the reports." *In re Wet Seal, Inc. Secs. Litig.*, 518 F.Supp.2d 1148 (C.D. Cal. 2007). Here, while it may be appropriate to judicially notice the existence of SEC filings and their contents, they post-date the events at issue and cannot establish whether the market knew about the Schlumberger deal during the Class Period. Thus, it appears their only relevance turns on the

truth of statements therein. Determining the ultimate truth or falsity of the statements contained in the analyst reports is not a proper subject of judicial notice.

As to Exhibits A and B, the Court **GRANTS** Defendants' requests for judicial notice because these documents are SEC filings. However, notice is taken to establish the existence of the documents, not for the truth of the disputed facts. *Ritz Camera & Image, LLC v. Sandisk Corp.*, 772 F. Supp. 2d 1100, 1109 (N.D. Cal. 2011), *aff'd*, 700 F.3d. 503 (Fed. Cir. 2012) ("[w]hile a court may take judicial notice of the existence of SEC filings, it may not take judicial notice of documents for the truth of disputed facts."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (taking judicial notice of the SEC documents for "the purpose of determining what statements the documents contain and not to prove the truth of the documents contents"). Thus, the Court **GRANTS** Plaintiffs' motion to strike all defendants' factual assertions and arguments derived from these exhibits.

## III. FACTUAL & PROCEDURAL BACKGROUND

In their Amended Class Action Consolidated Complaint, Plaintiffs allege as follows.

Defendant Energy Recovery is a Delaware Corporation with headquarters in San Leandro, California. Compl. ¶ 19. Energy Recovery designs, manufactures, and distributes "pressure energy technology" devices used in the water, oil and gas, and chemical industries. *Id.* ¶ 26. During the class period, Mr. Rooney was Energy Recovery's CEO and a member of the board of directors. *See id.* ¶¶ 8, 37. During the class period, Mr. Rooney was Energy Recovery's Chief Marketing Officer ("CMO"). *Id.* ¶ 6. The putative class consists of persons who purchased or otherwise acquired Energy Recovery common stock between March 7, 2013 and March 5, 2015 ("The Class Period"). *Id.* ¶ 1.

### A. False Statements

Energy Recovery is "an industry leader in capturing reusable energy from industrial fluid flows and pressure cycles." *Id.* ¶ 19. Energy Recovery's devices are used in "fluid flow" applications, such as water desalination and oil and gas extraction. *Id.* ¶ 26. Historically, Energy Recovery has derived the majority of its revenue from water desalination operations. *Id.* ¶¶ 3, 27. Mr. Rooney joined Energy Recovery in February 2011 with an objective to diversify Energy

United States District Court
For the Northern District of California

Recovery's operations into the gas and oil markets. *Id.* ¶ 3. According to the Complaint, during the Class Period Defendant Rooney made false statements about: (1) prospective clients and contract negotiations; (2) the supposed "pipeline" of sales; (3) technical difficulties with Energy Recovery's products; and 4) internal controls designed to provide reasonable assurance regarding the reliability of financial reporting for external purposes in accordance with a framework developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO").

1. <u>Energy Recovery's Prospective Clients and Contract Negotiations</u>

According to the Complaint, between 2011 and 2014, Mr. Rooney ran the day-to-day operations of Energy Recovery as the Company's CEO. Compl. ¶ 28. He joined the company to increase Energy Recovery's oil and gas operations due to uncertainty in desalination markets around the world. *See id*. ¶ 27. During a March 6, 2014 earnings conference call Rooney stated:

> In 2012, we poured millions into researching and developing 3 new platform technologies for use within the sour gas processing industry. Technologies that we now refer to as IsoBoost, IsoGen and IsoPro. We did so in concert and in collaboration with our oil and gas industry plant partners. In 2013, we continued to pour millions into developing, testing and refining our 3 platform technologies. By the end of 2013 all 3 of our oil and gas technology platforms have been shipped to field locations around the world.

*Id.* ¶ 27.

Plaintiffs allege that "Rooney repeatedly misrepresented the Company's arrangements and contractual negotiations with prospective clients." *Id.* ¶ 40. According to Plaintiffs, Mr. Rooney misled Energy Recovery's investors about dealings with potential clients in three separate instances. Docket No. 67 at 6, Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Opp'n"). First, during a March 7, 2013 earnings conference call, Mr. Rooney stated that Energy Recovery had succeeded in "reach[ing] a verbal agreement for a product sale to a new oil and gas client" from Mexico. Compl. ¶ 50. Second, Mr. Rooney misrepresented Energy Recovery's dealings with Aramco, the largest oil and gas producer in Saudi Arabia. Opp'n at 7; Compl. ¶¶ 86, 87. Third, Mr. Rooney misrepresented his dealings with Chinese oil and gas company, Sinopec. Opp'n at 7; Compl. ¶¶ 42, 88.

a. Pemex

Plaintiffs allege that Mr. Rooney made false and misleading statements about a "verbal agreement" with Pemex. Compl. ¶ 50. In March 2013, Energy Recovery's former employee ("FE 1"[1]), traveled to Mexico to present Energy Recovery's oil and gas products to Petróleos Mexicanos ("Pemex"). *Id.* ¶ 40. On March 6, 2013, after the client presentation, FE 1 called Mr. Rooney stating that the meeting had gone "well." *Id*. Pemex showed "interest" in proceeding with the discussions, but no formal agreement was reached. *Id*. FE1 also reported that Energy Recovery would need to participate in a public bidding and procurement process. *Id*. FE1 explained to Mr. Rooney that because Pemex was a state-run company, the procurement process could take anywhere from 6 to 18 months. *Id*.

The next day, on March 7, 2013, Mr. Rooney held a conference call to discuss 4Q12 financial results. *Id*. ¶ 49. During the call, he stated:

> Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client. We've just now begun our outbound sales effort. *Id*. ¶ 50. As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year. And that will likely spawn additional projects next year. [] So the verbal agreement that we had with the client yesterday was the first of 20 gas field operations that they'd like to attack.

*Id*. ¶ 51.

During the call, Mr. Rooney was referring to Pemex. Ultimately, Energy Recovery did not get the Pemex contract. *Id*. ¶ 53. Plaintiffs maintain that the above statements were false because, as noted above, a confidential witness – a former Energy Recovery vice president of sales – reported that Energy Recovery did not in fact have a contract with Pemex. *See id*. 40.

b. Saudi Aramco

Next, Plaintiffs allege that Mr. Rooney made false and misleading statements about the

---

[1] FE1 worked for Energy Recovery from July 2011 through July 2014 as Senior Vice President of Sales and Vice President of Product Development for oil and gas. *Id*. ¶¶ 30, 82. FE1 worked with Mr. Rooney on a day-to-day basis and was hired to assist Mr. Rooney to diversify out of water desalination and into oil and gas services, including but not limited to developing products and business in the oil and gas sector. *Id*. ¶ 30.

delivery of an IsoGen product to Saudi Aramco. On November 7, 2013, Mr. Rooney held a conference call to discuss the 3Q13 financial results. *Id.* ¶ 85. During the call, Rooney stated: "[j]ust this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia." *Id.* ¶ 86. Plaintiffs allege that the above statements were false because, in fact, "on or about September 24, 2013, the [Energy Recovery's] IsoGen product had failed a critical internal test and required replacement parts." *Id.* ¶ 87. Plaintiffs claim that, as a result of this failure, it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014.

c. <u>Sinopec</u>

Plaintiffs allege that Mr. Rooney made false and misleading statements about a meeting with Sinopec executives. Between October 25 and 28, 2013, FE 1, Mr. Rooney and Ms. Bold traveled to China to visit a Chinese oil and gas facility, Sinopec. *Id.* ¶ 42. On November 7, 2013 Rooney held a conference call to discuss 3Q13 financial results. *Id.* ¶ 85. During the call, Rooney stated that "[w]hile in China, [he] took the occasion to visit with the regional leadership and plant management of the Sinopec facility in the Chaoyang gas plant where [he] saw firsthand, the progress being achieved in one of [Energy Recovery's] oil and gas field trials." *Id.* ¶ 88. Plaintiffs maintain that the above statements were false because Mr. Rooney "did not in fact meet with Sinopec's executive management." *Id.* ¶ 89.

2. <u>Energy Recovery' Core Products and Marketing Strategy</u>

Next, Plaintiffs allege that Mr. Rooney and Ms. Bold were actively and publicly championing Energy Recovery's oil and gas products as "commercial" while they were still in the "engineering prototype phase." *Id.* ¶¶ 38, 39. According to the Complaint, Energy Recovery's core products are IsoBoost, IsoGen, and IsoPro. *Id.* ¶ 27. During several conference calls between March7, 2013 and November 7, 2013, Mr. Rooney made statements indicating that (1) there is no severe technology risk with Energy Recovery core products and that (2) it is certain engineering and technical bureaucracies inside of the oil and gas companies that impede full technical and commercial acceptance of Energy Recovery's core products with the oil and gas

United States District Court
For the Northern District of California

companies and that (3) challenges of Energy Recovery's technically successful devices are "more about logistics, approvals and procedures than matters of technical success and acceptance." *Id.* ¶¶ 51, 63, 64, 90.

Plaintiffs allege that the above statements were false because according to FE1, by late-2013, IsoBoost was in the engineering prototype phase; IsoGen had failed internal lab tests twice; IsoPro was still waiting to be put into the field. *Id.* ¶ 38. More specifically, in mid-September 2013, Chesapeake Energy Corp. ("Chesapeake") raised concerns with FE 1 about total installations costs of the IsoPro product because the product was not able to function dynamically and had to be controlled manually. *Id.* ¶ 33. Also in September 2013, IsoGen failed a critical internal test performed in San Leandro, California. *Id.* ¶ 34. During the same month, FE1 and Dr. Prem Krish[2] refused to present Energy Recovery's core products at the Gas Processors Association ("GPA") conference scheduled for March/April 2014 because they were not ready. FAC ¶¶ 35, 36. Finally, on November 5, 2013, Energy Recovery's Board of Directors decided that the company would not in fact attend the GPA conference because the products were still experiencing technical difficulties at field-testing sites. *Id.* ¶¶ 7, 37.

The Complaint further alleges that Ms. Bold, as Chief Marketing Officer, created and implemented a public marketing strategy by which Energy Recovery misrepresented the operational status of the company's core products. ¶¶6-7, 31; Opp'n at 29. According to Plaintiffs, Ms. Bold "convinced Rooney that with smart marketing, Energy Recovery could market products before they were ready for commercialization." *Id.* ¶ 31. Plaintiffs allege that FE1 objected to Mr. Rooney's and Ms. Bold's marketing strategy after the October 2013 corporate retreat in Tucson, Arizona. *Id.*

3. Requests for Commercial Proposals

Next, the Complaint alleges that Mr. Rooney materially misled investors about the supposed "pipeline" of sales from oil and gas products while "omitting the truth concerning the design and testing status of the products upon which the 'pipeline' was purportedly based." *Id.* ¶

[2] Energy Recovery's Chief Technology Officer.

9. For example, on May 8, 2014, Rooney held a conference call to discuss 1Q14 financial results. *Id.* ¶ 110. During the call, Rooney stated:

> I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year. *Id.* ¶ 112. [W]e received requests for very specific commercial proposals pertaining to specific locations with technical specs already provided to us. Requesting commercial proposals for a substantial number of clients and the sum total of all that is as I say, close to a $100 million, if all were converted to one time cash sales.

*Id.* ¶ 113.

On August 7, 2014, during the 2Q14 conference call, Mr. Rooney stated:

> So, what we are seeing is we opened the dam if you will on February 23, inbound interest well in excess of $100 million, commercial contracts, technical vetting, field plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things. *Id.* ¶ 123. So I think possibly a more interesting question for investors to think about is not is there are $100 million plus worth of pipeline activity, sales pipeline activity, but exactly how quickly will this turn into (revenue).

*Id.* ¶ 124.

Finally, on November 11, 2014, during the 3Q14 conference call, Mr. Rooney indicated that a "significant run-up revenue for [Energy Recovery] in oil and gas is inevitable." *Id.* ¶ 141.

Plaintiffs maintain that the above statements are "materially false and/or misleading" because Mr. Rooney "materially misled investors into believing that revenue was guaranteed and imminent," while omitting the truth about technical difficulties with Energy Recovery's core oil and gas products which impeded the recognition of revenue. *Id.* ¶¶ 114, 125, 142.

4. <u>Energy Recovery's Internal Controls Over Financial Reporting</u>

In a string of identical paragraphs, Plaintiffs allege that Mr. Rooney made materially false and/or misleading statements when Mr. Rooney certified in Form 10-K reports that Energy Recovery's internal control over financial reporting was effective according to criteria from the internal-control frameworks developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO"). *Id.* ¶¶ 56-61, 68-73, 79-84, 93-98, 104-09, 116-21, 127-32, 133-38. Plaintiffs maintain that Mr. Rooney falsely certified that he was complying with the law

United States District Court
For the Northern District of California

as required by the Sarbanes-Oxley Act of 2002, because he failed to implement and maintain adequate internal controls. *Id.* ¶ 44.

Form 10-K for fiscal 2012 states:

> There were no changes in our internal control over financial reporting that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. *Id.* ¶ 57.
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*Id.* ¶ 58.

The Complaint alleges that Mr. Rooney manipulated Energy Recovery's internal projections and "strong-arm[ed]" his subordinates into increasing internal sales projections as well. *Id.* ¶ 59. For example, according to FE1, in April 2013 Mr. Rooney forced FE1 against FE1's judgment to increase his sales projection for the gas and oil industry from $1 million to $4 million. *Id.* ¶ 45. Moreover, Energy Recovery's former SVP of Sales told FE1 that Rooney "calibrated" the desalination projections "all the time." *Id.* ¶ 48.

Plaintiffs maintain that the statements in the 10-K report were materially false and misleading because Mr. Rooney's certification misled investors that Energy Recovery "was implementing and maintaining a rigorous set of internal controls in accordance with COSO's criteria and guidelines," when in fact Energy Recovery's internal controls were ineffective. *Id.* ¶ 60.

B. <u>Disclosures of Truth</u>

As alleged in the Complaint, the truth was partially disclosed on January 12, 2015, and

subsequently on March 5, 2015.

On January 12, 2015, Energy Recovery issued a press release announcing Mr. Rooney's resignation from his position as Chief Executive Officer. *Id.* ¶ 144. Plaintiffs allege that in light of this news, Energy Recovery's stock declined by 20% and market capitalization decreased by approximately $50 million. *Id.* ¶ 147. According to Plaintiffs, another disclosure took place on March 5, 2015 during the 4Q14 conference call. During that call, Joel Gay[3] expressed his disappointment with Energy Recovery's "unacceptable" 2014 financial results. *Id.* ¶ 150. Plaintiffs allege that after that call, Energy Recovery's stock declined by 14.5% and market capitalization decreased by $24.5 million in one day. *Id.* ¶ 153.

C. Claims

Based on the above allegations, Plaintiffs have asserted two federal securities claims against Energy Recovery and its executives Mr. Rooney and Ms. Bold:

(1) Violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. *Id.* ¶¶ 190-200.

(2) Violation of section 20(a) of the Act. *Id.* ¶¶ 201-206.

In the pending motion to dismiss, Defendants seek dismissal of both claims. Docket No. 64 ("MTD").

## IV. DISCUSSION

A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted

[3] After Mr. Rooney's resignation, Mr. Gay, then-current CFO, replaced Mr. Rooney as CEO in April 2015. *Id.* ¶ 20.

United States District Court
For the Northern District of California

inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 550 U.S. at 678.

B. Elements of §10(b)/10b-5 Claim

As noted above, Plaintiffs have asserted two claims against Defendants: (1) a section 10(b)/10b-5 claim and (2) a section 20(a) claim. Section 10(b) and Rule 10b-5 essentially impose liability for securities fraud. There are five elements that must be proven to establish a violation of Rule 10b-5. More specifically, a plaintiff must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal citations omitted).

As for section 20(a), it essentially provides for derivative liability; that is, it "makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 912 (N.D. Cal. 2012) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)). In order to prove a prima facie case under section 20(a), plaintiff must prove: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator (here, Energy Recovery). *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (internal quotation marks and citations omitted).

Because Plaintiffs have brought securities fraud claims, Rule 12(b)(6) is not the only governing legal standard; so too are Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleading requirement is further heightened by the Private Securities Litigation Reform Act, which requires that a plaintiff alleging securities fraud

> plead with particularity both falsity and scienter." Thus, to properly allege falsity, a securities fraud complaint must now "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." To adequately plead scienter, the complaint must now "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Zucco*, 552 F.3d at 990-91 (emphasis added).

In the instant case, Defendants challenge Plaintiffs' securities fraud claims on the ground that Plaintiff has failed to adequately plead both material falsity and scienter. MTD at 7.

C. <u>Falsity</u>

To plead falsity, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). If an allegation regarding the statement or omission is made on information and belief, the complaint must "state with particularity all facts on which that belief is formed." *Id.*

"Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A statement is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1976). To plead materiality, the complaint's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *Matrixx Initiatives, Inc. v. Siracusano*,

131 S. Ct. 1309, 1323 (2011). "Although determining materiality in securities fraud cases should ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera*, 610 F.3d at 1108.

1. Energy Recovery's Prospective Clients and Contract Negotiations

a. Pemex

The Complaint alleges that the following statements made by Mr. Rooney are false or misleading statements of material fact:

- **March 7, 2013 Earnings Call, Mr. Rooney Statement**: "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." Compl. ¶ 50.

- **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trial, in commercial field trials now this year." *Id.* ¶ 51.

As discussed above, during the call, Mr. Rooney was referring to Pemex. Ultimately, Energy Recovery did not get the Pemex contract. *Id.* ¶ 53. Defendants argue that the above statements are not actionable because: (1) Pemex was interested in moving forward with Energy Recovery but no formal agreement had been reached and (2) in Defendant's view "investors and analysts understand that reference to a 'verbal agreement' with a major oil company for a radically new product would mean an informal, non-final agreement that could be cancelled at any time." MTD at 14-15. Plaintiffs allege that Mr. Rooney made false and misleading statements about a "verbal agreement" with Pemex because FE1 who met with Pemex relayed to Mr. Rooney that because Pemex was a state-run company, Energy Recovery would need to participate in a lengthy public bidding and procurement process. Compl. ¶ 40. Pemex's interest did not rise to the level of an agreement, verbal or otherwise.

In light of the FE1 allegations (discussed *supra*), and taking all inferences in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately alleged that the statements about "verbal agreement" were false or misleading when made. The Complaint alleges that although FE1's meeting with Pemex had gone "well" and that Pemex showed "interest" in

proceeding with discussions, the procurement phase with Pemex could take anywhere from 6 to 18 months. *Id*. According to FE1, the procurement process begins with Energy Recovery providing Pemex with a design plan. Compl. ¶ 40. If acceptable, Pemex forwards the plan to its business management and procurement departments. *Id*. Pemex then tenders projects for open market bidding. *Id*. In response, firms provide Pemex with commercial and technical bids. *Id*. Only after these four steps are complete, does Pemex make the decision. *Id*. Given the complexity of and uncertainty in the procurement phase (including a bidding process) with Pemex, the state of affairs between Energy Recovery and Pemex on March 7, 2013, did not constitute any type of agreement – formal or informal.

b. <u>Saudi Aramco</u>

Next, Plaintiffs argue that Mr. Rooney misrepresented Energy Recovery's dealings with Aramco, the largest oil and gas producer in Saudi Arabia. Opp'n at 7; Compl. ¶¶ 86, 87. The Complaint alleges that the following statement made by Mr. Rooney is a false and misleading statement of material fact:

- **November 7, 2013 Earnings Call, Mr. Rooney Statement**: "Just this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Energy Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia. Compl. ¶ 86.

Plaintiffs allege that the above statements were false because, in fact, "on or about September 24, 2013, the [Energy Recovery's] IsoGen product had failed a critical internal test and required replacement parts." *Id*. ¶ 87. Defendants argue that the above statements are not actionable because: (1) Mr. Rooney did not provide a specific shipment date; (2) there is a two-month gap between the statement and the alleged test failure and that (3) in fact, the IsoGen was shipped to Saudi Aramco in November 2013. MTD at 16.

The Court finds that Plaintiffs have adequately alleged that Mr. Rooney's statement about IsoGen's "pending shipment" to Saudi Aramco was false and misleading for two reasons. First, the word "pending" can reasonably be interpreted as implying immediate shipment. Although Defendants contend the IsoGen was shipped in November 2013, there is nothing before the Court

at this juncture to prove this factual assertion. Plaintiffs generally allege that it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014. Compl. ¶ 87. Specifically, IsoGen product had failed a critical internal test and required replacement parts. *Id.* According to FE1, delivery of the replacement parts was not scheduled until the fourth quarter of fiscal 2013. *Id.* Furthermore, when FE1 reported the test results to Mr. Rooney, Mr. Rooney instructed FE1 not to tell Saudi Aramco that the test had failed. *Id.* ¶ 34. Plaintiffs have sufficiently alleged, for purposes of this motion, falsity.

c. Sinopec

Finally, Plaintiffs allege that Mr. Rooney made false and misleading statements about a meeting with Sinopec executives. The Complaint alleges that the following statement made by Mr. Rooney is a false and/or misleading statement of material fact:

- **November 7, 2013 Earnings Call, Mr. Rooney Statement**: "While in China, we also took the occasion to visit with the regional leadership and plant management of the Sinopec facility in the Chaoyang gas plant where we saw first hand, the progress being achieved in one of our oil and gas field trials . . . . And so 10 days ago or so, I was physically at the plant in China with Sinopec and they are and were effusive in their praise, sharing with us their economics, specifically named individuals at the plant level and at the corporate level that stand ready to give references . . . . So we feel very, very good about that and we expect the same thing. I could say that just first hand, having physically been at the plants, and dealt with my counterpart at Sinopec, and also at the plant level management." *Id.* ¶ 88.

Plaintiffs maintain that the above statements were false because according to FE1, during the facility visit at Sinopec, Mr. Rooney declined "to meet a member of Sinopec's executive management team." *Id.* ¶ 89. Defendants argue that the above statements are not actionable because Mr. Rooney merely stated that he visited "with ***regional leadership*** and ***plant***," not executive management. MTD at 15. (emphasis in original). The Court concludes that Plaintiffs have adequately alleged that the statements about dealings with Sinopec were false and misleading when made. Mr. Rooney did state the he met with his "counterpart at Sinopec" while visiting the Sinopec facility in the Chaoyang gas plant. *Id.* ¶ 89.

However, the Complaint does not sufficiently allege that Mr. Rooney's statements about

meeting with the executive at Sinopec are material. "Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). "For purposes of securities fraud, 'materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.' A statement is material if 'a reasonable investor would have considered it useful or significant.'" *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011). In the context of Mr. Rooney's one-time visit with Sinopec, it is unlikely that a reasonable investor would deem significant the difference between Energy Recovery's meeting with Sinopec's plant leadership and meeting with executive management.

Accordingly, the Court rules that when viewed in Plaintiffs' favor, the allegations that Mr. Rooney's statements about Energy Recovery's dealings with Pemex and Saudi Aramco were false and misleading are sufficient to survive a Rule 12(b)(6) motion. As to Sinopec, the Court holds that Plaintiffs have not alleged materiality.

2. Energy Recovery's Core Products and Marketing Strategy

Plaintiffs allege that Mr. Rooney and Ms. Bold were actively marketing Energy Recovery's oil and gas products as "commercial" while they were still in the "engineering prototype phase." *Id.* ¶¶ 38, 39. The Complaint alleges that the following statements made by Mr. Rooney are false and/or misleading statement of material fact:

- **March 7, 2013 Earnings Call, Mr. Rooney Statement**: "We probably have ongoing discussions with 8 to 10 [oil and gas companies] right now. We actually have not moved forward with anymore than the first 3 until just recently because we did not want to expose ourselves to anymore technology risk than we had with the first 3. We've seen enough in the trials now to change that and so I'd mentioned, we hired our first full-time sales mode. We don't see the technology risk being severe anymore so with the 8 to 10 that we've been working with, we're now actively in discussions about moving forward with various projects." *Id.* ¶ 51.

- **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "[W]hat I can tell you is that the field trials have looked very promising and the conversations with the oil companies we've got going right now suggest extreme interest. But there are certain engineering and technical bureaucracies inside of these oil and gas companies and so as we work our way through that for full commercial acceptance, the timeline is the part that becomes least certain to us, but the level of interest is

United States District Court
For the Northern District of California

extreme." *Id.*

- **March 7, 2013 Earnings Call, Mr. Rooney Statement:** "The part that I don't control and maybe I don't even have as much clarity on as I will say a year from now is the path that you work through technical and commercial acceptance with these large giants. We will for sure make it through that, but does it take a month or 3 months or 6 months or where – and in each oil giant case, it seems to have a little bit different pace and speed, but we seem to be getting a great deal of attention in moving things along nicely." *Id.*

- **May 9, 2013 Earnings Call, Mr. Rooney Statement:** "For the most part, our challenges are more about logistics, approvals and procedures than matters of technical success and acceptance." *Id.* ¶ 63.

- **May 9, 2013 Earnings Call, Mr. Rooney Statement:** "[I]n all cases, it's been a tremendous amount of bureaucracy and approvals, double approvals, triple approvals in some cases and so we are methodically working through that and so I guess that of a severe case of naiveté, we felt that upon delivering technically successful devices, we would instantly go into trial modes and trial modes with last 6 months, we would get approvals and move on. And it turns out there is more – there are more hurdles, more bureaucracy, and we are literally creating a new industrial category around Energy Recovery for pressurized fluid flows and so, we simply need to be considerably more patient." *Id.* ¶ 64.

- **August 1, 2013 Earnings Call, Mr. Rooney Statement:** "Entering the oil and gas industry with revolutionary new energy recovery devices is and has taken longer than we originally expected but the outlook is very promising. So on the oil and gas area, as was mentioned in the last call, the field trial process has many more stages, hurdles and logistics to it than we knew when we first entered it." *Id.* ¶¶ 75-76.

- **November 7, 2013 Earnings Call, Mr. Rooney Statement:** "The one thing that we've learned about the oil and gas industry is that it has its own pace and we've been working through things at the oil and gas industry pace, but we are convinced that we're going to be moving now to contracts." *Id.* ¶ 90.

Defendants argue that the above statements are not actionable because: (1) Plaintiffs fail to cite a single marketing statement that was false and misleading; 2) that Mr. Rooney repeatedly referred to the need for "field trials" before receiving commercial contracts; and 3) that Mr. Rooney "never stated that the products were fully developed, tested, or ready to be sold to customers." MTD at 13-14. As to each challenged statement, Plaintiffs allege that the statements were false because according to FE1, by late-2013, IsoBoost was in the engineering prototype phase; IsoGen had failed internal lab tests twice; IsoPro was still waiting to be put into the field.

*Id.* ¶ 38. Plaintiffs state that Energy Recovery's core products "were not yet commercially developed" because:

- (a) "Energy Recovery's products . . . were only engineering prototypes (*i.e.*, either in the midst of field-testing or being modified to remedy certain design deficiencies)." *Id.* ¶ 31.

- (b) "[I]n mid-September 2013, one of Energy Recovery's potential clients, Chesapeake Energy Corp. was experiencing problems with the Company's IsoPro product. Specifically, the IsoPro's "contractor" component was not applying pressure properly throughout the processing phase. The "contractor" is a component or stag in which gas comes into contact with liquid. In other words, the product was not able to function dynamically and had to be controlled manually. Chesapeake began raising concerns with FE1 about the total installation costs of the product. FE 1 relayed these concerns to Rooney. Rooney became worried that Chesapeake may not proceed with Energy Recovery's IsoPro product and, as a result, Rooney told FE1 not to discuss the problems with Chesapeake with anyone, including the public." *Id.* ¶ 33.

- (c) In September 2013, "Energy Recovery's IsoGen product also failed a critical internal test. The particular problem with the product involved vibrations emanating from a bearing between a tribune and generator. The vibrations were so severe that they began to bend the product's chassis, which resulted in the nonalignment of the motor and leaking. The test had been performed in San Leandro, California. When FE1 reported the test results to Rooney, Rooney told FE1 not to tell the Company's prospective client, Saudi Aramco, that the test had failed." *Id.* ¶ 34.

- (d) "Notwithstanding, Rooney wanted to present Energy Recovery's products at the GPA conference, which was scheduled to occur in March or April 2014. In September 2013, FE 1 had a conversation with Rooney during a management meeting at the San Leandro office. FE 1 told Rooney that FE 1 refused to present the Company's products at the GPA conference because the product was not ready yet. In response, Rooney immediately asked Dr. Prem Krish (Energy Recovery's Chief Technology Officer) to present at the GPA instead of FE 1. Nocair Bensalah (Energy Recovery's Vice President, Manufacturing, and Bold were present during this conversation." *Id.* ¶ 35.

- (e) "Thereafter, Dr. Krish went to FE 1 and asked FE 1 for advice because he, just like FE 1, did not feel comfortable presenting the products at the GPA conference. FE 1 and Dr. Krish then went to Rooney to tell them that neither of them would present the Company's products at the GPA conference. Facetiously, Dr. Krish suggested that Rooney have Bold present at the conference in light of the fact that she could avoid certain technical questions on the basis that she was in marketing and not engineering. Rooney asked Dr. Krish why he was declining to speak at the conference, to which Dr. Krish replied that Energy Recovery simply did not have a

United States District Court
For the Northern District of California

working product yet." *Id.* ¶ 36.

- (f) "On November 5, 2013, Energy Recovery's Board of Directors held a meeting. During the meeting, FE 1 presented on the status of the Company's products (i.e., that they were in the engineering prototype phase). One of the Company's directors later that after FE 1 had left the meeting, the Board of Directors had asked Rooney why he was so intent on presenting at the GPA if FE 1 was advising against it. According to FE 1, the director said that Rooney responded by stating that "[FE 1] and [Buehler] are now against me so I guess I can't." The Board of Directors decided that the Company would not attend the GPA conference. *Id.* ¶ 37.

- (g) According to FE 1, by late-2013, Energy Recovery's Oil and Gas products still had not reached commercialization. The IsoBoost product had field-tested, but was still in the engineering prototype phase. Energy Recovery's two other products were also still in the engineering prototype phase—IsoGen had failed internal lab tests twice and had not been field-tested and IsoPro was still waiting to be put into the field after being assembled for Chesapeake. All of Energy Recovery's products were engineering prototypes, which meant that nothing was ready for commercial production. *Id.* ¶ 38.

- (h) Meanwhile, Rooney and Bold were actively marketing these products as commercial. Rooney and Bold even went so far as to record a promotional video for the IsoBoost product by filming a gas processing facility in Texas that used only a component of the IsoBoost product (as opposed to the IsoBoost product itself). The component was a product manufactured by Pump Engineering, a company acquired by Energy Recovery in December 2009. Rooney and Bold visited the gas processing facility and recorded the promotional video in December 2013. *Id.* ¶ 39.

The Court finds that falsity has not been adequately pled for the August 8, 2013 and November 7, 2013 earnings calls statements. A serious shortcoming of the Complaint is its failure to allege specific facts showing exactly what is false about the full field trial process. As for the November 7, 2013 earnings call statement, it is too vague and general to imply anything concrete.

However, taking all inferences in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have adequately alleged that the remaining statements contained in the Complaint were false and misleading when made. The Complaint alleges serious technical difficulties with IsoGen and IsoPro that caused Energy Recovery's Board of Directors to decline to present these products at the GPA conference. *Id.* ¶¶ 33-38. The statements about challenges concerning the full commercial acceptance of Energy Recovery's core products were also misleading because they created the impression that the delay in commercial revenue was due only to bureaucracy;

meanwhile, Energy Recovery allegedly suffered from serious technical shortcomings of its products. Accordingly, the Court rules that when viewed in Plaintiffs' favor, the allegations that Mr. Rooney's statements were misleading are sufficient to survive a Rule 12(b)(6) motion.

3. Requests for Commercial Proposals

Plaintiffs assert that Mr. Rooney made false and misleading statements in March, May, August, and November 2014 by referring to requests for very specific commercial proposals when, in fact, in September 2013, Energy Recovery had experienced significant technical difficulties with IsoGen and IsoPro. *See id*. ¶¶ 33-38, 101, 112, 123, 124, 141. More specifically, during a November 11, 2014, 3Q14 conference call, Mr. Rooney indicated that a "significant run-up revenue for [Energy Recovery] in oil and gas is inevitable." *Id*. ¶ 141. Plaintiffs maintain that Mr. Rooney "materially misled investors into believing that revenue was guaranteed and imminent," while omitting the truth about technical difficulties with Energy Recovery's core oil and gas products. *Id*. ¶ 114, 125, 142. Here, it is unclear whether Energy Recovery was still experiencing technical problems with its core products as of November, 2014. The Complaint alleges that according to FE1, "Energy Recovery's products remained in the engineering prototype phase well into late-2013 and beyond." *Id*. ¶ 77.

Furthermore, during oral argument Plaintiffs' counsel asserted that Energy Recovery's products were not ready for sale until late-2013/early-2014. Thus, as currently pled, it is unclear what the status of the core products was at the end of 2014. Because the most specific statement about the revenue from oil and gas was made in November 2014 (well after late-2013), the Court concludes that Plaintiffs have failed to allege with sufficient particularity under PSLRA and the plausibility standard of *Iqbal* and *Twombly* that the statement about "inevitable" revenue identified in the Complaint was false or misleading when made. As for August 7, 2014 statements about "calendarizing things" and that there was a question about "how quickly [sales pipeline activity] will . . . turn into (revenue)," these statements are neither false nor misleading because they merely indicate that Energy Recovery was enjoying a certain level of commercial interest; these statements did not imply with requisite specificity that the oil and gas products were ready to be sold on the market. Finally, Mr. Rooney's revenue projections (including a prediction about

"inevitable" revenue) are too vague to be false and misleading. The Complaint fails to allege specific representations or projections: even with the "inevitable" revenue statement, Mr. Rooney does not commit to predictions of "significant revenue." Accordingly, the statements about commercial proposals and revenue projections are dismissed in their entirety.

4. Energy Recovery's Internal Controls Over Financial Reporting

For the statements about internal controls over financial reporting, Plaintiffs allege that Mr. Rooney made materially false and/or misleading statements when Mr. Rooney certified in Form 10-K reports that (1) Energy Recovery's internal control over financial reporting was effective according to criteria from the internal-control frameworks developed by the Committee of Sponsoring Organizations for the Treadway Commission ("COSO"); and (2) Energy Recovery was complying with the law as required by the Sarbanes-Oxley Act of 2002. *Id.* ¶ 44.

Form 10-K for fiscal 2012 states:

> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*Id.* ¶ 58.

Plaintiffs maintain that the statements in the 10-K report were materially false and misleading because Energy Recovery's internal controls were ineffective for two reasons. *Id.* ¶ 60. First, Mr. Rooney was forcing his subordinates into increasing internal sales projections. *Id.* ¶ 59. Second, Mr. Rooney was "calibrating" his own sales projections "all the time." *Id.* ¶ 48.

Defendants argue that the above statements are not actionable because: (1) the COSO frameworks are not the law; and (2) the adjustment of ***internal*** sales projections does not render the Company's internal control over ***external*** financial reporting ineffective. Opp'n at 11 n. 7; *Id.*

United States District Court
For the Northern District of California

at 12 (emphasis in original). The Court addresses each argument in turn. First, courts have imposed liability for non-compliance with COSO frameworks. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 471, 504 (S.D.N.Y. 2011) *on reconsideration*, No. 07 CIV. 10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011) and *on reconsideration*, No. 07 CIV. 10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011) (stating that the Securities Complaint has provided sufficiently detailed allegations regarding Bear Stearns' failure to maintain effective internal controls related to its financial reporting and violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and the Sarbanes-Oxley Act."); *In re Wash. Mut. Inc. Sec.*, 694 F. Supp. 2d 1192, 1212 (W.D. Wash. 2009) (finding misstatements about the adequacy of internal controls as actionable).

Nonetheless, it is not clear from the Complaint whether Mr. Rooney's "calibrated" internal reports produced unreliable and skewed external reports. Plaintiffs rely on *In re Wash. Mut. Inc. Sec.*, 694 F. Supp. 2d 1192 (W.D. Wash. 2009) to argue that misstatements in offering documents about the adequacy of internal controls are actionable under Securities Act. Opp'n at 20. In that case, however, the defendant issued a press release containing false statements as to the defendant's net income, allowance, and earnings per share. *Id*. Here, Plaintiffs do not identify false or misleading financial statements or documents made to the public; nor do Plaintiffs identify how *internal* sales projections materially sanctioned by Mr. Rooney misled the public. Finally, Plaintiffs have failed to pinpoint precisely how paragraph 5 of the Form 10-K contains a false or misleading statement that was made to the market.

Accordingly, the allegations about Mr. Rooney's statements regarding internal controls fail to state a claim.

D. <u>Safe Harbor/Bespeaks Caution</u>

Defendants argue that many of the allegedly false or misleading statements are forward-looking, thus the safe harbor provision of the PSLRA and the bespeaks caution doctrine immunize them from liability. MTD at 22-23.

Under the PSLRA's safe harbor provision:

> a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward-looking statement is—
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement . . . .

15 U.S.C. § 78u–5(c)(1).

The bespeaks caution doctrine provides for immunity in essentially the same circumstances as does the safe harbor provision *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) (noting that the PSLRA safe harbor provision codifies the bespeaks caution doctrine for forward-looking statements); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (noting that "[t]he PSLRA created a statutory version of [the bespeaks caution] doctrine by providing a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements"). Thus, the Court addresses the two protections simultaneously. *See e.g., In re Copper Mt. Secs. Litig.*, 311 F.Supp.2d 857, 876 (N.D. Cal.2004) (stating that "it is appropriate to consider the two protections simultaneously").

1. Energy Recovery's Prospective Clients and Contract Negotiations

a. Pemex

As noted above, Plaintiffs claim that Mr. Rooney's March 7, 2013 comments about a "verbal agreement" with Pemex were materially false or misleading because FE1 who met with Pemex relayed to Mr. Rooney that because Pemex was a state-run company, Energy Recovery would need to participate in a lengthy public bidding and procurement process before securing a formal contract. Compl. ¶ 40. The statements about a "verbal agreement" with Pemex do not constitute "forward-looking statements" because these statements all contain representations of historical fact – for example, the assertion that Energy Recovery "actually came to" or "reached" a verbal agreement with a significant oil company. *Id.* ¶¶ 50, 51. Thus, the Court concludes that the PSLRA safe harbor does not apply and need not address whether Defendants' cautionary language

United States District Court
For the Northern District of California

was "meaningful." *See e.g., City of Hialeah Employees' Retirement Sys. & Laborers Pension Trust Funds v. Toll Brothers, Inc.*, No. 07-1513, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) ("[B]ecause these statements were not forward-looking . . . the safe harbor provision of the PSLRA [is] inapplicable.").

b. Saudi Aramco

As noted above, Plaintiffs claim that Mr. Rooney's November 7, 2013 statement about IsoGen's pending shipment to Saudi Aramco was materially false and misleading because IsoGen failed a critical internal test in September 2013. Compl. ¶ 87. The statement about a "pending shipment" to Saudi Aramco does not constitute a "forward-looking statement" because this statement contains representations of a present fact. Thus, the Court concludes that the PSLRA safe harbor does not apply and need not address whether Defendants' cautionary language was "meaningful." *City of Hialeah Employees' Retirement Sys.*, No. 07-1513, 2008 WL 4058690, at *2.

2. Energy Recovery's Core Products and Marketing Strategy

As discussed above, Plaintiffs allege that Mr. Rooney concealed from the market serious technical difficulties with Energy Recovery's core products by blaming the delay with the full commercial acceptance of Energy Recovery's core products on logistics, approvals, engineering and technical bureaucracies inside the oil and gas companies. Compl. ¶¶ 51, 63. Because Mr. Rooney's statements concerning the bureaucracies and general business practices within the oil and gas industry are in the past or present tense, the PSLRA's safe-harbor does not apply. *Id.* ¶¶ 51, 63, 64, 76, 90.

3. Requests for Commercial Proposals

In their motion to dismiss, Defendants point out that the following allegedly false or misleading statements are forward-looking. MTD at 23:

- "I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year."
  *Id.* ¶ 112. (May 8, 2014 statement by Rooney during earnings call).

- "And then meaningful revenue on oil and gas next year, I think we stand right now is that we see a whole wall of client activity going on, and proposal activity, that give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year."
  *Id.* ¶ 141. (November 11, 2014 statement by Rooney during earnings call).

- "We're positioning for a significant revenue in 2015, but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable. It is going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016? We are taking one step at a time. The word internally now is that this oil and gas industry and revenue there for us is inevitable . . . Significant revenue in 2015? I would like to think so, but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us."
  *Id.* (May 8, 2014 statement by Rooney during earnings call).

Defendants argue that these statements are forward-looking because they are statements about future economic performance. Docket No. 69 at 7 ("Reply"). The Court need not address whether Mr. Rooney's statements concerning Energy Recovery's "inevitable" sales "pipeline" is forward-looking because as discussed above this statement is too vague to be false and misleading. The remaining statements, however, are clearly forward-looking. *See* 15 U.S.C. § 78u-5(i)(1)(B).[4] *See generally In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (earnings projections by definition are forward-looking statements); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (analysts calls are "classic growth and revenue projections, which are forward-looking on their face.").

However, to fall within the safe harbor, a statement must not only be forward-looking, but also accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i). This requires that the cautionary language "relate directly to that to which plaintiffs claim to have been misled." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1415 (9th Cir. 1994). Plaintiffs contend that the cautionary language here is inadequate because Defendants used the rote opening statements at the outset of their conference calls. Opp'n at 28. In support of this argument,

---

[4] "The term 'forward-looking statement means' . . . a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B).

United States District Court
For the Northern District of California

Plaintiffs cite a number of cases where warnings of the generic risks did not constitute meaningful cautionary language. *See e.g.*, *Fecht v. Price Co.*, 70 F.3d 1078, 1081-82 (9th Cir. 1995) (stating that cautionary language did not render statements not misleading); s*ee also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004) (stating that under PSLRA's safe harbor provision for forward-looking statements, "boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning").

In this case, Defendants' Forms contain virtually identical risk factor language.[5] Defendants rely on *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) to argue that less specific factors have been held to be meaningful by the Ninth Circuit. Reply at 8. In *Police Ret. Sys.*, however, defendants "identif[ied] important factors that could cause actual results to differ materially from those in the forward-looking statement." 759 F.3d at 1058. In this case, Energy Recovery's warnings were not attendant to specific types of problems relevant to Energy Recovery. Thus, Mr. Rooney's statements are more akin to non-specific boilerplate warnings insufficient to confer immunity. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 882. Thus, Mr. Rooney's statements about potential revenue, though forward-looking, are not protected by bespeaks caution doctrine.

E. <u>Corporate Optimism</u>

Defendants argue that "the Complaint alleges eight statements which are clearly inactionable optimistic corporate statements." MTD at 19:

---

[5] Transcripts of the earnings calls state: "Consequently, some of our comments and responses to questions may contain forward-looking statements about market trends, future revenue, growth expectations, cost structure, gross profit margins, new products, and business strategy. Such forward-looking statements are based on current expectations about future events and are subject to the Safe Harbor provisions of the US Private Securities Litigation Reform Act. Forward-looking statements are not guarantees of future performance and are subject to certain risks, uncertainties, and other factors that could cause actual results to differ materially from those discussed. A detailed discussion of these factors and uncertainties is contained in the reports that the Company files with the US Securities and Exchange Commission. The Company assumes no obligation to update any forward-looking statements made during this call except as required by law." D's RJN, Ex. D, I-O at 2.

- "Entering the oil and gas industry with revolutionary new energy recovery devices is and has taken longer than we originally expected but the outlook is very promising. We have solid expectations for revenue in 2014, followed by strong growth well into the future."
  *Id.* ¶ 75. (August 1, 2013 statement by Rooney during earnings call).

- "With sales cycle in these 2 industries can be long, but we will remain confident that we will achieve revenue in 2014 with serious growth leading into 2015. Where we sit today I feel very good about how far we have come in 3 short years. We have spent the past 3 years steadily and patiently building our position in the oil and gas industry to appoint where today we're now comfortably moving into full speed commercial roll out. The long term potential for Energy Recovery in the oil and gas industry is immense."
  *Id.* ¶ 100. (March 6, 2014 statement by Rooney during earnings call).

- "I think it's probably safe to say that we'll see revenue conversion in 2015 and contract conversions that would beget press releases we hope to see this year and into next year. But I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert, but I will dwell on, I guess the one point that I know which is the amount of attention we are on, I guess the one point that I know which is the amount of attention we are getting in the specific commercial requests and the magnitude of all of those."
  *Id.* ¶ 112. (May 8, 2014 statement by Rooney during earnings call).

- "I think we announced last quarter that after our outbound marketing efforts that began on February 23 I believe we had close to $100 million of commercial interest. We have – that number continues to grow and I would prefer not to quantify that anymore and kind of get into that cycle, but let's just say it continues to grow very nicely, where we stand and we are putting together and issuing commercial proposals against that interest level . . . the results have been eye-popping.
  *Id.* ¶ 123. (August 7, 2014 statement by Rooney during earnings call).

- "So what we are seeing is, we opened the dam if you will on February 23, inbound interest well in excess of $ 100 million, commercial contracts, technical vetting, filed plant visits, again which have been spectacularly well received and then beginning to talk about calendarizing things . . . . That's one thing we have learned, but the activity level and the interest level has been very, very positive."
  *Id.* (August 7, 2014 statement by Rooney during earnings call). [p. 10]

- "The $100 million-plus in solicited proposals is an indication of the strength of our value proposition."
  *Id.* ¶ 140. (November 11, 2014 statement by Rooney during earnings call).

- "And then meaningful revenue on oil and gas next year, I think we stand right now is that we see a whole wall of client activity going on, and proposal activity, that

give us a very wide spectrum in terms of what potential revenue could come from oil and gas next year."
*Id.* ¶ 141.  (November 11, 2014 statement by Rooney during earnings call).

- "We're positioning for a significant revenue in 2015, but really what we've accepted is that a significant run-up of revenue for us in oil and gas is inevitable.  It is going to happen in the first quarter, in the fourth quarter, is it going to happen in 2016?  We are taking one step at a time.  The word internally now is that this oil and gas industry and revenue there for us is inevitable . . . Significant revenue in 2015? I would like to think so, but really what we're more focused on is moving significant numbers of projects into the pipeline into this inevitable future for us." *Id.*  (November 11, 2014 statement by Rooney during earnings call).

"'Vague statements of opinion are not actionable under the federal securities laws because they are considered immaterial and discounted by the market as mere puffing.'" *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1102 (N.D. Cal. 2013) (quoting *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998)).  As the Ninth Circuit has noted, "[w]hen valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."  *In re Cutera*, 610 F.3d at 1111.  Thus, courts have noted that "puffing" statements are generally "'not capable of objective verification,' and 'lack[] a standard against which a reasonable investor could expect them to be pegged.'"  *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

For example, courts have found statements "projecting 'excellent results,' a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next several years'" held inactionable.  *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In re Mellanox Techs., Ltd. Sec. Litig.*, No. 13-CV-04909,  2014 WL 7204864, at *3 (N.D. Cal. Dec. 17, 2014) (statements "we continue to soar"; "I'm sure we'll get there"; "we will continue to grow"; and "[w]e intend to increase our market share to 30% and more" held inactionable).

However, "[w]hen determining whether statements amounted only to puffery, the court must analyze the context in which the statements were made."  *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM (WMC), 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013).  Thus, even a statement of opinion or an expression of corporate optimism may be deemed

actionable in certain circumstances because "there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in 'misrepresentations of existing facts.'" *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). Accordingly, the courts do not evaluate the statements in a vacuum by "plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery," but rather examine the entire statement and its circumstances to determine if it is actionable. *Scritchfield v. Paolo*, 272 F. Supp. 2d 163, 176 (D.R.I. 2003).

"Puffery" is not-actionable under the PSLRA because the law deems such statements so amorphous as to be immaterial. *See In re Omnivision*, 937 F. Supp. 2d at 1102. However, determining whether a given statement is material "entail[s] fact-intensive assessments that are more properly left to the jury." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012). Thus, "[i]n deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution." *Id.*; *see also In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (declining to hold that statements were puffery at the motion to dismiss stage because materiality involves "delicate assessments of the inferences a reasonable shareholder would draw"). Accordingly, to dismiss claims on the ground that the statements are "puffery," the Court must conclude that the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (citation omitted); *see also In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) ("A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available.").

United States District Court
For the Northern District of California

In this case, Plaintiffs conceded that Rooney's statements about Energy Recovery's oil and gas products were "amorphous." Compl. ¶ 28. Plaintiffs, however, rely on *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008) to argue that Rooney's optimistic statements are actionable. Opp'n at 16. In *Berson*, defendants stated in their SEC's filings that "[o]ur backlog . . . consists of anticipated revenues from the *uncompleted portions of existing contracts* . . . ." *Berson*, 527 F.3d at 985-86 (9th Cir. 2008) (emphasis in original). In that case, defendants argued that reasonable investors would have interpreted the emphasized phrase to mean that backlog included stopped work. *Id.* at 986. The Ninth Circuit disagreed and stated that "had defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone. But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of. We cannot say, as a matter of law, that defendants fulfilled this duty." *Id.* at 987.

Plaintiffs argue that like Defendants in *Berson*, "once [Rooney] chose to tout the [C]ompany's [pipeline], [he] [was] bound to do it in a manner that wouldn't mislead investors as to what that [pipeline] consisted of." Opp'n at 16. Plaintiffs' reliance on *Berson* is misplaced because Rooney did not make specific representations on which his statements of corporate optimism were based; in contrast to *Berson* where the statements were predicated specifically on backlog, Rooney did not say, *e.g.,* that Energy Recovery secured existing contracts sufficient to base revenue growth projections; at most, he referred only to requests for commercial proposals and "commercial interest," none of which Plaintiffs claim were factually false.[6] *Id.* ¶ 114. Furthermore, during the May 8, 2014 earnings call, Rooney clarified that "I guess I will not pretend to be an expert in terms of the pace at which this stuff will convert." D's RJN, Ex. D at 7. The Court finds that the alleged statements are enthusiastic statements of corporate optimism

[6] Plaintiffs do not contest accuracy of the assertion there was $100M of commercial interest. Moreover, some of Mr. Rooney's predictions resulted in contracts and revenue. D's RJN, Ex. H at 5, 7: "We have contracted and delivered oil and gas solutions, as pilot projects and sales, comprised of our IsoBoost and IsoGen systems to customers in Asia and the Middle East. For the year ended December 31, 2014, we recognized oil and gas revenue from the operating lease and lease buy-out of an IsoGen system to a customer in Saudi Arabia."

which are not actionable. *Police Ret. Sys.*,759 F.3d at 1060; *In re Cutera*, 610 F.3d at 1111.

F. Summary

The following table summarizes the statements that survive the falsity, safe harbor and corporate optimism tests. Unless otherwise noted, all "source" information refers to paragraphs from Plaintiffs' Amended Complaint.

| **Allegation Number and Source** | **Group** | **Who, How, When, Where** | **Statement** |
|---|---|---|---|
| (1)<br>¶ 50 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." |
| (2)<br>¶ 51 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year." |
| (3)<br>¶ 86 | Saudi Aramco | Def. Rooney, during the 3Q13 conference call, on November 7, 2013. | "Just this week after a full year of testing the system in our facility, we're happy to announce that as we speak, our first IsoGen Energy Recovery solution is pending shipment to the world's largest oil and gas producer, Aramco, in Saudi Arabia." |
| (4)<br>¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "We probably have ongoing discussions with 8 to 10 [oil and gas companies] right |

United States District Court
For the Northern District of California

| Allegation Number and Source | Group | Who, How, When, Where | Statement |
|---|---|---|---|
| | | | now. We actually have not moved forward with anymore than the first 3 until just recently because we did not want to expose ourselves to anymore technology risk than we had with the first 3. We've seen enough in the trials now to change that and so I'd mentioned, we hired our first full-time sales mode. We don't see the technology risk being severe anymore so with the 8 to 10 that we've been working with, we're now actively in discussions about moving forward with various projects." |
| (5)<br>¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "[W]hat I can tell you is that the field trials have looked very promising and the conversations with the oil companies we've got going right now suggest extreme interest. But there are certain engineering and technical bureaucracies inside of these oil and gas companies and so as we work our way |

United States District Court
For the Northern District of California

| Allegation Number and Source | Group | Who, How, When, Where | Statement |
|---|---|---|---|
| | | | through that for full commercial acceptance, the timeline is the part that becomes least certain to us, but the level of interest is extreme." |
| (6) ¶ 51 | Core Products | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "The part that I don't control and maybe I don't even have as much clarity on as I will say a year from now is the path that you work through technical and commercial acceptance with these large giants.  We will for sure make it through that, but does it take a month or 3 months or 6 months or where – and in each oil giant case, it seems to have a little bit different pace and speed, but we seem to be getting a great deal of attention in moving things along nicely." |
| (7) ¶ 51 | Core Products | Def. Rooney, during the 1Q13 conference call, on May 9, 2013. | "For the most part, our challenges are more about logistics, approvals and procedures than matters of technical success and acceptance." |

United States District Court
For the Northern District of California

| Allegation Number and Source | Group | Who, How, When, Where | Statement |
|---|---|---|---|
| (8) ¶ 64 | Core Products | Def. Rooney, during the 1Q13 conference call, on May 9, 2013. | "[I]n all cases, it's been a tremendous amount of bureaucracy and approvals, double approvals, triple approvals in some cases and so we are methodically working through that and so I guess that of a severe case of naiveté, we felt that upon delivering technically successful devices, we would instantly go into trial modes and trial modes with last 6 months, we would get approvals and move on. And it turns out there is more – there are more hurdles, more bureaucracy, and we are literally creating a new industrial category around Energy Recovery for pressurized fluid flows and so, we simply need to be considerably more patient." |

G. Scienter

Under the PSLRA, plaintiffs must plead "with particularity facts giving rise to a *strong inference*" that the Defendants acted with scienter when making the alleged false statements. 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added). In determining whether the facts give rise to a

"strong" inference of scienter, "the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "A strong inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The inference must be that the "'defendant[] made false or misleading statements either *intentionally* or with *deliberate recklessness*.'" *Id.* (quoting *Zucco*, 552 F.3d at 991 (emphasis in original)). This requires that the plaintiff plead that "the defendants knew specific facts at the time that rendered their [statements] fraudulent." *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1011 (N.D. Cal. 2008).

1. <u>Pemex</u>

One avenue by which to establish scienter is to show, through direct or circumstantial evidence, that the defendants knew or should have known that their statements were false or misleading. "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004).

As discussed above, the Allegations (1) and (2) turn on the alleged falsity of Mr. Rooney's claim that Energy Recovery reached a "verbal agreement" with Pemex. Thus, the issue here is whether Mr. Rooney knew, in fact, that Energy Recovery did not have such an agreement.

Here, Plaintiff's strongest allegation on scienter is in ¶ 40. Plaintiffs allege that "FE1 reported that, due to the fact that Pemex was state-owned, [Energy Recovery] would need to participate in a public bidding and procurement process." *Id.* FE1 explained to Rooney that "because Pemex was a state-run company, the procurement phase would be significant in terms of length." *Id.* According to the Complaint, Mr. Rooney was "aware" that due to a lengthy procurement process it would have taken at least 6-18 months before Energy Recovery would reach any kind of agreement with Pemex. Compl. ¶¶ 40, 53. Given the lengthy procurement phase and uncertainty in the bidding process with Pemex, the Court finds that Plaintiffs have sufficiently alleged a strong inference of scienter by Mr. Rooney with respect to Allegations (1)

and (2). Mr. Rooney acted with deliberate or conscious recklessness when he told investors that Energy Recovery had a "verbal agreement" with Pemex.

2. Saudi Aramco

With respect to Allegation (3), the issue here is whether Mr. Rooney knew that IsoGen was not ready for shipment on November 7, 2013. Plaintiffs maintain that the statement about the pending shipment of IsoGen to Saudi Aramco was false because (1) it was impossible for Energy Recovery to ship IsoGen product to Saudi Aramco before fiscal 2014, (2) Mr. Rooney knew that "on or about September 24, 2013" IsoGen had failed a critical internal test, and (3) the delivery of the replacement parts for IsoGen was not scheduled until the fourth quarter of fiscal 2013. Compl. ¶ 87. Given the high bar imposed by the PSLRA, Plaintiffs have failed to make a "strong showing" of scienter with respect to IsoGen's "pending" shipment. First, there is a 45-day gap between the failure of IsoGen's critical internal test and the allegedly fraudulent statement. Second, Plaintiffs have not provided any specifics why it was impossible to deliver IsoGen to Saudi Aramco before fiscal 2014. Finally, Plaintiffs failed to allege a specific date or range of dates for "the fourth quarter of fiscal 2013." In the absence of such specifics, the Court cannot ascertain whether there is any basis for the allegation that Mr. Rooney had actual or constructive knowledge of Energy Recovery's problems with IsoGen. *Silicon Graphics*, 183 F.3d at 985.

3. Core Products

Plaintiffs further allege that Mr. Rooney concealed from the market significant technical problems with Energy Recovery's core products. *Id.* ¶¶ 51, 63. The Complaint, however, does not allege whether Mr. Rooney was receiving weekly reports about the status of the core products throughout the class period. Nor, until September 2013, is there any other substantial evidence of Mr. Rooney's knowledge. As currently plead, Mr. Rooney instructed FE1 (1) to conceal from Chesapeake and the public the problems with IsoPro in mid-September 2013 and (2) not to tell Saudi Aramco about the problems with IsoGen in September 2013. *Id.* ¶¶ 33, 34. Therefore, with regard to Energy Recovery's core products, the Court finds no scienter until mid-September 2013.

As a result, the Allegations (4) – (8) that pre-date September 2013 do not survive the scienter test.

United States District Court
For the Northern District of California

4. Motive

Plaintiffs argue that there was a clear motive for Mr. Rooney to "lie about the Company's success in diversifying to the oil and gas industry." Opp'n at 24. While working for Energy Recovery, Mr. Rooney "received exorbitant compensation relative to Energy Recovery's other members of senior management." *Id.* ¶ 172. Mr. Rooney's Pay for 2014 ($1,448,971) was greater than the total compensation of the Company's Chief Technology Officer, Chief Sales Officer, and Chief Marketing Officer combined. *Id*. Plaintiffs allege that Rooney's lucrative position at Energy Recovery was a motivating factor to retain his job as long as possible – even if it meant over-promising project pipelines to investors and analysts." *Id*. There are two problems with Plaintiffs' argument. First, in the Ninth Circuit motive by itself is not enough to establish a strong inference of scienter. *In re Silicon Graphics Securities Litigation*, 183 F.3d 970 (9th Cir.1999), *abrogated on other grounds as stated in South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir.2008). In *Silicon Graphics*, 183 F.3d at 970, the Ninth Circuit stated:

> [A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide *some* reasonable inference of intent, they are not sufficient to establish a strong inference of deliberate recklessness. In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity.

*Id.* at 974 (emphasis added); *see also In re Terayon Communs. Sys.*, No. C 00-01967 MHP, 2002 WL 989480, at *8 (N.D. Cal. Mar. 29, 2002) (stating that "[f]acts showing mere recklessness or a motive to commit fraud and an opportunity to do so may provide some reasonable inference of intent, but they are not sufficient to establish a strong inference of deliberate recklessness"; adding that "facts showing motive and opportunity to commit fraud can provide confirming reasonable inferences that help establish a strong inference along with other allegations").

Second, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), on which Plaintiffs rely in support of its incentive compensation argument is distinguishable from the case at bar. Opp'n at 25. In *No. 84 Employer-Teamster*, defendants were motivated to inflate their company's financial results and stock prices

because defendants' eligibility for stock options and executive bonuses were based primarily on the company's financial performance. *No. 84 Employer-Teamster*, 320 F.3d at 944. In that case, the court inferred the strong inference of scienter because the defendants received thousands of options during the year of alleged misrepresentations, while receiving none in the previous year. *Id.* In this case, Plaintiffs' sole allegations about Mr. Rooney's salary fall short of specific, particularized allegations in *No. 84 Employer-Teamster*.

However, "generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics*." *Lipton*, 284 F.3d at 1038. Financial motivation can be a relevant factor, but only if Plaintiffs "provide[] specific, particularized allegations." *No. 84 Employer-Teamster*, 320 F.3d at 944 (quoting *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002).

Taking into account the minimal probative value of the allegations of Mr. Rooney's financial motives, the Court finds that Plaintiffs have sufficiently alleged particularized facts to support a strong inference of scienter under Section 10(b) with respect to Mr. Rooney only as to Allegations (1) and (2).

H. Respondeat Superior

The Court also finds that Mr. Rooney's scienter may be imputed to Energy Recovery based on respondeat superior. The Ninth Circuit recognizes respondeat superior liability for a corporation under 10(b) and 10b-5 based on common law agency principles. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1576-78 (9th Cir. 1990) (en banc) (imputing individual officer's knowledge to the company through the application of the doctrine of respondeat superior). In *Hollinger*, the Ninth Circuit held that the district court erred in concluding that the doctrine of respondeat superior was supplanted by the controlling person provisions of the Securities Act and the Exchange Act, 15 U.S.C. §§ 77o & 78t(a). *Hollinger*, 914 F.2d at 1576-78. Thus, there are two forms of secondary liability for violations of Section 10(b): the statutory "control person" liability set forth in Section 20(a) and the common law doctrine of respondeat superior. *See id*.

Although the PSLRA now imposes a heightened scienter requirement for pleading, courts

have held or assumed that *Hollinger* remains good law. As one district court stated:

> The Supreme Court's decision in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), may appear to cast some doubt on the future viability of the Ninth Circuit's holding in *Hollinger* regarding respondeat superior liability under the federal securities laws, but currently *Hollinger* remains the law in this circuit. In *Central Bank of Denver*, the Court held that there is no aiding and abetting liability in a private action under § 10 and Rule 10b-5. 511 U.S. at 191-92. In a dissenting opinion, Justice Stevens stated that "the majority's approach to aiding and abetting at the very least casts serious doubt . . . on *other* forms of secondary liability that, like the aiding and abetting theory, have long been recognized by the SEC and the courts but are not expressly spelled out in the securities statutes." 511 U.S. at 200 (Stevens, J., dissenting). The dissenting opinion then cites *Hollinger* in a list of cases upon which such doubt may fall. *Id.* at 200 n. 12. Nevertheless, *Hollinger* has not in the interim been overruled by the Supreme Court or the Ninth Circuit.

*In re Musicmaker.com Sec. Litig.*, No. CV00-2018 CAS(MANX), 2001 WL 34062431, at *12 n. 5 (C.D. Cal. June 4, 2001).

Multiple district courts have cited *Hollinger* after passage of the PSLRA. *See e.g.*, *Curry v. Hansen Med., Inc.*, No. C 09-5094 CW, 2012 WL 3242447, at *13 (N.D. Cal. Aug. 10, 2012) (stating that "as in *Hollinger*, although [defendant company] may not be primarily liable for securities fraud, it is secondarily liable under the theory of respondeat superior); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1204 (N.D. Cal. 2012) (finding that an individual officer's information and guilty plea may be imputed to the company based on respondeat superior) (citing *Hollinger*, 914 F.2d at 1576-78). *See generally S.E.C. v. Sells*, 2012 WL 3242551, *8 (N.D. Cal. Aug. 10, 2012) (imputing individual officer's knowledge onto the company through the application of the doctrine of respondeat superior); *In re Hienergy Tech., Inc.*, 2005 WL 3071250, *8 (C.D. Cal. Oct. 25, 2005) (imputing scienter onto the company when the pleadings supported a finding of scienter on the part of a corporate officer or director.).

Respondeat superior is a common law principle of secondary liability and generally 'summarizes the doctrine that a master or other principal is responsible, under certain conditions, for the conduct of a servant or other agent.'" *Id.* at n.28 (quoting Seavey, *Speculations as to "Respondeat Superior*,*"* Harv. Legal Essays 433 (1934)). A common application of this doctrine

United States District Court
For the Northern District of California

is the liability of an employer for a tort committed by one of its employees acting within the scope of his employment, or for a misleading statement made by an employee or other agent who has actual or apparent authority. *See Restatement (Second) of Agency* §§ 219, 257, 261 (1958). Here, it sufficient that Mr. Rooney was acting in what reasonably appeared to the third party to be in the scope of his employment, under the doctrine of apparent authority. *See id*. § 265. Apparent authority liability is imposed even when the agent was acting solely for his own purposes, unless this is known to the person with whom the agent is dealing. *Id.* § 262. Here, Mr. Rooney, a corporate officer, made false and misleading statements within the scope of employment with Energy Recovery. In light of the imputation of Mr. Rooney's scienter through respondeat superior, the Court finds that Plaintiffs have sufficiently alleged a primary violation of Section 10(b) and Rule 10(b)-5 by Energy Recovery.

I. <u>Section 20(a)</u>

Plaintiffs' second cause of action is for a violation of Section 20(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78t, or control person liability. Plaintiffs allege that "by virtue of their positions as controlling persons, Rooney and Bold are liable pursuant to Section 20(a) of the Exchange Act." Compl. ¶ 205.

Section 20(a) provides derivative liability for those who control others found to be primarily liable under the Act. *See In re Ramp Networks, Inc. Sec. Lit.*, 201 F.Supp.2d 1051, 1063 (N.D. Cal. 2002); *see also Johnson v. Aljian*, 490 F.3d 778, 781 n.11 (9th Cir. 2007). To claim "control person" liability under Section 20(a), Plaintiffs must demonstrate "'a primary violation of federal securities law' and 'that the defendant exercised actual power or control over the primary violator.'" *Zucco,* 552 F.3d at 990 (citations omitted). "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. *See In re Ramp Networks,* 201 F. Supp. 2d at 1063. "In general, the determination of who is a controlling person . . . is an intensely factual question." *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996) (citation

omitted); *see also Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000) (determining who is a controlling person is usually an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."). Plaintiffs "need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Id.* Courts have found "general allegations concerning an individual's title and responsibilities" to be sufficient to establish control at the motion to dismiss stage. *In re Metawave Communications Corp. Sec. Litig.*, 298 F.Supp.2d 1056, 1087 (W.D. Wash. 2003); *see also In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1031-32 (S.D. Cal.2005) (finding allegations that defendants held positions as CEO and Chairman of the Board and described their roles were sufficient to show they were involved in the company's day-to-day business); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1079 (N.D. Cal. 2001) (finding sufficient for control person liability allegations that the individual defendants, "by virtue of their executive and managerial positions had the power to control and influence [Cylink], which they exercised").

1. Mr. Rooney

Plaintiffs allege that between 2011 and 2014, Rooney ran the day-to-day operations of Energy Recovery as the Company's CEO. *Id.* ¶ 28. Such allegations are sufficient at this procedural stage to state a claim for control person liability. *See S.E.C. v. Todd*, 642 F.3d 1207, 1223-24 (9th Cir. 2011) (finding sufficient for control person liability allegations that the defendant had "day-to-day control of the company."); *Howard*, 228 F.3d at 1065 (finding control where the CEO participated in "the day-to-day management" of the company).

2. Ms. Bold

Ms. Bold joined Energy Recovery in 2005 and served as its Chief Marketing Officer until April 2015. *Id.* ¶ 21. Plaintiffs have not sufficiently alleged that she possessed the requisite control over a primary violator. *See e.g.*, *In re Int'l Rectifier Corp. Sec. Litig.*, No. CV07-02544-JFWVBKX, 2008 WL 4555794, at *22 (C.D. Cal. May 23, 2008) (stating that the defendant's position as "Executive Vice President, Global Sales and Marketing does not establish that he had control."). Ms. Bold did not speak on the Company's behalf during earnings conference calls with

investors, nor did she sign any SEC filings. There is no allegation that she directed or exercised control over Rooney who allegedly made the false and misleading statements. Plaintiffs have failed to allege sufficient facts to state a claim under Section 20(a) against Ms. Bold.

## V. CONCLUSION

For the foregoing reasons, the Court rejects Defendants' arguments that Plaintiffs' Complaint is lacking with respect to allegations of falsity and that, as a matter of law, Defendants' conduct is immunized by the safe harbor provision or bespeaks caution doctrine. Because Plaintiffs have sufficiently alleged a strong inference of scienter as to some claims, the Court **GRANTS** in part and **DENIES** in part Defendants' motion to dismiss. In particular, Plaintiffs have adequately pled falsity and scienter with respect to the Allegations (1) and (2):

| **Allegation Number and Source** | **Group** | **Who, How, When, Where** | **Statement** |
|---|---|---|---|
| (1) ¶ 50 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "Just yesterday, we reached a verbal agreement for a product sale to a new oil and gas client." |
| (2) ¶ 51 | Pemex | Def. Rooney, during the 4Q12 conference call, on March 7, 2013. | "As I'd mentioned, we actually came to a verbal agreement with another significant oil company yesterday to move a project into field trials, in commercial field trials now this year." |

///

///

///

///

United States District Court
For the Northern District of California

As for the claims otherwise discussed, Plaintiff is given leave to amend within thirty (30) days from the date of this order.

This order disposes of Docket Nos. 64, 66, and 68.

**IT IS SO ORDERED**.

Dated: January 27, 2016

EDWARD M. CHEN
United States District Judge